156

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF IOWA
2               DAVENPORT DIVISION

3
UNITED STATES OF AMERICA,          )
4                                  )
          Plaintiff,               )
5                                  )
          -vs-                     ) CRIMINAL NO. 3:08-cr-54
6                                  )
GILARIME MUELLER,                  ) PARTIAL TRANSCRIPT
7                                  ) OF PROCEEDINGS
          Defendant.               ) TRIAL DAY TWO
8                                  )

9

10         PARTIAL TRANSCRIPT OF PROCEEDINGS, held before the

11   Honorable John Jarvey, at the Federal Courthouse, Davenport,

12   Iowa, commencing at 8:32 a.m., November 19, 2009, reported by

13   Linda Faurote-Egbers, Certified Shorthand Reporter and Notary

14   Public for the State of Iowa.

15

16                    APPEARANCES

17   Plaintiff by:          RICHARD D. WESTPHAL
                            Assistant United States
18                          Attorney
                            131 East Fourth Street
19                          Davenport, IA  52801

20
     Defendant by:          JACK E. DUSTHIMER
21                          Attorney at Law
                            1503 Brady Street
22                          Davenport, IA  52801

23

24   Reported by:

25   Linda Faurote-Egbers
     Certified Shorthand Reporter

INDEX

| Witness | Attorney | Page |
|---|---|---|
| Mario Williams | Mr. Westphal | 162 |
| | Mr. Dusthimer | 196 |
| | Mr. Westphal | 206 |
| Kevin Smull | Mr. Westphal | 207 |
| | Mr. Dusthimer | 230 |
| | Mr. Westphal | 248 |
| | Mr. Dusthimer | 250 |
| Daniel Westbay | Mr. Westphal | 253 |
| | Mr. Dusthimer | 264 |
| John Hutcheson | Mr. Westphal | 271 |
| | Mr. Dusthimer | 288 |
| | Mr. Westphal | 294 |
| Scott Lansing | Mr. Westphal | 296 |
| | Mr. Dusthimer | 301 |
| Tara Loose | Mr. Westphal | 303 |
| | Mr. Dusthimer | 310 |
| | Mr. Westphal | 313 |
| | Mr. Dusthimer | 314 |
| Matthew Thomas Schwarz | Mr. Westphal | 315 |
| | Mr. Dusthimer | 331 |
| Amanda Frohwein | Mr. Westphal | 335 |
| | Mr. Dusthimer | 342 |
| Thomas W. Carnahan | Mr. Westphal | 343 |
| | Mr. Dusthimer | 348 |

| Government's Exhibits | Offered | Received |
|---|---|---|
| 1 - 13.4 grams Crack Cocaine | 223 | 224 |
| 2 - Yellow Packaging for Exhibit 1 | 223 | 224 |
| 3 - 26.14 grams Crack Cocaine | 225 | 225 |
| 4 - Yellow Packaging for Exhibit 3 | 225 | 225 |
| 5 - .45 Semi-Automatic Handgun (2319 Linwood) | | 159 |
| 6 - Magazine with 12 Rounds .45 Caliber Ammunition (2319 Linwood) | | 159 |
| 7 - .45 Caliber Ammunition (2319 Linwood) | | 159 |
| 16 - Pyrex Dish (5372 Linwood) | 284 | 284 |
| 17 - Measuring Cup (5372 Linwood) | 283 | 283 |

```
 1   18  -  Yellow Plastic Sack (5372 Linwood)         285           285
     19  -  Digital Scale (5372 Linwood)               284           284
 2   20  -  Pillowcase (5372 Linwood)                  301           301
     21  -  Baking Soda (5372 Linwood)                 286           286
 3   22  -  Blue Barkan's Sack                         287           287
     23  -  Yellow Shopping Bags (5372 Linwood)        287           287
 4   24  -  Western Union Receipt in the name of
            Gilarime Mueller                           300           300
 5   25  -  Gilarime Mueller's Cell Phone              259           259
     32  -  Photo - East Side of 5372 Linwood          254           254
 6   33  -  Photo - East Side of 5372 Linwood          254           254
     34  -  Photo - 5372 Linwood                       254           254
 7   35  -  Photo - West Deck (5372 Linwood)           254           254
     36  -  Photo - Garages (5372 Linwood)             254           254
 8   38  -  Photo - Abandoned Gas Station              216           217
     39  -  Photo - Abandoned Gas Station              179           179
 9   49  -  Photo - West Side, Abandoned Gas Station   220           220
     50  -  Photo - South Side, Abandoned Gas Station  220           220
10   51  -  Photo - Roof, Abandoned Gas Station        220           220
     52  -  Photo - Two Bags of Crack on Roof of
11          Abandoned Gas Station                      220           220
     53  -  Photo - Dresser (5372 Linwood)             298           298
12   54  -  Photo - Closet (5372 Linwood)              298           298
     55  -  Photo - End Table (5372 Linwood)           298           298
13   56  -  Photo - Currency (5372 Linwood)       261, 298      261, 298
     57  -  Photo - Currency (5372 Linwood)       261, 298      261, 298
14   58  -  Photo - Currency (5372 Linwood)            298           298
     59  -  Photo - White Trash Bag and Contents  264, 281      264, 281
15   60  -  Photo - White Trash Bag and Contents       281           281
     61  -  Photo - White Trash Bag and Contents       281           281
16   62  -  Photo - White Trash Bag and Contents       281           281
     63  -  Photo - Digital Scale (5372 Linwood)       281           281
17   64  -  Photo - Dish Rack (5372 Linwood)           281           281
     68  -  Resume - Amanda Frohwein                   336           336
18   69  -  DCI Lab Report                             340           340
     76  -  CD of Digital Fingerprint Photos           308           308
19   78  -  Screen Shot from AFIS                      326           326
     79  -  Fingerprint of Matt Canady                 326           326
20   80  -  Developed Latent Fingerprint               326           326
     81  -  Developed Latent Fingerprint               326           326
21   82  -  Latent Fingerprint                         326           326
     83  -  Known Fingerprint for Gilarime Mueller     326           326
22   84  -  Known Fingerprint for Matt Canady          326           326
     85  -  Iowa Work Force and Development Records     348           348
23   86  -  Renata Wilson's Cell Phone                 299           299

24

25   Certificate of Shorthand Reporter                               355
```

1          (Outside the presence of the jury.)

2          THE COURT:  Be seated, please.  Just a couple things I

3   wanted to visit with you about.  Yesterday I reserved ruling on

4   some exhibits, they were the gun exhibits.  What has been and

5   and what will be the evidence about the reasonable

6   foreseeability of a firearm as it pertains to this defendant?

7          MR. WESTPHAL:  Your Honor, I think a couple things.

8   Matt Canady will be a proposed co-conspirator to defendant Mr.

9   Mueller; that during this same time period there was some

10  evidence I believe yesterday about Mr. Canady pulling a gun

11  during a dispute with Damar Hampton with Mr. Mueller present;

12  during one of the trips Mr. Hampton allegedly did something to

13  draw attention to them when they were bringing drugs back from

14  Chicago and I think there will also be additional evidence about

15  the drug activity at the residence, 2319 North Linwood, where

16  the gun was found, Damar Hampton will also describe that

17  incident in his testimony and that he saw Mr. Canady with a

18  firearm too.

19         THE COURT:  And that Mr. Mueller was present for that

20  incident?

21         MR. WESTPHAL:  Yes, I think that was testified to

22  yesterday as well.

23         THE COURT:  It was.  All right.  The objections are

24  overruled.  The exhibits that I reserved ruling on are now

25  received.

1      Let's talk a little bit about schedule.  We did pretty

2  well yesterday I thought for the first day of trial.  We got

3  through the first I believe five witnesses.  Are you proceeding

4  right along with your list here?

5      MR. WESTPHAL:  I am.  We will start with Mario

6  Williams and proceed to other police officers.

7      THE COURT:  What are you anticipating assuming

8  reasonable cross-examination in terms of your ability to rest

9  today?

10     MR. WESTPHAL:  I would say maybe right now resting

11 maybe tomorrow morning.

12     THE COURT:  Okay.  We kind of anticipated that we

13 would finish by noon on Thursday.  Does that still seem

14 realistic to you, Mr. Dusthimer?

15     MR. DUSTHIMER:  Yes.

16     THE COURT:  Okay.  But you told the clerk that you had

17 some other hearings or something like that on Thursday?

18     MR. DUSTHIMER:  It is nothing.  I was just trying to

19 schedule my time.  What I was concerned about more than anything

20 else when we left yesterday I thought I heard the Court say that

21 the Court was going to be dealing with other matters today at

22 four o'clock and 4:30 and I heard the Court may be doing

23 something else today at 1:00 and like I told the clerk, it is

24 not really affecting me in any impact regarding the testimony or

25 the presentation of the evidence, I just know that when you take

1  that time out of my trial day it gets moved to the next trial

2  day.

3          THE COURT:  We are going to run a little late over the

4  lunch hour and I do have about a half hour's worth of work at

5  one o'clock and then we do have those preliminary hearings, they

6  might get waived, you know how preliminary hearings go, so I am

7  not sure that I am going to be needed right at four o'clock, but

8  I have to take that plea at 4:30.  We will work it out somehow.

9  All right.  Who is proposing an aiding and abetting instruction?

10  I assume that is you?

11          MR. WESTPHAL:  Yes.

12          THE COURT:  I noticed in the proposed jury

13  instructions that I hadn't included in the quantity instruction

14  some way to determine the quantity based on reasonable

15  foreseeability.  I assume you want that.

16          MR. WESTPHAL:  Yes.

17          THE COURT:  I don't know why I didn't include that.

18  That will be in there.  Do you object to an aiding and abetting

19  instruction on Count 2, Mr. Dusthimer?

20          MR. DUSTHIMER:  I don't believe I have a legal basis

21  to do so.

22          THE COURT:  It is pretty standard.  Good.  I will put

23  an aiding and abetting instruction as it pertains to Count 2.  I

24  will modify the quantity instruction to talk about reasonable

25  foreseeability.  What other concerns do you have before we begin

1    today?

2           MR. WESTPHAL:  Nothing else from the government, Your

3    Honor.

4           MR. DUSTHIMER:  No, thank you.

5           THE COURT:  Thank you.  See you at 9:00.

6           (A recess was taken from 8:36 a.m. until 9:02 a.m.)

7           THE COURT:  Please be seated.  Members of the jury,

8    we are proceeding on in the matter of the United States of

9    America versus Gilarime Mueller.  We have a witness on the

10   witness stand.  Ms. Clerk, please swear him in.

11                          MARIO WILLIAMS,

12   witness herein, called as a witness by the government, after

13   having been first duly sworn, was examined and testified as

14   follows:

15          THE COURT:  Be seated.  When you are comfortably

16   seated, get close to that microphone, tell us your name and

17   spell your last name, please.

18          THE WITNESS:  Mario Williams.  W-i-l-l-i-a-m-s.

19          THE COURT:  You can tell that you have to be close to

20   the microphone.  Go ahead.

21                           EXAMINATION

22   BY MR. WESTPHAL:

23       Q.   Good morning, Mr. Williams.

24       A.   Good morning.

25       Q.   How old are you, sir?

1      A.    21 years old.

2      Q.    How far have you been in school?

3      A.    High school diploma.

4      Q.    Have you taken any classes beyond high school?

5      A.    No, sir.

6      Q.    Now, in May of 2008 were you arrested?

7      A.    Yes, sir.

8      Q.    Do you remember what day?

9      A.    May 2nd.

10     Q.    You are currently in custody of the State of Iowa, is

11 that correct?

12     A.    Yes, sir.

13     Q.    And have you pled guilty to some state criminal

14 offenses?

15     A.    Yes, sir.

16     Q.    What did you plead guilty to?

17     A.    Possession with intent to deliver less than 10 grams

18 of crack cocaine.

19     Q.    And you have been sentenced on that charge, is that

20 correct?

21     A.    Yes, sir.

22     Q.    Do you know a Matt Canady?

23     A.    Yes.

24     Q.    How long have you known Mr. Canady?

25     A.    Seven years.

1      Q.    Do you know a Rachel Canady?

2      A.    Yes, sir.

3      Q.    And how do you know her?

4      A.    My girlfriend, the mother of my kids.

5      Q.    How are Rachel and Matt related?

6      A.    Brother and sister.

7      Q.    When you were together with Rachel would she also

8   during those times have frequent contact with Matt?

9      A.    Sir?

10     Q.    Let me say that a little clearer.  Did you spend a lot

11  of time with Rachel before you were arrested?

12     A.    Yes, every day.  We lived together.

13     Q.    Would she also during that time spend time with her

14  brother, Matt?

15     A.    Not too much.

16     Q.    Would you two see him on a regular basis?

17     A.    Yes.

18     Q.    Do you know Gilarime Mueller?

19     A.    Yes.

20     Q.    How long have you known Mr. Mueller?

21     A.    Over a year.

22     Q.    On May 2nd of 2008 did you go to a residence at 5372

23  North Linwood?

24     A.    Yes, sir.

25     Q.    And who lived there on May 2nd?

1    A.    Gilarime.

2    Q.    Anyone else that you know of?

3    A.    Renata, his girlfriend.

4    Q.    Had you been there before?

5    A.    Yes.

6    Q.    What time did you first go over to the residence on

7    May 2nd, the residence of 5372 Linwood?

8    A.    Around four o'clock.

9    Q.    Why did you go there?

10    A.    I just went over there just to -- just to hang out,

11    just to see what was going on.

12    Q.    How did you get over there?

13    A.    My girlfriend dropped me off.

14    Q.    What was she driving?

15    A.    A black truck.

16    Q.    When you say black truck, do you know what kind?

17    A.    It was a Chevy Tahoe.

18    Q.    Had you spoken to Matt Canady earlier that day before

19    you went over there?

20    A.    Yes.

21    Q.    Did you know he was over there when you decided to go

22    over to 5372 North Linwood?

23    A.    Yes.

24    Q.    When you went in, what door do you normally go in?

25    A.    I went in the back door.

1    Q.    When you went in the back door, what room does that go

2  into?

3    A.    It leads to the kitchen.

4    Q.    Was anyone in the kitchen when you walked in?

5    A.    Yes.

6    Q.    Who was in the kitchen?

7    A.    Matt, Gilarime, and Jeremy.

8    Q.    And what is Jeremy's last name, if you know?

9    A.    Canady.

10    Q.    When you went into the kitchen initially did you see

11  anything in the kitchen besides Matt, Gilarime, and Jeremy?

12    A.    Yes.

13    Q.    What did you see?

14    A.    I saw a bag of cocaine sitting on the counter.

15    Q.    Anything else on the counter?

16    A.    Digital scale.

17    Q.    What was -- the bag of cocaine, what was that -- can

18  you describe the bag that it was in?

19    A.    A ripped up Hy-Vee grocery bag.

20    Q.    Did you see Hy-Vee on the bag?

21    A.    No.

22    Q.    Do you remember what color the bag was?

23    A.    Like a clearish white with black lettering on it.

24    Q.    Did you see -- actually see what was inside the bag?

25    A.    No.

1      Q.   Could you tell from the bag how big the object was

2   that was in it?

3      A.   Yeah, it was like a nice sized bag, just -- I mean, it

4   wasn't too big, it wasn't too small.

5      Q.   So this bag you observed on the counter in the

6   kitchen, and is Matt, Gilarime, and Jeremy also in the kitchen?

7      A.   Yes.

8      Q.   Did you hear any conversation between Matt and

9   Gilarime and Jeremy at the time?

10     A.   No, Jeremy wasn't talking, Matt and Gilarime, it was

11  just a little conversation back and forth.

12     Q.   Do you recall what they were talking about?

13     A.   Not really.

14     Q.   What did you do once you went inside?

15     A.   I stood there and I started talking to Matt.

16     Q.   What were you and Matt talking about?

17     A.   Just everyday stuff, what we was going to go do and

18  how we was going to spend the night because it was a nice day

19  that day.

20     Q.   Do you remember what the individuals in the kitchen

21  were wearing, Matt Canady, do you remember what he was wearing?

22     A.   Yeah.

23     Q.   What was he wearing?

24     A.   I don't know, a white and orange shirt with some blue

25  jeans.  Gilarime had on a white T-shirt and Jeremy had on a

1    black zip-up hooded-like sweatshirt.

2         Q.    And what were you wearing that day?

3         A.    I had a black shirt -- black and red shirt, some black

4    jeans, black and red shoes and a hat.

5         Q.    Prior to going inside the residence at 5372 North

6    Linwood did you see anything outside that drew your attention?

7         A.    Yes.

8         Q.    What did you see?

9         A.    I seen some vans driving around the house.

10        Q.    And what about that drew your attention?

11        A.    I thought they was the police.

12        Q.    Did you tell anyone inside what you saw outside?

13        A.    No.

14        Q.    After talking to Matt Canady did you do anything

15   inside the residence?

16        A.    Yeah, I rolled up -- I rolled up some marijuana and I

17   started smoking some weed.

18        Q.    Where were you at in the residence when you did that?

19        A.    I was sitting at the kitchen table.

20        Q.    Where did the marijuana come from?

21        A.    Myself.

22        Q.    What did you do after that?

23        A.    I left out and I walked out to the gas station.

24        Q.    Why did you leave?

25        A.    Because I was nervous, had a bad feeling, and I needed

1  -- I just went to the gas station to grab a water and some more

2  cigarellos to roll up some more weed.

3      Q.    When you left to walk to the gas station did you see

4  anything else that drew your attention outside?

5      A.    Yeah.

6      Q.    What did you see?

7      A.    I seen a van sitting outside across the street from

8  the school.

9      Q.    And why did that draw your attention?

10     A.    Because it was just sitting there and once I looked at

11  the van, it rolled its window up real quick and it just kind of

12  gave me an awkward feeling.

13     Q.    You went to the gas station, is that correct?

14     A.    Yes, the BP.

15     Q.    How far away is that?

16     A.    Just a short distance, I just walked across the field,

17  not even a block away.

18     Q.    What did you do at the BP gas station?

19     A.    I bought some -- bought some cigarellos, some water,

20  some gum, a bag of chips, and I talked to one of my friends who

21  I seen up there.

22     Q.    Did you decide to go back to the residence at 5372

23  North Linwood at some point?

24     A.    Yeah, after I got done talking to the guy who I was

25  talking to.

1    Q.   You saw all these observations outside that were

2  making you nervous, why did you go back?

3    A.   I don't know.  I really don't.

4    Q.   How long were you gone?

5    A.   Maybe 14, 15 minutes.

6    Q.   When you went back what door did you go in?

7    A.   Went in the back door.

8    Q.   Same door you went in before?

9    A.   Yes.

10   Q.   And what did you see when you went in?

11   A.   Seen the pot in the sink and a scale on the counter

12  and I stood there for about a minute and Matt told me let's ride

13  and he grabbed two bags off the -- two yellow bags off the table

14  and we left out the back door.

15   Q.   When you go back in through the back door into the

16  kitchen, who all is in the kitchen?

17   A.   The same people, Matt, Gilarime, and Jeremy.

18   Q.   And what were they doing when you went back in?

19   A.   Matt was putting his shirt on and Gilarime was just

20  standing there, standing against the counter, and Jeremy was

21  still sitting at the table on the phone.

22   Q.   Do you recall noticing any smells when you went back

23  in?

24   A.   Yes.

25   Q.   And did you associate something with that smell?

1    A.    Meaning like --

2    Q.    What did you think it was?

3    A.    Someone had just got done cooking up some crack.

4    Q.    Prior to that have you been around crack cocaine when

5    it's been cooked before?

6    A.    Yes.

7    Q.    And you are familiar with what it smells like after

8    someone has been cooking?

9    A.    Yes.

10   Q.    The pot that you observed in the sink, what kind of

11   pot was that?

12   A.    It was a glass pot.

13   Q.    Now, you described that Matt Canady picked up two

14   packages.  Where were they at?

15   A.    Sitting on the kitchen table.

16   Q.    And were they smaller or bigger than the package you

17   observed the first time you went in?

18   A.    Smaller.

19   Q.    And what color were those packages?

20   A.    Yellow.

21   Q.    Different color in packaging than you observed the

22   first time?

23   A.    Yes.

24   Q.    And what happened to those two packages?

25   A.    Matt put them in his pocket and we left out the door.

1     Q.   Did anyone else go outside at the same time you left?

2     A.   No.

3     Q.   When you were inside the residence on May 2nd of 2008

4 did you see any substantial amounts of cash?

5     A.   No.

6     Q.   Did anyone talk about having cash on May 2nd?

7     A.   Yes.

8     Q.   Who did you hear talk about the cash?

9     A.   Gilarime.

10    Q.   Where was he at when he was having this conversation?

11    A.   He was still standing in the kitchen.

12    Q.   And was he having this conversation with you or

13 someone else?

14    A.   Someone else.

15    Q.   Who else was he talking to?

16    A.   Matt.

17    Q.   You could hear their conversation?

18    A.   Yes.

19    Q.   What did he say about cash?

20    A.   It was just more of eavesdropping, I just heard him

21 mention he had some money upstairs and that's about it.

22    Q.   Did he say how much he had?

23    A.   No.

24    Q.   Why was he -- did he say why he was talking about

25 money?

1      A.    No, he didn't.

2      Q.    When you and Matt Canady go out, I don't know if you

3  said, which door do you go out?

4      A.    We went out the back door.

5      Q.    Where did you go?

6      A.    We went and got in the car.

7      Q.    What -- do you recall what kind of car it was?

8      A.    It was a Volkswagen Passat.

9      Q.    Did you drive that car there?

10     A.    No.

11     Q.    Who was driving?

12     A.    Matt.

13     Q.    Where did you go first?

14     A.    Went out the driveway, we went down 54th Street to

15  Division Street and we stopped at somebody's house.

16     Q.    And what happened when you stopped at that house?

17     A.    Matt got out of the car and went and knocked on the

18  door but didn't nobody come to the door so he got back in and we

19  proceeded -- started heading down Division Street.

20     Q.    Did Matt Canady say why he stopped there?

21     A.    No.

22     Q.    Do you recall, was he making -- did you see Matt

23  Canady with a cell phone?

24     A.    Yeah.

25     Q.    Was he making any calls during the time he stopped

1    or --

2          A.    Yeah, he was on the phone as he got out of the car and

3    when he got back in.

4          Q.    When you left that residence where did you drive next?

5          A.    We went down -- we was going down Division Street.

6          Q.    And Matt Canady is still driving?

7          A.    Yes.

8          Q.    As you are going down Division Street did you see

9    anything that again drew your attention?

10         A.    Yeah, I noticed a police officer on the side of us in

11   a van.

12         Q.    And did you recognize that police officer?

13         A.    I did.

14         Q.    And do you know his name?

15         A.    Detective Proehl.

16         Q.    When you saw Detective Proehl did you say anything to

17   Matt Canady?

18         A.    Yeah.

19         Q.    What did you tell him?

20         A.    I told him that the police was following us.

21         Q.    Did he respond?

22         A.    Not much of a response, we just tried to get away from

23   them, tried to lose them in traffic.

24         Q.    After that did you see law enforcement vehicles

25   attempt to stop the vehicle you were in?

1    A.    Yes.

2    Q.    And describe what you saw when that took place.

3    A.    We made -- we made a right on 36th and Division and

4   five black cars, all black police cars came out of nowhere and

5   tried to pull us over.  We didn't stop.  We ran from them.

6    Q.    All right.  Prior to running was there any contact

7   between any of these cars?

8    A.    Yeah.

9    Q.    What contact was that?

10    A.    The police -- the police car hit the side that I was

11   on, it hit me basically, ran into my door.

12    Q.    Where were you sitting?

13    A.    I was in the passenger side.

14    Q.    Front or back?

15    A.    Front.

16    Q.    And did you -- well, did the vehicle you were in stop

17   at that point?

18    A.    No.

19    Q.    Where did you go next?

20    A.    We went around 36th Street, we got on Pine Street,

21   back up north, and we went to an abandoned gas station right

22   there off of 53rd and Pine.

23    Q.    How would you describe the speed this vehicle was

24   going?

25    A.    It was going pretty fast.

1    Q.   Do you know how fast?

2    A.   Not offhand.  It was going pretty fast though.

3    Q.   As you were driving up North Pine did you and Matt

4  Canady have any conversation?

5    A.   Yes.

6    Q.   And what do you remember him saying to you?

7         MR. DUSTHIMER:  Objection.  Hearsay.  Under the Bell

8  test, offered as co-conspirator.

9         THE COURT:  Objection is overruled.  I am

10  conditionally admitting it.  Go ahead and answer the question.

11  BY MR. WESTPHAL:

12   Q.   What did Matt Canady say?

13   A.   Told me to call Gilarime.

14   Q.   And did you attempt to do that?

15   A.   Yes.

16   Q.   And whose phone did you use?

17   A.   Mine.

18        THE COURT:  There's no point in the Bell procedure

19  there.   That's not hearsay.  Somebody says call Gilarime, that

20  is not hearsay.  It is not offered for the truth of the matter

21  asserted.  The objection is overruled.

22  BY MR. WESTPHAL:

23   Q.   Did you get ahold of Gilarime?

24   A.   No.

25   Q.   Did you -- did Matt Canady ask you to call anyone

1  else?

2       A.    Yup.

3             MR. DUSTHIMER:  Same objection.

4             THE COURT:  Overruled.  Answer the question.

5             THE WITNESS:  Told me to call Jeremy.

6  BY MR. WESTPHAL:

7       Q.    Did you try to call Jeremy?

8       A.    Yes.

9       Q.    Using your phone?

10      A.    Yes.

11      Q.    Did you get ahold of him?

12      A.    No.

13      Q.    Did Matt Canady ask you to call anyone else?

14      A.    No.

15      Q.    Did you try to call anyone else?

16      A.    No.

17      Q.    As you and Mr. Canady drove up North Pine Street, did

18  law enforcement officers catch up to your vehicle?

19      A.    Yeah, they did.

20      Q.    Were they able to stop it?

21      A.    No.

22      Q.    I think you described coming to an abandoned gas

23  station.  What happened there?

24      A.    We pulled -- we pulled behind the abandoned gas

25  station and I got out of the car.

1     Q.   And what happened then?

2     A.   Matt threw the two bags of crack out the window at me

3 and I threw them on the roof and I ran.

4     Q.   Did he say anything prior to your getting out of the

5 vehicle, Matt Canady?

6     A.   No, just told me to get out.

7     Q.   Did he say anything after he threw these two bags at

8 you?

9     A.   He sped off.

10    Q.   Which way did he go?

11    A.   I think it was 54th Street or 52nd Street, he went --

12 as we was coming up, he went on -- he did like a circle, we was

13 in the back of the gas station and he came out the back and went

14 up the side street, I think it is like 52nd Street.

15    Q.   Do you know which direction he would have been

16 directionally, south, east, west?

17    A.   East.

18    Q.   Mr. Williams, in front of you is Government's Exhibit

19 39.  Do you recognize what is shown in that photo?

20    A.   Yes.

21    Q.   And where do you recognize that location from?

22    A.   That's the building, the abandoned gas station.

23    Q.   Does that picture fairly and accurately depict how

24 that gas station looked on May 2nd of 2008?

25    A.   Is that how it looked then?

1      Q.   Yes.  Is the gas station in the same spot?

2      A.   Yeah, in the same spot, but I don't remember this

3  building right here.  (Indicating)

4      Q.   Okay.

5      A.   It wasn't there that day.

6           MR. DUSTHIMER:  I have no objection to 39, Your Honor.

7           MR. WESTPHAL:  We offer 39.

8           THE COURT:  39 is received.

9  BY MR. WESTPHAL:

10      Q.   On the screen in front of you is Government's Exhibit

11  39.  Can you see on there where Matt Canady pulled in and you

12  got out?

13      A.   We came -- we came in off the side street right here

14  (Indicating) where the red building would be at and we came

15  around to the back.

16      Q.   Okay.  If you touch the screen in front of you it

17  might -- it should leave a mark.

18           THE COURT:  If you tap it, it will leave an arrow.

19  BY MR. WESTPHAL:

20      Q.   Can you tap the screen in front of you where you would

21  have stopped and got out?

22      A.   Right here.  (Indicating)

23      Q.   Okay.  And after Matt Canady tosses these two packages

24  at you, what did you do with them?

25      A.   I threw them on the roof.

1          Q.    On the roof of what?

2          A.    The abandoned gas station.

3          Q.    What did you do after you threw those items on the

4     roof?

5          A.    I ran up north.

6          Q.    Where were you heading?

7          A.    Away from the police.

8          Q.    Did you try to make any phone calls while you were

9     running on foot?

10         A.    Yes.

11         Q.    Who did you try to call?

12         A.    I tried to -- I tried to call my mother-in-law.

13         Q.    Did police officers catch up with you?

14         A.    Yes.

15         Q.    How far away did you get?

16         A.    They caught up to me maybe about two blocks ahead.

17         Q.    And were you placed under arrest at that point?

18         A.    Yes.

19         Q.    Did you still have your cell phone on you though when

20    they caught up to you?

21         A.    If I had it on me, it was around me because I can't

22    honestly remember if I dropped it or not.

23         Q.    In front of you is Government's Exhibit 26.  Do you

24    recognize what that is?

25         A.    It is my cell phone.

1    Q.    Is that the cell phone you had with you on May 2,

2    2008?

3    A.    Yes.

4    Q.    Did you have any cash on you that day?

5    A.    Yes, I did.

6    Q.    How much did you have?

7    A.    $2,606.

8    Q.    Where did that money come from?

9    A.    Selling marijuana.

10   Q.    All of it?

11   A.    Not all of it.  I got paid that day from my job so it

12   made it roughly about $200 came from work, the other 24 came

13   from selling marijuana.

14   Q.    Where were you working?

15   A.    Genghis Grill in Bettendorf off of Utica Ridge Road.

16   Q.    So the remaining approximately $2,400 was from your

17   sale of marijuana?

18   A.    Yes.

19   Q.    On your cell phone you had on May 2nd of 2008 did you

20   have an address book or list of contacts in that phone?

21   A.    Yes.

22   Q.    And did you -- were you aware that your phone kept

23   track of recent calls and recent calls placed and that type of

24   information?

25   A.    Yes.

1      Q.    In front of you on the screen is Government's Exhibit

2    Number 89.  This number here, 579-0307, do you recognize that

3    number?

4      A.    Yes.

5      Q.    Whose number is that?

6      A.    That's my number.

7      Q.    Do you recognize these numbers on -- at the top there,

8    are those contacts or individuals that would have been listed in

9    your address book on May 2nd?

10     A.    Yes.

11     Q.    There is an entry for it looks like G-E-M.

12     A.    Yes.

13     Q.    Do you know who that individual was?

14     A.    Yes.

15     Q.    Who was it?

16     A.    That was Jeremy.

17     Q.    And underneath it is a designation of G-L-M.  Do you

18   know who that was?

19     A.    Yes.

20     Q.    Who was that?

21     A.    That was Gilarime.

22     Q.    On this it has a list of dialed numbers, do you see

23   that?

24     A.    Yes.

25     Q.    The second page of that list there's a number, I am

1  pointing to that, you made a call 3:43 p.m., 563-571-7763.  Do

2  you know whose number that was?

3       A.   Yes.

4       Q.   Whose number was that?

5       A.   That was Matt's number.

6       Q.   Matt Canady?

7       A.   Yes.

8       Q.   At 5:13 p.m. you have a call that says G-L-M.

9       A.   Yes.

10      Q.   Who was that?

11      A.   That was Gilarime.

12      Q.   Do you know where you were at at 5:13 p.m.?

13      A.   Yes.

14      Q.   Where were you at?

15      A.   I was in the car.

16      Q.   With who?

17      A.   Matt.

18      Q.   Was that during the pursuit?

19      A.   Yes.

20      Q.   At 5:15 you have a call to the G-E-M.  Who was that?

21      A.   That's Jeremy.

22      Q.   And underneath that you have a call to 563-570-1673.

23  Do you recall whose number that is?

24      A.   Yes.

25      Q.   Whose number is that?

1      A.    My mother-in-law.

2      Q.    At 5:17 you have a call that was listed as MA.  Who

3 was that?

4      A.    That's my mother.

5      Q.    And 5:19 you have a call it is listed as Baby.  Who

6 was that?

7      A.    That's Rachel.

8      Q.    Prior to May 2nd of 2008 had you been to Matt Canady's

9 residence?

10      A.    Yes.

11      Q.    Do you know where he was living in May of 2008?

12      A.    2319 Linwood.

13      Q.    On the screen in front of you is Government's Exhibit

14 29.  Do you recognize what the residence is in that photo?

15      A.    Yeah, that's Matt's house.

16      Q.    Do you know who was living there with him?

17      A.    Nicky and his son and his daughter.

18      Q.    Have you ever been present at that residence shown in

19 Government's Exhibit 29 when crack cocaine was cooked over

20 there?

21      A.    Yes.

22      Q.    How many times?

23      A.    Twice.

24      Q.    Who was present when crack cocaine was being cooked at

25 that residence?

1    A.    Me, Gilarime, and Matt.

2    Q.    Do you know approximately when you would have -- those

3  two cooks would have taken place?

4    A.    October of 2007.

5    Q.    You were present, you saw this cooking going on, is

6  that correct?

7    A.    Yes.

8    Q.    Were you doing anything yourself in relation to those

9  cooks?

10    A.    You mean anything with the process?

11    Q.    Yes.

12    A.    No.

13    Q.    Who did you see actually doing the cooking?

14    A.    Matt.

15    Q.    What did you see Gilarime Mueller do?

16    A.    He was standing by the window.

17    Q.    And where were you at?

18    A.    I was standing by the other window.

19    Q.    Why were you standing by the window?

20    A.    I was looking out.

21    Q.    For what?

22    A.    Police.

23    Q.    Where was Matt Canady cooking at?

24    A.    In the kitchen.

25    Q.    Once he was done did you see -- was crack cocaine

1   produced?

2        A.   Yes.

3        Q.   What happened after the crack cocaine was produced on

4   these two cooks?

5        A.   I would take it off the scale and I would bag it up.

6        Q.   And what type of quantities would you bag up?

7        A.   Ounces.

8        Q.   Did you see Gilarime Mueller do anything in relation

9   to once the crack cocaine was produced?

10       A.   Yes.

11       Q.   What did you see him do?

12       A.   He did the same.

13       Q.   The same as who?

14       A.   As I did, just bag it up.

15       Q.   What did the scale look like that you used?

16       A.   Black, all black digital scale.

17       Q.   During the cook was it you, Matt, and Gilarime for

18  both of these cooks?

19       A.   Yes.

20       Q.   During the cook itself do you know was Nicky present?

21       A.   She could -- I think she was there.

22       Q.   Was she actually out in the same area as you?

23       A.   No, she was like in the room with the door shut

24  sleeping or in the shower or something like that, a different

25  part of the house.

1    Q.   Were the children present?

2    A.   No, sir.

3    Q.   After the cooking was done was there any cleanup done?

4    A.   Yes.

5    Q.   What did you see done as far as cleaning up?

6    A.   Hot water and vinegar.

7    Q.   Did you help clean up?

8    A.   Yes, I wiped off the counter.

9    Q.   With the hot water and vinegar?

10   A.   Yes.

11   Q.   You were bagging up ounces after both of these cooks,

12   is that correct?

13   A.   Yes.

14   Q.   How many ounces did you see once all the crack was

15   packaged up?

16   A.   No more than three.

17   Q.   Did you see what happened to that crack cocaine after

18   it was packaged up?

19   A.   Yes.

20   Q.   What did you see?

21   A.   Either sat there or went in the pockets of someone,

22   either Gilarime would put it in his pocket or Matt would put it

23   in his pocket as they were proceeding to leave.

24   Q.   Did you actually see Gilarime Mueller put any of the

25   crack cocaine from those two cooks in his pocket?

1      A.    Just one time.

2      Q.    Did you get any of that crack cocaine yourself?

3      A.    No.

4      Q.    During this time period you were selling drugs

5   yourself, is that correct?

6      A.    Yes.

7      Q.    What type of drugs were you distributing?

8      A.    Marijuana.

9      Q.    Did you ever help Matt Canady or Gilarime Mueller find

10  customers for their crack cocaine?

11     A.    Couple of my weed customers would call me and I would

12  send them to Gilarime or Matt or I would do the transaction.

13     Q.    When you would do the transaction, how would that

14  work?

15     A.    I'd just tell them what I needed and go get their

16  money and I'd take them the money back.

17     Q.    Tell who what you needed?

18     A.    Either Matt or Gilarime.

19     Q.    How many times did that take place?

20     A.    Three to four times.

21     Q.    How many of those times with Gilarime Mueller?

22     A.    Just twice.

23     Q.    When you would contact Gilarime Mueller, how would you

24  get ahold of him?

25     A.    One of the times I called him on his cell phone,

1   another time he was already -- we was already together.

2       Q.   During the time -- during this time that you were

3   calling him did he always have the same cell phone number?  Did

4   Gilarime Mueller always have the same cell phone number?

5       A.   No.

6       Q.   How often would he change it?

7       A.   Maybe every two weeks.

8       Q.   If you saw Gilarime Mueller again would you recognize

9   him?

10      A.   Yes.

11      Q.   Do you see him anywhere in court here this morning?

12      A.   Yes.

13      Q.   Can you describe where he is at so we know who you are

14  referring to?

15      A.   Sitting right behind you.

16      Q.   What is he wearing?

17      A.   Gray colored shirt.

18      Q.   On the day you got arrested on May 2nd of 2008 did you

19  -- were you interviewed by law enforcement officers?

20      A.   Yes.

21      Q.   On May 2nd of 2008 did they ask you about the crack

22  cocaine that ended up on the roof of the gas station?

23      A.   Yes.

24      Q.   And whose crack cocaine did you tell them that

25  belonged -- let me ask this.  Who did you say it belonged to on

1   May 2nd?

2       A.   Me.

3       Q.   Did you tell them whether or not you observed any

4   crack cocaine in Matt Canady's car during the chase initially on

5   May 2nd?

6       A.   I told them that I didn't.

7       Q.   Did you tell them where you got that crack cocaine

8   from on May 2nd of 2008?

9       A.   Told them I stole it.

10      Q.   From where?

11      A.   Out of Gilarime's residence.

12      Q.   Did you deny to them that those drugs came from Matt

13  Canady?

14      A.   Yes.

15      Q.   Were any of those statements the truth?

16      A.   No.

17      Q.   Why on May 2nd, 2008, did you tell police that that

18  crack belonged to you?

19      A.   I was just accepting my responsibility.

20      Q.   You didn't tell them the truth about where it came

21  from, correct?

22      A.   Right.

23      Q.   And you told them that you had stolen it out of the

24  residence.  Was that true?

25      A.   No, it wasn't.

1    Q.   Why would you tell them that on May 2nd of 2008?

2    A.   I wanted -- I was scared.  I didn't want nobody to get

3 in trouble.

4    Q.   Didn't want who to get in trouble?

5    A.   I didn't want Matt or Gilarime to.

6    Q.   On May 23rd of 2008 were you interviewed again by

7 agents concerning the facts of this case?

8    A.   Yes.

9    Q.   And on that day did you tell them that Matt Canady had

10 thrown that crack cocaine to you and you threw it on the roof?

11    A.   Yes.

12    Q.   Was that the truth?

13    A.   Yes.

14    Q.   Did you tell them on May -- was that interview on May

15 23rd, does that sound right, a couple weeks after your arrest?

16    A.   Yes.

17    Q.   Did you tell them on that May 23rd interview that when

18 you left the house it was because Gilarime Mueller had asked you

19 to leave?

20    A.   Yes.

21    Q.   Is that truth?

22    A.   No, it wasn't.

23    Q.   Did they ask you whether or not you saw any crack

24 cocaine in the residence when you were there on May 2nd?

25    A.   Yeah, they asked me.

1     Q.   Did you tell them you didn't see any?

2     A.   I told them I didn't see nothing.

3     Q.   Was that the truth?

4     A.   No, it wasn't.

5     Q.   Did they ask you whether or not you had ever seen Matt

6 Canady sell or deliver crack cocaine before?

7     A.   Yes.

8     Q.   And you told them no, that was the first time?

9     A.   Yes, I did.

10    Q.   Was that the truth?

11    A.   No.

12    Q.   Did they ask you if you had ever seen Gilarime Mueller

13 with crack cocaine before on May 23rd?

14    A.   Yes.

15    Q.   And did you tell them no?

16    A.   Yes.

17    Q.   Was that the truth?

18    A.   No.

19    Q.   Why on May 23rd of 2008 did you not tell them the

20 truth about your response to these questions?

21    A.   I was scared.

22    Q.   Scared of what?

23    A.   I really don't know.

24    Q.   You were in custody, is that right?

25    A.   Right.

1    Q.    Why would you have not told them the truth on May 23rd

2  when they asked you?

3    A.    It was -- I really don't know.

4    Q.    Were you trying to protect anybody?

5    A.    Yes.

6    Q.    Who were you trying to protect?

7    A.    Matt and Gilarime.

8    Q.    Why?

9    A.    Because those was my friends and I didn't want to --

10  really didn't want to see them get in no trouble.

11    Q.    Did your relationship with Rachel Canady have anything

12  to do with what you said?

13    A.    Yes.

14    Q.    How?

15    A.    She the mother of my three kids and that's Matt's

16  sister and we was all real tight, we was all real close, and I

17  just didn't -- I don't know how it would be accepted, you know,

18  I didn't want to lose out on my family.

19    Q.    Well, on July 16th of 2008 do you remember testifying

20  under oath about these same facts?

21    A.    Yes.

22    Q.    You were placed under oath at that time to answer any

23  questions, correct?

24    A.    Yes.

25    Q.    Do you remember being asked in those proceedings what

1 everyone was doing when you first walked in the residence?

2     A.   Yes.

3     Q.   Do you remember what your response was on July 16th of

4 2008?

5     A.   Yes.

6     Q.   What did you say?

7     A.   I said that Gilarime and Matt was just standing there

8 and Jeremy was either sitting at the table counting some money

9 or on the telephone.

10    Q.   Was that the truth?

11    A.   Yes.

12    Q.   Is that -- did you describe at all that -- when you

13 were under oath making these other observations you described

14 this morning?

15    A.   What did you --

16    Q.   Did you tell them about seeing this bag on the

17 counter?

18    A.   No.

19    Q.   Do you remember being asked under oath why you left

20 and went to the BP on July 16th?

21    A.   Yes.

22    Q.   What did you say then?

23    A.   That Gilarime put me out.

24    Q.   Is that true?

25    A.   No.

1    Q.   Do you remember being asked under oath whether or not

2    you had ever seen Matt Canady cook up crack cocaine on July 16th

3    of 2008?

4    A.   Yes.

5    Q.   And what did you say in July?

6    A.   I told them I didn't.

7    Q.   Was that the truth?

8    A.   No, it wasn't.

9    Q.   Were you asked on July 16th of 2008 whether or not you

10   had ever possessed crack cocaine?

11   A.   Yes.

12   Q.   And do you remember what your response was?

13   A.   Told them I didn't.

14   Q.   Was that the truth?

15   A.   Yes.  Well, the situation with throwing it on the roof

16   so technically, no.

17   Q.   You possessed it before you threw it on the roof,

18   correct?

19   A.   Right.

20   Q.   And you possessed it according to your description

21   this morning when you were bagging it up.

22   A.   Yes.

23   Q.   That also was not the truth?

24   A.   No, it wasn't.

25   Q.   Do you remember being asked on July 16th of 2008

1  whether or not you had ever seen Gilarime Mueller with crack

2  cocaine?

3      A.   Yes.

4      Q.   What did you tell them in July?

5      A.   I never did.

6      Q.   Was that the truth?

7      A.   No, it wasn't.

8      Q.   What is different about today than when you were

9  testifying in July of 2008?

10     A.   Tired of lying, trying to tell the truth.

11     Q.   Has anyone promised you any type of benefit in

12  exchange for your testimony here this morning?

13     A.   No.

14          MR. WESTPHAL:  Those are my questions for now, Mr.

15  Williams.

16          THE COURT:  Mr. Dusthimer?

17                      EXAMINATION

18  BY MR. DUSTHIMER:

19     Q.   Do you remember your testimony that it's technically

20  true that you did not have crack cocaine prior to the May 2nd

21  date?

22     A.   Yes.

23     Q.   Is that what you said?

24     A.   Yes, that's what I just said.

25     Q.   But then Mr. Westphal asked you questions about maybe

1   helping package up.

2       A.   Right.

3       Q.   Was that the only time?

4       A.   Yes.

5       Q.   But didn't you also testify that you helped

6   transactions?

7       A.   Yeah.

8       Q.   And that in helping transactions you would get some

9   supply, take it to your marijuana customers, and then bring it

10  back?

11      A.   Right.

12      Q.   Isn't that having crack cocaine?

13      A.   Yes, it is.  I didn't understand though what he meant

14  with the possession.

15      Q.   Well, did you possess the crack cocaine in order to

16  give it to your customers?

17      A.   Yeah, I did.

18      Q.   You possessed cocaine when you supposedly packaged it

19  up?

20      A.   Yeah, I did.

21      Q.   But you were only ever truthful -- technically you

22  didn't possess crack cocaine before this May 2nd date, that's

23  what your testimony is?

24      A.   I was wrong.  Okay?  I possessed it.

25      Q.   So help us understand.  You get arrested on May 2nd.

1     A.   Right.

2     Q.   You tell the officers the story.

3     A.   Yeah.

4     Q.   Were you wrong then?

5     A.   Yeah, I lied.

6     Q.   Okay.  You get interviewed --

7     A.   Yeah.

8     Q.   -- May 23rd.  You tell the officers a different story.

9 Were you wrong then?

10    A.   Yup, I lied again.

11    Q.   Next time, you take an oath to tell the truth, you

12 tell a story.  Were you wrong then?

13    A.   I lied again.

14    Q.   You testified today that Mr. Canady lived at North

15 Linwood.

16    A.   Yeah.

17    Q.   Were you aware of any residence on High Street?

18    A.   High Street?

19    Q.   For Mr. Canady.

20    A.   Yeah, his girlfriend lived there.

21    Q.   He didn't live there?

22    A.   I don't know.  He just went over there every once in a

23 while.

24    Q.   This is a different girlfriend than Nicky?

25    A.   Yeah.

1    Q.   You mentioned your mother-in-law.  Do you remember
2    that?
3    A.   Yeah.
4    Q.   Are you married?
5    A.   No.
6    Q.   We are talking about Rachel's mother?
7    A.   Yes.
8    Q.   She is not in your contacts?
9    A.   Excuse me?
10   Q.   Your list of people that you keep in your cell
11   phone --
12   A.   Yeah.
13   Q.   -- she is not in your contact list?
14   A.   No.
15   Q.   You have to keep that number memorized?
16   A.   I just know it.  She's always had that number.
17   Q.   You testified you were working out at Genghis Grill?
18   A.   Yeah.
19   Q.   And your paycheck was about, what did you say?
20   A.   About $200.
21   Q.   Is that a week's worth of work?
22   A.   No, that's every two weeks.
23   Q.   So you are making $100 a week basically?
24   A.   It was a part-time -- it was about six hours a day,
25   sometimes less than that.

1   Q.   How come you were working there if you were making

2   $2,000 selling marijuana?

3   A.   Because I needed a cover-up.

4   Q.   Help us understand.  Why did you need a cover-up?

5   A.   Because I was on probation.

6   Q.   What were you on probation for?

7   A.   For selling marijuana.

8   Q.   How long had you been on probation in May of 2008?

9   A.   How long before that?

10   Q.   Yes, please.

11   A.   Maybe a year.

12   Q.   When you started probation had you signed a probation

13   agreement?

14   A.   Yeah.

15   Q.   In the probation agreement did you agree that you were

16   going to not commit any further crimes?

17   A.   That's right.

18   Q.   Was that true?

19   A.   Nope.

20   Q.   Did your -- did you meet with your probation officer?

21   A.   Every month.

22   Q.   And did your probation officer ask how you were doing?

23   A.   Yes, he did.

24   Q.   And did he ask you whether or not you were making any

25   money?

1    A.    Yeah.

2    Q.    And did you tell him every place you made money?

3    A.    Nope.

4    Q.    You lied to him?

5    A.    Sure did.

6    Q.    I change topics a little bit.  I try to tell you so

7  you know.  Changing topics.  On this May 2nd date if somebody

8  testified they saw someone in a blue or black sweatshirt with a

9  white shirt underneath going and taking garbage out from that

10 North Linwood address, who would that have been?

11   A.    Can you clarify what you mean?  I don't understand

12 your question.

13   Q.    Sure.  No problem.  I believe somebody else testified

14 that right after two or three people left the residence, that

15 somebody else went out of the residence and took a bag out to

16 the garbage can and that the person who took the bag out to the

17 garbage can, if I recall correctly, said that the individual

18 carrying it was a male black with a blue or a black sweatshirt

19 with what happened to be a white type of shirt underneath that.

20 If that was the testimony, who was in the house that looked like

21 that?

22   A.    Well, Jeremy was the only one with a black hooded

23 sweatshirt.

24   Q.    You mentioned it was only you and Matt Canady who left

25 the house.

1      A.   Yes, sir.

2      Q.   There was not three people?

3      A.   No, it wasn't.

4      Q.   You talked about your testimony about now for the

5  first time a cook that occurred in October of '07 --

6      A.   Yes.

7      Q.   -- where Matt Canady and/or Mr. Mueller were there.

8  Do you recall that testimony?

9      A.   Yeah.

10     Q.   Different than anything else you have ever said before

11 today regarding your interviews, correct?

12     A.   I told them I had never seen nothing previous to this

13 day.

14     Q.   But you also said you were standing by the window on

15 that day?

16     A.   Yup.

17     Q.   And you were looking out?

18     A.   Yup.

19     Q.   Did somebody tell you to look out?

20     A.   Well, no, not really.

21     Q.   And you supposedly mentioned that you were using this

22 black digital scale, do you remember that testimony?

23     A.   Yeah.

24     Q.   You testified that you observed Mr. Mueller also

25 weighing stuff out, correct?

1    A.    Yup.

2    Q.    What color scale was he using?

3    A.    Black.

4    Q.    The same black scale or a different black scale?

5    A.    Same black scale.

6    Q.    But you testified you did it one time and he did it

7    another time, was that your testimony?  If I misspoke, tell me.

8    A.    You mean the same day?

9    Q.    I heard you say that you used a black digital scale

10   and that you testified, if I heard you correctly, that Mr.

11   Mueller did the same thing, just bag it up.

12   A.    Both times it was a black scale, yes.

13   Q.    When you were interviewed on May 2nd, the first story

14   that you told --

15   A.    Yes.

16   Q.    -- did you have an attorney with you then?

17   A.    No, I did not.

18   Q.    When you were reinterviewed on May 23rd and you told

19   the second story, did you have an attorney then?

20   A.    Yes, I did.

21   Q.    Prior to your Grand Jury -- or prior to your testimony

22   on July 16th when you were under oath did you have an attorney

23   then?

24   A.    I did, but she wasn't present.

25   Q.    Do you understand what being under oath means?

1      A.    Yes, I do.

2      Q.    Let's go back to that May 2nd interview.  How many

3    different versions did you tell that day?

4      A.    One or two.

5      Q.    When you started off did you throw anything up on the

6    roof?

7      A.    Nope.

8      Q.    But by the time you ended you did?

9      A.    I sure did.

10      Q.    When you started off did you know whether or not Mr.

11    Canady had any drugs in the car?

12      A.    No, I told them he didn't.

13      Q.    Did not?

14      A.    He did not.

15      Q.    What did you first tell them about where the money

16    came from?

17      A.    My money that I had?

18      Q.    The money that was in your pocket, correct.

19      A.    I told them it was my girlfriend's, half was hers and

20    half was mine, we were going to buy a car.

21      Q.    You were arrested in February of '06 for drug

22    trafficking, is that correct?

23      A.    Yup, possession with intent to deliver marijuana.

24      Q.    And then you were rearrested in November of the same

25    year?

1      A.   Yes.

2      Q.   Same charge, different charge?

3      A.   Different -- it was same charge.

4      Q.   Let me ask the question differently.

5      A.   Okay.

6      Q.   Same incident or different incident?

7      A.   Different incident.

8      Q.   Each time you were arrested then were you interviewed?

9      A.   No.

10     Q.   Just declined not to answer?

11     A.   Yeah, I told them I didn't have nothing to say to

12 them.

13     Q.   This happened on May 2nd, correct?

14     A.   Yes.

15     Q.   And you were arrested on that day, correct?

16     A.   Yes.

17     Q.   And you were reinterviewed on May 23rd, correct?

18     A.   Yes.

19     Q.   Did you get rearrested on June 1st for a possession of

20 marijuana charge?

21     A.   June 1st of this year?

22     Q.   I am sorry, that was 2007.

23     A.   Yeah.

24          MR. DUSTHIMER:  May I have a minute, Your Honor?

25          (An off-the-record discussion was held.)

1    MR. DUSTHIMER:  Thank you, Your Honor.  That's all the

2  questions I have.

3    THE COURT:  Anything else, Mr. Westphal?

4  <u>FURTHER EXAMINATION</u>

5  BY MR. WESTPHAL:

6    Q.   Have you seen any photographs -- well, are you aware

7  that a search warrant was done on 2319 North Linwood on May 2nd

8  of 2008?

9    A.   I was informed later on that night after I got booked

10  in the Scott County Jail.

11    Q.   Has anyone shown you any photographs or any items that

12  were seized out of that residence?

13    A.   No.

14    Q.   Has anyone shown you any reports of any items that

15  were seized out of that residence?

16    A.   Yes.

17    Q.   Okay.  As part of your state case?

18    A.   Yes.

19    Q.   Have you seen any of those actual items?

20    A.   No.

21    Q.   Now, prior to this trial have you seen your cell phone

22  since May 2nd of 2008?

23    A.   No.

24    Q.   Prior to this trial has anyone shown you your contact

25  list of your recent calls from that cell phone?

1      A.   No.

2      Q.   Has -- prior to this trial anyone shown you any

3   reports, any interview reports of anyone else and what they said

4   about Gilarime Mueller?

5      A.   No.

6           MR. WESTPHAL:  I think those are my questions.  Thank

7   you.

8           THE COURT:  Anything else, Mr. Dusthimer?

9           MR. DUSTHIMER:  None.  Thank you.

10          THE COURT:  You are excused.  Call your next witness.

11          MR. WESTPHAL:  We call Kevin Smull.

12                        KEVIN SMULL,

13   witness herein, called as a witness by the government, after

14   having been first duly sworn, was examined and testified as

15   follows:

16          THE COURT:  When you are comfortably seated there,

17   state your name and spell your last name for us.

18          THE WITNESS:  Kevin Smull, S-m-u-l-l.

19                        EXAMINATION

20   BY MR. WESTPHAL:

21      Q.   Good morning.

22      A.   Good morning.

23      Q.   For the record can you tell us your occupation?

24      A.   I'm a sergeant with the Davenport Police Department.

25      Q.   How long have you been with the Davenport Police

1   Department?

2       A.    It will be 14 years in December.

3       Q.    How long have you been a sergeant?

4       A.    I think around four years.

5       Q.    On May 2nd of 2008 what was the general nature of your

6   duties at the Davenport Police Department?

7       A.    We were conducting an investigation involving Matt

8   Canady and the distribution of crack cocaine.

9       Q.    And as a sergeant what was your role in relation to

10  other officers on May 2nd of 2008 involved in that

11  investigation?

12      A.    To make --

13      Q.    Go ahead.

14      A.    To supervise over the investigation and to assist in

15  the investigation reference surveillance.

16      Q.    Did you assist in some surveillance on May 2nd of

17  2008?

18      A.    I did.

19      Q.    Where did you go first?

20      A.    I went to Scott Community College, in the area of

21  Scott Community College and assisted Agent Allers and Corporal

22  Gil Proehl.

23      Q.    And what was the focus of your attention over at Scott

24  Community College?

25      A.    Agent Allers had located Mr. Canady's vehicle over at

1   Scott Community College and they were going to follow it away

2   once he was released from school.

3        Q.   Do you remember what that vehicle was?

4        A.   It was a Denali, champagne colored Denali.

5        Q.   At some point in time did someone come and get in that

6   Denali?

7        A.   Yes.

8        Q.   And where did that Denali go from Scott Community

9   College?

10       A.   From Scott Community College to 2319 Linwood Avenue.

11       Q.   And did you conduct some surveillance at 2319 North

12  Linwood?

13       A.   I did assist, yes.

14       Q.   Government's Exhibit Number 29, do you recognize what

15  that shows?

16       A.   Yes.

17       Q.   What does that show?

18       A.   2319 Linwood Avenue.

19       Q.   Did you in your capacity in doing surveillance at 2319

20  North Linwood, did you actually take a position where you could

21  see 23 -- the actual front of the residence?

22       A.   No.

23       Q.   At some point in time did some vehicles leave the area

24  of 2319 North Linwood and follow it to another location?

25       A.   Yes.

1    Q.   Do you know what vehicles left?

2    A.   The silver Grand Prix registered to Nicky Hill who

3  lives -- who is Matt Canady's girlfriend.

4    Q.   Where did that vehicle go?

5    A.   To Enterprise Rental Car located in the 300 block of

6  West Locust.

7    Q.   Did you assist in following that vehicle to Enterprise

8  Rent-a-Car?

9    A.   Yes.

10   Q.   Did officers -- did you and other officers conduct

11 some surveillance from Enterprise Rent-a-Car -- how many

12 vehicles did officers follow leaving Enterprise Rent-a-Car?

13   A.   Two.

14   Q.   And where did they go?

15   A.   Back to 2319 Linwood Avenue.

16   Q.   Did you again go back to 2319 Linwood?

17   A.   I did.

18   Q.   Again, from your vantage point could you actually see

19 the front of the residence?

20   A.   No.

21   Q.   At some point in time did a vehicle leave the area of

22 2319 North Linwood and go somewhere else?

23   A.   Yes.

24   Q.   Were you aware of what type of vehicle that was?

25   A.   It was a Volkswagen Passat.

1    Q.   And where did -- where was it followed from there?

2    A.   It was followed to 5372 North Linwood Avenue in

3  Davenport.

4    Q.   And did you assist in following the vehicle over

5  there?

6    A.   I did.

7    Q.   Again, from where you were at, were you able to see --

8  actually see the front or the back of the residence at 5372

9  North Linwood?

10   A.   I was not.

11   Q.   At some point in time did you become aware that that

12  vehicle left -- the Volkswagen Passat left the area of 5372

13  North Linwood?

14   A.   Yes.

15   Q.   Did you attempt to find the vehicle and follow it?

16   A.   Yes.

17   Q.   Where did you first see the Volkswagen Passat?

18   A.   As it was traveling eastbound on West 55th Street east

19  of Pine.

20   Q.   And did you yourself follow the vehicle?

21   A.   Yes.

22   Q.   Where did you see it go?

23   A.   It went to the address of 1719 West 55th Street.

24   Q.   What did it do when it got there?

25   A.   It parked.

1    Q.    Did you see anything happen around that vehicle after

2    it parked?

3    A.    Yes.

4    Q.    What happened?

5    A.    The driver who was Matt Canady exited and went to the

6    door of 1719 West 55th.

7    Q.    Government's Exhibit 37, do you recognize what is

8    shown in that photograph?

9    A.    I do.

10    Q.    What is shown in that photograph?

11    A.    1719 West 55th Street.

12    Q.    And did this location have some relationship to the

13    investigation on May 2, 2008?

14    A.    Yes.

15    Q.    What was that?

16    A.    This was the informant's residence at that time.

17    Q.    Did the -- you saw Matt Canady get out and go to the

18    residence.  Did you see what he did at the residence?

19    A.    No, I could not see what he did at the residence.  I

20    know it was a short stay at the area of the front door and then

21    he returned to the car.

22    Q.    And did you see where the Volkswagen Passat went next?

23    A.    Yes.

24    Q.    Where did it go?

25    A.    It continued east to Division and south.

1     Q.   On?

2     A.   Division.

3     Q.   On Division.  Okay.  And did you continue following
4 the vehicle at that point?

5     A.   Detective or Corporal Proehl actually was the main eye
6 on the vehicle at that time and followed it southbound and I
7 followed about two, two and a half blocks behind.

8     Q.   Did someone make a decision to have the vehicle
9 stopped at that point?

10    A.   Yes.

11    Q.   Who made that decision?

12    A.   I did.

13    Q.   Were you actually involved in the actual stop of the
14 vehicle?

15    A.   I tried to.

16    Q.   Okay.  What did you see in relation to the attempted
17 stop of the vehicle?

18    A.   When the decision was made to make the stop, we were
19 actually trying to do a plain car intervention which we try to
20 use when we're dealing with investigations of this nature and
21 what I mean by a plain car intervention, our undercover cars get
22 in position and try to block in the suspect vehicle.  At that
23 time of day which was around 5:00 p.m., traffic was extremely
24 heavy, we were on Division Street approaching Kimberly Road, and
25 there was a lot of cars stacked up.

1       Corporal Proehl was following the car and was trying

2   to get in front of it so he would be the blocking vehicle and we

3   would follow up behind to block it from the rear and the side.

4   Well, the light changed at the stoplight and it turned green

5   then pretty much a quick yellow and a red, Corporal Proehl and

6   the suspect vehicle driven by Mr. Canady got through the red

7   light and the rest of us got stuck in traffic.

8       Q.   Were you able to catch up at all to the Volkswagen

9   Passat after that before the stop?

10      A.   No.

11      Q.   At some point in time did you become aware that an

12  attempt was made to stop that vehicle?

13      A.   Yes.

14      Q.   And were you advised whether or not the vehicle was

15  able to be stopped?

16      A.   No, it did flee.

17      Q.   Now, in your capacity as a supervisor do you have

18  authority to authorize the pursuit of vehicles in these type of

19  situations?

20      A.   Yes, I do.

21      Q.   And did you authorize the pursuit of the Passat on May

22  2, 2008?

23      A.   I did.

24      Q.   And what about this situation did you consider in

25  authorizing that pursuit?

1    A.    Based on the nature of the investigation that we were

2  doing, who we were investigating, Mr. Canady, and the fact that

3  Mr. Canady who is the driver of the car struck a police vehicle

4  and that it was potentially intentional, I decided to authorize

5  the pursuit.

6    Q.    Did you yourself attempt to catch up to the vehicle?

7    A.    Yes.

8    Q.    Were you able to catch up to it?

9    A.    No.

10    Q.    Why not?

11    A.    The high rate of speed and I was not in a marked

12  vehicle with emergency lights that would be visible 360, I tried

13  to get up there as quick as I could, but they were driving way

14  too fast.

15    Q.    Did you ever actually get your eyes on the Passat

16  again?

17    A.    No.

18    Q.    At some point in time was the decision made to end

19  this pursuit?

20    A.    Yes.

21    Q.    And again, in your role in this investigation was that

22  -- did you make that decision?

23    A.    Sergeant Hansen and I did.

24    Q.    And why was the pursuit terminated?

25    A.    Because the way Mr. Canady was driving recklessly and

1   the high rates of speed and the heavy traffic, it was not from

2   our standpoint safe for the public to continue to chase him.

3       Q.   Where were you at when this pursuit -- decision was

4   made to end this pursuit?

5       A.   I was northbound on Pine from Kimberly Road.

6       Q.   And did you end up stopping in that area?

7       A.   Yes, around 46th and Pine.

8       Q.   What is at 46th and Pine?

9       A.   There's an old abandoned gas station at 4607 Pine

10  Street.

11      Q.   Why did you decide to stop there?

12      A.   Actually had heard information over the radio that a

13  subject had been dropped off and something had been thrown up

14  there plus I also got flagged down by a -- well, it appeared

15  that they were flagging us down by people in the neighborhood.

16      Q.   In front of you is Government's Exhibit Number 38.  Do

17  you recognize that photograph?

18      A.   I do.

19      Q.   What is shown in that photograph?

20      A.   That is the abandoned gas station or the closed down

21  gas station at 4607 Pine.

22      Q.   Does the general location of the gas station and the

23  streets look the same as it did on May 2nd of 2008?

24      A.   Yes.

25           MR. WESTPHAL:  At this time we move to admit

1  Government's Exhibit 38.

2          MR. DUSTHIMER:  No objection.

3          THE COURT:  38 is received.

4  BY MR. WESTPHAL:

5      Q.   On the screen in front of you is Government's Exhibit

6  38.  When you stopped where did you park?

7      A.   On the south end of the building in the gravel lot

8  there.

9      Q.   Government's Exhibit 39 -- is where you stopped better

10  shown in Government's Exhibit 39?

11     A.   Say that again, please.

12     Q.   Can you see where you actually stopped better in

13  Government's Exhibit 39?

14     A.   Yes, actually where you see the door on the left, if

15  you are looking at it, directly south of that is about where my

16  vehicle was parked, between the two doors on that area there.

17     Q.   So we know what you are talking about, why don't you

18  tap the screen.

19     A.   (Witness complied.)

20     Q.   Okay.  When you got out of the vehicle did you talk to

21  anyone?

22     A.   I did.

23     Q.   And after talking to them did you make some type of

24  decision to go look somewhere?

25     A.   Yes.

1    Q.    Where did you decide to look?

2    A.    On top of the gas station.

3    Q.    How were you going to get up there?

4    A.    We called the fire department to bring a ladder in.

5    Q.    Did the fire department respond?

6    A.    Yes.

7    Q.    Do you know approximately how long that took?

8    A.    15, 20 minutes maybe.

9    Q.    Approximately what time do you recall the pursuit

10   itself ending?

11   A.    The pursuit itself I believe was between -- I called

12   it out I believe at 5:10 p.m. and it lasted no more than three

13   minutes.

14   Q.    Right after that ending is when you stopped at this

15   gas station?

16   A.    Correct.

17   Q.    Now, when the fire department arrived and -- what did

18   they do?

19   A.    They put the ladder up for me in this area

20   (Indicating) and then I crawled up on top of the gas station.

21   Q.    What did you see?

22   A.    Two yellow baggies containing a substance inside of

23   them sitting in a pool of water.

24   Q.    And did you do anything in relation to those two

25   items?

1    A.    Yes, I photographed them.

2    Q.    After you photographed them what did you do?

3    A.    I then removed them from the roof, took them down to

4  my car, looked at it first to see what was inside the baggies

5  which I thought was crack cocaine and then they were put in an

6  envelope and then Corporal Gil Proehl took custody of it and

7  transported it to the station.

8    Q.    What did the packaging look like?

9    A.    Yellow like shopping bag, plastic shopping bags.

10        THE COURT:  Mr. Westphal, we are going to take our

11 mid-morning recess.  Members of the jury, we will take our

12 mid-morning recess at this time and come back at 10:50.  We will

13 see you then.

14         (A recess was taken from 10:31 a.m. until 10:51 a.m.)

15         (In the presence of the jury.)

16        THE COURT:  Please be seated.  Mr. Westphal, you may

17 proceed.

18 BY MR. WESTPHAL:

19    Q.    I believe, Sergeant Smull, we were talking about the

20 items you found on the roof of the gas station.  You say you

21 took photographs of what you observed on May 2nd of 2008?

22    A.    Yes.

23    Q.    I have handed you Government's Exhibits 49 through 52

24 which are a series of photographs.  Do you recognize what is

25 shown in those photographs?

1    A.    Yes.

2    Q.    Did you take those photographs?

3    A.    Yes.

4    Q.    Do they fairly and accurately depict what was observed

5  at that abandoned gas station on May 2nd of 2008?

6    A.    Yes.

7         MR. WESTPHAL:  At this time we would move to admit

8  Government's Exhibits 49 through 52.

9         MR. DUSTHIMER:  No objection.

10         THE COURT:  Received.

11  BY MR. WESTPHAL:

12    Q.    Showing you Government's Exhibit 49, what is shown in

13  that photograph?

14    A.    That is the west side and part of the south side of

15  the gas station.

16    Q.    Which -- the long side of that building, which way is

17  that facing or which road would that be facing?

18    A.    That would be facing Pine to the left.

19    Q.    Government's Exhibit 50 is on the screen in front of

20  you.  What is shown in that photograph?

21    A.    The south side of the gas station and the east side.

22    Q.    And is the route you took up to the roof shown in that

23  photograph?

24    A.    Yes.

25    Q.    Can you tap the screen and show us where you went up?

1      A.    (Witness complied.)

2      Q.    For the record, what is there?

3      A.    That's a ladder.

4      Q.    Government's Exhibit Number 51, a photograph that is

5  on the screen in front of you.  What is shown in that

6  photograph?

7      A.    That is the roof, you can see the ladder to the right

8  and then the two baggies of crack cocaine.

9      Q.    That's how they appeared when you first went up on the

10 roof?

11     A.    Yes.

12     Q.    And you were there that day, what were those two

13 baggies in?

14     A.    A yellow plastic -- like a shopping bag that you would

15 get at a grocery store.

16     Q.    Government's Exhibit Number 52, what does that show?

17     A.    That's a close-up of the two bags of crack cocaine.

18     Q.    In that photograph those two bags appear to be sitting

19 in something.  What was it?

20     A.    Water.

21     Q.    And just to clarify, Government's Exhibit 52, you had

22 not moved these packages prior to taking this photograph?

23     A.    No.

24     Q.    Now, after you got done taking photographs you seized

25 those two baggies, is that correct?

1  A. I did.

2  Q. And you took them down to your car?

3  A. I did.

4  Q. And you placed them in something in your car?

5  A. An envelope.

6  Q. And you turned them over to someone else to take down

7 to the station?

8  A. I did, Corporal Gil Proehl.

9  Q. And in your experience and in your capacity as

10 supervisor you are familiar with how those items would be placed

11 into evidence down at the station?

12  A. Correct.

13  Q. And generally how does that process work?

14  A. Once it gets to the station it will be field tested,

15 once it is field tested then it is removed from its packaging,

16 the crack cocaine is, it is placed in a separate plastic

17 packaging and then put in an envelope.  The packaging that held

18 the crack cocaine would be placed in a separate envelope and

19 sealed up as a separate exhibit for evidence for fingerprinting

20 processing.

21  Q. Sergeant, in front of you are two envelopes containing

22 Government's Exhibits 1 and 2.  Can you tell just from looking

23 at the envelopes whether or not your standard procedure appears

24 to have been followed as far as entering those items into

25 evidence?

1    A.    Yes, it appears.

2    Q.    And there is also a description provided on those

3 labels, is that correct, as to what the items inside the

4 envelopes are?

5    A.    Yes.

6    Q.    And who -- does it show by the label who initially

7 collected those items?

8    A.    It was collected by me.

9    Q.    Does it appear that the actual items in those two

10 envelopes, Government's Exhibits 1 and 2, appear to be in the

11 same or substantially same condition?

12    A.    Yes.

13    MR. WESTPHAL:  At this time we move to admit

14 Government's Exhibits 1 and 2.

15    MR. DUSTHIMER:  May I visit with counsel for a minute?

16    THE COURT:  Yes.

17    (An off-the-record discussion was held.)

18 BY MR. WESTPHAL:

19    Q.    Government's Exhibit Number 1, what item is that?

20    A.    That is crack cocaine.

21    Q.    Is the substance in an envelope?  I'm sorry, the

22 actual exhibit itself is -- describe what it appears to be.

23    A.    It's in plastic.

24    Q.    Okay.

25    A.    The hard plastic that is used for evidence collection.

1    Q.   Okay.  And Government's Exhibit Number 2, the actual

2  exhibit itself, can you describe what that appears to be?

3    A.   It is plastic that is used for evidence collection.

4    Q.   Okay.  Inside there is a plastic bag?

5    A.   Correct, the packaging.

6       MR. DUSTHIMER:  No objections.

7       THE COURT:  One and two are received.  Mr. Westphal,

8  because we don't ordinarily send contraband exhibits back to the

9  jury room for use in deliberations, would you please have

10  Exhibit 1 passed among the jurors?  The jurors usually want to

11  see what crack cocaine looks like.

12       MR. WESTPHAL:  Shall I pass Government's Exhibit 2 as

13  well then?

14       THE COURT:  Sure, if you like.

15  BY MR. WESTPHAL:

16    Q.   In front of you is two envelopes containing Exhibits 3

17  and 4.  Can you tell from looking at the envelopes whether or

18  not the standard procedures were followed for preserving and

19  entering those two items into evidence?

20    A.   Yes, it appears that the procedure had been followed.

21    Q.   And initially who was it that collected those two

22  items, Government's Exhibits 3 and 4?

23    A.   I did.

24    Q.   And can you look at Government's Exhibit 3 and just

25  describe what the actual exhibit is?

1    A.    Number three is several chunks of crack cocaine.

2    Q.    In what?

3    A.    In a plastic bag that we use to secure this type of

4    evidence.

5    Q.    And what is Government's Exhibit Number 4?

6    A.    It is the packaging that Exhibit 3 which is the crack

7    cocaine was contained in.  It is also contained in a plastic

8    hard wrap used for collection and processing.

9          MR. WESTPHAL:  At this time we move to admit --

10    Q.    Both those exhibits appear to be in the same or

11    substantially same condition?

12    A.    Yes.

13          MR. WESTPHAL:  We move to admit Government's Exhibits

14    3 and 4.

15          MR. DUSTHIMER:  No objection.

16          THE COURT:  Three and four are received.

17          MR. WESTPHAL:  Pass those around as well?

18    Q.    Now, as part of this investigation there was a search

19    warrant conducted at 5372 North Linwood Avenue, is that correct?

20    A.    Correct.

21    Q.    On May 2, 2008, correct?

22    A.    Correct.

23    Q.    Did you actually do any searching out at that

24    residence?

25    A.    No, I did not.

1       Q.   As part of this investigation was Gilarime Mueller

2   taken into custody on May 2nd of 2008?

3       A.   He was.

4       Q.   As part of that did he provide a Social Security

5   number?

6       A.   I believe so, yes.

7       Q.   And what was the Social Security number that was

8   provided?

9       A.   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.

10      Q.   How many years have you been on the Davenport Police

11  Department?

12      A.   14 years.

13      Q.   And in those 14 years how many years have you focused

14  or concentrated on investigations relating to drug trafficking?

15      A.   Over half of my career.

16      Q.   As part of those investigations have you been involved

17  in other search warrants in the Davenport area concerning the

18  manufacture of crack cocaine?

19      A.   Yes.

20      Q.   As part of those have you observed some of the common

21  items that were used to manufacture crack cocaine in this area?

22      A.   Yes.

23      Q.   Have you spoken to individuals about how they cook

24  crack cocaine?

25      A.   Yes.

1      Q.   As part of these investigations have you seized items

2 related to the distribution of crack cocaine?

3      A.   Yes.

4      Q.   And have you spoken to individuals that have actually

5 distributed crack cocaine?

6      A.   Yes.

7      Q.   As part of those duties have you seized items related

8 to ingesting crack cocaine?

9      A.   Yes.

10      Q.   And have you spoken to people about the common methods

11 and the common quantities that they ingest crack cocaine?

12      A.   Yes.

13      Q.   Based on your career have you also received training

14 or reviewed materials on cocaine base and crack cocaine?

15      A.   Yes.

16      Q.   The term crack cocaine itself, where does that term

17 come from?  Is it a scientific term or a street --

18      A.   It is a slang word for cocaine base.

19      Q.   What are some of the commonly used methods for

20 ingesting crack cocaine here in the Davenport area?

21      A.   Smoking it.

22      Q.   And what type of items do individuals that use crack

23 cocaine use to smoke it?

24      A.   They use pipes and pretty much whatever they can make

25 a pipe out of.  I've seen beer cans used, pop cans, also seen

1  glass pipes, socket wrenches, they stuff Brillo pad in the end

2  of it for a filter and then they put the rock on that and then

3  they smoke it.

4      Q.   For individuals that use crack cocaine, what are some

5  of the most common amounts that they purchase crack cocaine in?

6      A.   Crack cocaine in Davenport is sold in $20 increments

7  and $50 increments for crack users.

8      Q.   So that's a dollar designation?

9      A.   Yes.

10     Q.   And a $20 rock normally is how much weightwise?

11     A.   A tenth of a gram to two-tenths of a gram.

12     Q.   And a $50 rock is normally how much as far as weight?

13     A.   Three-tenths of a gram to five-tenths of a gram.

14     Q.   Individuals that distribute crack cocaine, what are

15  some of the items -- what are some of the methods you have seen

16  crack cocaine packaged in your experience?

17     A.   I've seen it in sandwich baggie corners tied off in

18  small individual wrapper bags, I've seen it in the small Ziploc

19  baggies, I've seen tissue used, paper used, tin foil used, but

20  primarily what you -- I don't want to say typically, but what we

21  consistently see is in the baggie corners.

22     Q.   For someone that is distributing crack cocaine, what

23  are some of the normal weights that someone would possess if

24  they are going to distribute crack cocaine?

25     A.   It depends on the level of dealer they are, a street

1 level dealer will deal in individual rocks which we described

2 just a little bit ago of a $50 rock and a $20 rock. People that

3 are a little bit bigger than that will deal in larger

4 quantities, possibly eight balls which is 3.5 grams up to half

5 ounces, ounces, and then you have your large dealers that are

6 dealing in multiple ounces.

7 Q. For one ounce of crack cocaine, approximately how many

8 rocks could that be divided into for usage?

9 A. If you break it down as a tenth of a gram it would be

10 280 dosage units.

11 Q. And a half ounce would be again how many individual

12 rocks?

13 A. Again, if you break it down to a tenth of a gram it

14 would be 140.

15 Q. Is the weight itself -- if someone possesses one ounce

16 of crack cocaine, is that consistent with personal usage or with

17 someone that is distributing?

18 A. Distribution.

19 Q. What are some of the common items seized from

20 individuals that have distributed crack cocaine besides the

21 crack and the packaging?

22 A. Digital scales, razor blades, money, cell phones.

23 Q. Part of your experience in investigations has also

24 concerned cooking powder cocaine into crack cocaine, is that

25 correct?

1    A.    Correct.

2    Q.    And based on your education and experience what is the

3    most common process in this area for converting powder cocaine

4    into crack cocaine?

5    A.    The common way that -- through our interviews and what

6    I have been involved in is using glass cooking ware such as

7    Pyrex, cocaine, baking powder, and a heat source and water.

8    Q.    And how is the process supposed to work?

9    A.    You have your Pyrex dish, you place the cocaine in it,

10   they place the powder -- or the baking soda in it and a little

11   bit of water, they start stirring it, baking powder and the

12   cocaine have some type of reaction and then the cocaine base

13   which is crack cocaine starts clumping together in the water and

14   what they do is they're cooking the impurities out of the

15   cocaine then they scoop it out and let it dry.

16          MR. WESTPHAL:  I think those are my questions for now,

17   Sergeant Smull.

18          THE COURT:  Mr. Dusthimer?

19                         EXAMINATION

20   BY MR. DUSTHIMER:

21   Q.    Sergeant Smull, I want to take you to the very

22   beginning of what we were talking about today.  You testified

23   earlier that the Enterprise Rental Company was where?

24   A.    West Kimberly Road, 300 West Kimberly Road.

25   Q.    Do you know or do you recall whether or not that is

1   what you told the jury when you were talking during direct

2   examination or whether or not you said West Locust Street?

3       A.   I thought it was Kimberly.

4       Q.   If you said West Locust Street obviously that was an

5   oversight or just an erroneous misstatement?

6       A.   I made a mistake.

7       Q.   In that regard you were talking about your 14 years of

8   experience this coming -- or next month, correct?

9       A.   Correct.

10      Q.   Okay.  And during that 14 years I assume it has been

11  full time?

12      A.   Yes.

13      Q.   And full time means that you have been there at least

14  40 hours a week?

15      A.   Yes.

16      Q.   And during the 40 hours a week have you generated a

17  few reports during your career?

18      A.   Yes.

19      Q.   And you generate your reports for what reason and how

20  is it done generally?

21      A.   You collect the information and you generate a report

22  of a summary of the events that took place.

23      Q.   And it is very rarely verbatim, only if there might be

24  an audiotape or videotape which recorded the exact thing

25  otherwise you are putting down what helps you so you can testify

1   later, is that fair?

2        A.   Yes.

3        Q.   And during your 14 -- almost 14-year career thousands

4   of reports, tens of thousands of reports?

5        A.   A lot.

6        Q.   That's fair.  And have you made mistakes in those

7   reports?

8        A.   I'm sure I have.

9        Q.   And did you do more of those reports before you became

10  the supervisory responsibility or about the same?

11       A.   I do less now being a supervisor.

12       Q.   And how long have you been in supervisory role?

13       A.   As a sergeant, almost four years, around four years.

14       Q.   Some of us are not conversant with ranks in

15  professional activities like the Army, Navy, Marines, or police

16  officers.  Where is a sergeant in relationship to everybody

17  else?

18       A.   You have first class officers, actually you have third

19  class officers, second class officers, first class officers,

20  corporal, sergeant, lieutenant, captain, deputy chief, and

21  chief.

22       Q.   And the first three people are the people that are out

23  on the streets actually having almost consistent contact with

24  the public and trying to help in the community, is that fair?

25       A.   Yes.

1    Q.    And then sergeant -- corporal is kind of the first

2  level of supervisor?

3    A.    Yes.

4    Q.    And then sergeant is the closest to being the public

5  contact supervisor, is that fair?

6    A.    Depending on what your role is in the department, yes.

7    Q.    And you said at least half your career here has been

8  with drug investigation and drug prosecution, is that correct?

9    A.    Yes.

10   Q.    And in that regard both as a line officer and now a

11 supervisory officer have you had the benefit to use recording

12 devices?

13   A.    Yes.

14   Q.    And when did this investigation -- I think you said it

15 was with Mr. Canady -- when did it first start approximately?

16 And I am just asking rough.

17   A.    I'll be honest with you, I don't know.  I can't give

18 you -- I wouldn't be able to give you a specific date or even a

19 rough estimated time period.

20   Q.    Well, there's discussion about a controlled buy on

21 April 20th, are you aware of that?

22   A.    Yes, I am.

23   Q.    So at least two weeks prior to this May 2nd date there

24 was investigation ongoing?

25   A.    Yes.

1    Q.    And then there was something going on on the 22nd as

2    well?

3    A.    Correct.

4    Q.    And on the 20th did the department take steps to --

5    did the investigators take steps to in any way record or

6    document the alleged criminal activity?

7    A.    Yes.

8    Q.    Was there audiotape done?

9    A.    I believe there was audio and video.

10    Q.    During -- since that time you have had an opportunity

11    to review the reports, correct?

12    A.    To the best of my ability, yes.

13    Q.    Well, you are sitting here today some time -- if I do

14    my math right six months later?

15    A.    Yes.

16    Q.    And you want to make sure you are telling the truth

17    the best you can?

18    A.    Correct.

19    Q.    Sometimes we use the wrong word, we understand that;

20    but you use those reports to refresh your recollection so you

21    can tell the jury the best possible story, correct?

22    A.    Correct.

23    Q.    The most truthful as you know it?

24    A.    Yes.

25    Q.    And in that regard you reviewed your reports, you

1  reviewed reports of others?

2      A.    I have reviewed mine and I did go over some of the

3  others, yes.

4      Q.    You have had an opportunity to look at the videotapes?

5      A.    No.

6      Q.    Have you looked at the videotapes at any time?

7      A.    I have not.

8      Q.    Did somebody tell you what they had generally?

9      A.    Yes, Corporal Proehl did.

10     Q.    And have you looked or have you -- look is the wrong

11  word.  Have you listened to the audiotapes?

12     A.    I have not.

13     Q.    Are you aware of any of those audiotapes or videotapes

14  showing or having Mr. Mueller involved?

15     A.    I am not aware, yes.

16     Q.    And there were hand-to-hand deals during this

17  investigation, correct?

18     A.    Yes.

19     Q.    Changing topics.  In the investigation of drug

20  activity, sometimes search warrants are used, correct?

21     A.    Correct.

22     Q.    And during the time search warrants are used, you have

23  to create a paper document for the benefit of the Judge or the

24  Magistrate to review the circumstances to determine whether or

25  not it is appropriate to go someplace where you would not

1    otherwise be allowed to go, is that a fair summary?

2        A.   Yes.

3        Q.   And in that regard does the investigation team that

4    you regularly work with have stock or standard words or

5    languages that they use in the search warrant paperwork for

6    purposes of presenting the best but most truthful statement to

7    the Court for the purposes of receiving the search warrant

8    permission?  Do you understand my question?

9        A.   I'm not for sure.

10       Q.   Okay.  Do you use common paperwork, are their common

11   phrases sometimes used as far as where you want to look or why

12   you want to look in a certain place?

13       A.   Each individual officer that types up a search warrant

14   adds the information into the application and Affidavit area.

15   As for -- not every narcotics crime is exactly the same.  You

16   have your different individuals and different methods and it

17   depends on what kind of drug it is so is it boilerplate

18   throughout the whole search warrant, no, it is not.

19       Q.   That is not -- thank you first of all.  But is there

20   some boilerplate type language that is commonly used or

21   typically used regarding what you expect to find or the general

22   practices such as you talked about here earlier today?

23       A.   Yes.

24       Q.   And in that regard, is it common in your training and

25   experience for you to see people who have allegations of drug

1  trafficking to have some type of storage unit?

2      A.    Ask me that question again, please.

3      Q.    I will try.  Let's make it simple.  At some point

4  there was -- you determined that there were storage units in the

5  name of both Mr. Mueller and Mr. Canady, correct?

6      A.    Correct.

7      Q.    And in that regard you asked the Judge permission to

8  go to those storage units for the purposes of looking to see if

9  there was criminal activity in there, correct?

10     A.    Correct.

11     Q.    And you were hoping or believing based upon your

12  training and experience that there's expectation that some type

13  of drug trafficking evidence would be inside those storage

14  units, that's why you asked for the search warrants, right?

15     A.    We developed probable cause for the Judge to sign a

16  search warrant, yes.

17     Q.    That's why you asked for it, right?

18     A.    Yes.

19     Q.    When you looked did you find anything?

20     A.    We did not.

21     Q.    But it is not necessarily uncommon for other people to

22  have storage units as well, correct?

23     A.    Correct.

24     Q.    Did I hear your testimony to be that the most an end

25  user will buy is a $50 rock?

1    A.    I'm saying commonly you'll see users buy 20 and $50

2    increments.

3    Q.    What is the most you have seen end users purchase in

4    one time?

5    A.    I've seen less than an eight ball.  I have not seen

6    anything over an eight ball.

7    Q.    Okay.  These are magic words for you and I, but let's

8    help the jury understand.  As far as measurements are concerned,

9    we've got the $20 rock, we've got the $50 rock, the next size up

10   is a teener?

11   A.    Yes.

12   Q.    And a teener is about a 16th of --

13   A.    An ounce.

14   Q.    An ounce and the 16th of an ounce is how big in

15   relationship to a $50 rock?  Five, four, three, ten?

16   A.    Well, to describe a 20, it would be the size of an

17   eraser, smaller than an eraser for a pencil, the 50 would be a

18   little bit bigger than that, and then a teener which we don't

19   see sold on the streets, I haven't, my team hasn't, it's a

20   little bit bigger than that, less than a marble size.

21   Q.    What is an eight ball?  Two teeners first of all?

22   A.    Yes.

23   Q.    So -- that's a bad question.  Is an eight ball equal

24   to two teeners?

25   A.    Roughly, yes.

1    Q.   And an eight ball is how many twenties or how many

2  fifties?

3    A.   If you have it at 3.5 grams, it could be 35 dosage

4  units at one-tenth of a gram.

5    Q.   I didn't ask dosage units because we will talk about

6  that in a minute.  I asked about twenties and fifties.

7    A.   Yes.

8    Q.   How many twenties or fifties?

9    A.   Could be 35 twenties and half of it would be fifties.

10    Q.   We don't want to confuse the jury about a lot of

11  unnecessary things, but as far as crack cocaine is sold, it is

12  sold by whatever the size of the rock is, right?

13    A.   Yes.

14    Q.   The consumption is what -- but a bigger rock, they

15  just get more money for it, is that fair?

16    A.   Yes.

17    Q.   And as far as these weights are concerned and

18  everything else, you talked about you don't see teeners here, we

19  talked about eight balls, we talked about twenties, we talked

20  about fifties, what is the next size up?

21    A.   Quarter ounce.

22    Q.   And is there any special street name or --

23    A.   Quarter ounce.

24    Q.   Quarter ounce.  Then after quarter ounce, how much?

25    A.   Half ounce.

1    Q.    Those are the different items that are sold?

2    A.    Yes.

3    Q.    Then the next one is?

4    A.    An ounce.

5    Q.    And an ounce sometimes is called what?

6    A.    Zip.

7    Q.    And that's about 28 grams?

8    A.    28.35.

9    Q.    And these items, when you were having contact with

10   your sellers, your distributors, your users, they understand

11   these size differences, right?  They know very much what a $20

12   rock looks like versus a $50 rock?

13   A.    Yes.

14   Q.    And they talk grams and convert grams to ounces and

15   back and forth faster than you and I do, right?

16   A.    Probably.

17   Q.    But is it your experience that there are very few of

18   them that graduated from high school or if they did, they got by

19   by the skin of their teeth?

20   A.    I don't know.

21   Q.    But they have a lot of street smarts, right?

22   A.    Yes.

23   Q.    A lot of street smarts how to calculate, how to figure

24   out profit margin, even though they may have limited education?

25   A.    Some of them, yes.

1     Q.   And some of them can do real quick down and dirty

2  weight appreciation as far as whether or not that is a $50 rock

3  or a $20 rock?

4     A.   Some can, yes.

5     Q.   And may have similar experiences when talking to

6  police, they have different levels of experience?

7     A.   Who are you referring to?

8     Q.   The users and the dealers.  Some of them have better

9  street sense, street smarts as far as whether or not that is a

10 $20 rock or $50 rock, that's what you said, right?

11    A.   I don't quite understand what you are asking.

12    Q.   Well, I asked you whether or not the dealers had a

13 better sense, almost an impressive sense looking at the drug

14 quantity and knowing what size it is as far as what they can

15 make off it, correct, and I thought your answer was some more

16 than others.

17    A.   Some, yes.

18    Q.   And the same application applies to those people when

19 they talk to police, some have more street sense and street

20 smarts than others in talking to the police, correct?

21    A.   Yes.

22    Q.   More experienced people many times are more adept in

23 talking to the police, they have a lot more experience?

24    A.   That's not necessarily true.

25    Q.   But it is true in some instances just like the weight

1   of the drugs?

2        A.    Yes.

3        Q.    And they learn over time and over their profession

4   when to talk and when not to talk?

5        A.    Yes.

6        Q.    And they learn what to say and what not to say?

7        A.    I'm assuming, yes.

8        Q.    And these people don't necessarily comply by society

9   rules, correct?

10       A.    Correct.

11       Q.    Some carry guns?

12       A.    Yes.

13       Q.    They lie?

14       A.    Yes.

15       Q.    They cheat?

16       A.    Yes.

17       Q.    They steal?

18       A.    Yes.

19       Q.    From each other?

20       A.    They can, yes.

21       Q.    It's not uncommon to have robberies where one drug

22  dealer goes in with a weapon and is stealing from another drug

23  dealer?

24       A.    Yes.

25       Q.    That happens regularly or not regularly, but it

1  happens, correct, here in Davenport?

2      A.   Yes, it does.

3      Q.   And they even deal with illegal substances the day

4  they get released from prison, don't they?  You have interviewed

5  people like that, haven't you?

6      A.   You mean they just got out?

7      Q.   You bet.

8      A.   Yes.

9      Q.   And some of these people -- some of the people in this

10 case have been interviewed multiple times, correct?

11     A.   Yes.

12     Q.   Are you familiar with the term jumping on a case?

13     A.   Yes.

14     Q.   What -- tell the jury, what does that mean?

15     A.   My understanding of it is once an individual learns of

16 a case, they try to gather as much information and then try to

17 provide it to the prosecution.

18     Q.   Okay.  Gather information, tell the jury, what does it

19 mean to gather information?  What do they do?

20     A.   Provide law enforcement with information.

21     Q.   How do they gather it?

22     A.   By listening, prior knowledge.

23     Q.   Do they lie?

24     A.   Some, yes.

25     Q.   They cheat?

1     A.   Some, yes.

2     Q.   They steal?

3     A.   Some, yes.

4     Q.   And they do that more in State Court or more in

5 Federal Court?

6     A.   I don't know.

7     Q.   Federal cases though, sometimes it is a more harsh

8 sentence than State Court?

9     A.   They can be, yes.

10    Q.   When these various witnesses come in, how are the

11 different ways to jump on a case?  Are they housed in the same

12 location as other defendants?

13    A.   Could be.

14    Q.   Are they kept in the same cell in the back waiting to

15 testify with other defendants?

16    A.   I don't know.

17    Q.   Fair answer.  Do they ride in the same van to or from

18 the courthouse?

19    A.   They can.

20    Q.   Do they have opportunities to look through others'

21 paperwork as far as what the reports say or anything else?

22    A.   I don't know.

23    Q.   But if the paperwork is at the jail, whatever it is,

24 that is available for others to see sometimes?

25    A.   I don't know.

1     Q.    Is there street talk for people that are outside to

2  communicate as far as what the claims are in a particular case?

3     A.    Sure, there can be.

4     Q.    Are there people that go -- people from the outside

5  that go see people on the inside?

6     A.    Yes.

7     Q.    How long does it take to cook crack cocaine?

8     A.    Depending on the process, it could take up to 10, 15

9  minutes.

10     Q.    How long does it take to dry?

11     A.    Depends if you accelerate it or not.  If you put it in

12  the freezer --

13     Q.    Help the jury understand.  What do you mean by

14  accelerate?

15     A.    You can put it in the freezer, it will harden up a

16  little bit quicker in that.

17     Q.    I told you I jump around on occasion.  There's another

18  question I am going to ask you.  Have you talked general

19  discussion regarding smoking and general consumption of crack

20  cocaine, correct?

21     A.    Correct.

22     Q.    You talked about pipes and what you can use to make a

23  pipe, you talked about pop cans, beer cans, you talked about

24  glass tubes, you talked about -- one other -- oh, socket, like a

25  socket wrench, socket wrenches type thing?

1    A.    Yes.

2    Q.    What is a primo?

3    A.    Primo is marijuana inside a hollowed out cigar

4    wrapping with crack cocaine sprinkled on it.

5    Q.    So is that a way crack cocaine can be consumed without

6    any type of pipe device?

7    A.    Yes.

8    Q.    Are there other types of consumption methods available

9    other than pipe type devices?

10    A.    I guess you could put it on a cigarette too.

11    Q.    In your training and experience are you familiar with

12    the general medical impact by people who use marijuana daily?

13    A.    The medical aspect, no.  Have I read some articles,

14    yes.

15    Q.    As far as your training and experience as far as how a

16    person who uses marijuana daily, would you want to know how it

17    impacts them biologically or chemically in order to know how to

18    evaluate their truthful testimony?   You'd want to know,

19    wouldn't you?

20    A.    I guess I am not sure what you are asking me, Mr.

21    Dusthimer.

22    Q.    Don't you want to know whether or not a person who is

23    telling you a story if they use marijuana on a daily basis, how

24    much they're really able to tell you the truth?

25    A.    Actually no matter if they are using marijuana or not

1  to tell me the truth.

2       Q.  But a lot of the people you have contact with have a

3  daily marijuana use, correct?

4       A.  I don't know about daily.  Do they smoke marijuana

5  that I've dealt with?  Yes.

6       Q.  And you don't -- and you don't know or you are not

7  comfortable in commenting as far as what you understand

8  medically and the impact that it has on a person's ability to be

9  truthful?

10      A.  I don't have enough knowledge to make a comment on

11 that reference, the medical aspect of it.

12      Q.  Jumping around again.  I'm sorry.  Ultimately it was

13 determined that the impact between the Volkswagen, Mr. Canady's

14 vehicle, and the unmarked squad car, Sergeant Hansen's vehicle,

15 was not an intentional impact where it was used for the purposes

16 of threats or violence, it was more avoidance and escape, is

17 that your understanding?

18      A.  Initially I thought it was --

19      Q.  An intentional  --

20      A.  -- intentional ramming and then later it was

21 determined it was more fleeing.

22           MR. DUSTHIMER:  May I have a minute, Your Honor?

23           THE COURT:  Yes.

24           (An off-the-record discussion was held.)

25

BY MR. DUSTHIMER:

Q.   One more area.  Users also can carry scales for the purposes of making sure what they are buying is a legitimate weight, correct?

A.   I have not seen that with crack cocaine.

MR. DUSTHIMER:  Thanks.  That's all the questions I have.

THE COURT:  Anything else, Mr. Westphal?

FURTHER EXAMINATION

BY MR. WESTPHAL:

Q.   You were asked about an incident on April 20th of 2008, a controlled purchase.  Is that -- do you remember being asked about that?

A.   Yes.

Q.   Who was that purchase from?

A.   Matt Canady.

Q.   Where did it take place at?

A.   At the Chef's Hat on West Locust Street just east of Division.

Q.   And on April 22nd of 2008, you were asked about an incident that occurred on that date, is that correct?

A.   Correct.

Q.   And what was -- that was also a controlled transaction of some sort?

A.   It was a controlled delivery of the remaining amount

1   of money we owed to Mr. Canady.

2       Q.   And where did that take place at?

3       A.   Heatherton Drive and around Michigan.

4       Q.   Was Gilarime Mueller involved at all that day?

5       A.   He was present when the controlled delivery of money

6   was made.

7       Q.   Every search warrant -- is it fair to say you

8   participated in a large number of search warrants on drug

9   investigations, is that correct?

10      A.   Hundreds.

11      Q.   Do you find drugs every time you conduct a search?

12      A.   No.

13      Q.   And in relation to other defendants, has it been your

14  experience that in relation to drug trafficking are the

15  individuals actually involved in the drug trafficking often in

16  the best position to describe what takes place?

17      A.   Yes.

18      Q.   Is it your experience that when some drug dealers get

19  caught they are anxious to tell the truth?

20      A.   Yes.

21      Q.   Looking through other people's paperwork, showing

22  reports, allowing defendants to talk to each other, allowing

23  defendants to provide -- receive information from outside,

24  comparing notes, is that how you conduct your drug

25  investigations?

1          A.   No, I do not.

2               MR. WESTPHAL:  Okay.

3               THE COURT:  Anything else, Mr. Dusthimer?

4               MR. DUSTHIMER:  My client asked me to visit with him

5     for a minute.

6               (An off-the-record discussion was held.)

7                       FURTHER EXAMINATION

8     BY MR. DUSTHIMER:

9          Q.   That April 22nd date, were you there?

10         A.   I was.

11         Q.   Did you see Mr. Mueller?

12         A.   No, I did not.

13         Q.   Do you know how many people total were there at the

14    scene?  Let me ask the question differently.  Participants from

15    the broadest use of the term not counting police officers, does

16    that help clarify my question?   I mean, if somebody was there

17    being watched and was just part of the group, that's the number

18    I want.

19         A.   Whether Officer Peiffer approached Mr. Canady, Mr.

20    Mueller and I believe two other subjects so there possibly could

21    have been four if my memory serves me right.  It was three or

22    four.

23         Q.   And as far as this was in a general public area, the

24    parking lot at the Chef's Hat?

25         A.   No, not at the Chef's Hat.  You said the 22nd if I

1  heard you right.

2     Q.   I did say -- I did say -- I did say the 22nd because I

3  thought you said the purchase -- was the purchase at Chef's Hat,

4  is that what happened?

5     A.   On the 20th.

6     Q.   Thank you for clarifying.  That's what the -- you

7  misspoke earlier, at least I thought I heard you misspoke

8  earlier, I misspoke.  On the 22nd, on that transaction, where

9  was that?

10     A.   That was on Heatherton Drive.

11     Q.   That's right.

12     A.   That was a controlled delivery of money.

13     Q.   By Michigan?

14     A.   Yes.

15     Q.   Thank you.  Was that in a parking lot, hallway, help

16  us understand.

17     A.   It was in a parking lot, actually the controlled

18  delivery took place near the street from my understanding of it.

19  They were in the parking lot.

20     Q.   They being the four people you were talking about?

21     A.   Yes.

22     Q.   And there was no recording at all of what was said?

23     A.   Not to my knowledge of the audio verbally.

24     Q.   And there's no video as far as -- audio or video?

25     A.   As for the video, there might be something on the

1  squad car tape.

2      Q.   Do you know how far away Mr. Canady was in

3  relationship to Mr. Mueller?  Do you personally?

4      A.   No, I do not.

5      Q.   Do you personally know whether or not Mr. Mueller even

6  got out of the car, out of the vehicle?

7      A.   I believe he was out of the vehicle standing in the

8  parking lot.

9      Q.   Do you know that personally?

10     A.   No, that's what came over the radio.

11     Q.   Did what come over the radio include Mr. Canady

12  walking away from the others?

13     A.   Yes.

14         MR. DUSTHIMER:  That's all.  Thank you.

15         MR. WESTPHAL:  Nothing further.

16         THE COURT:  Thank you.  Call your next witness.

17         MR. WESTPHAL:  Government would call Daniel Westbay.

18                      DANIEL WESTBAY,

19  witness herein, called as a witness by the government, after

20  having been first duly sworn, was examined and testified as

21  follows:

22         THE COURT:  When you are comfortably seated there,

23  tell us your name and spell your last name.

24         THE WITNESS:  My name is Daniel Westbay,

25  W-e-s-t-b-a-y.

1     THE COURT: Go ahead.

2        <u>EXAMINATION</u>

3 BY MR. WESTPHAL:

4   Q.  Good morning.

5   A.  Good morning.

6   Q.  Tell us for the record what your occupation is.

7   A.  I'm a police officer with the City of Davenport.

8   Q.  How long have you been a police officer with the City

9 of Davenport?

10   A.  About eight years.

11   Q.  And in those eight years have your duties included a

12 focus on narcotics investigations?

13   A.  Yes, they have.

14   Q.  How many out of those eight years?

15   A.  About three and a half years.

16   Q.  On May 2nd of 2008 did you assist in conducting some

17 surveillance on a residence at 5372 North Linwood Avenue?

18   A.  Yes, I did.

19   Q.  Approximately what time of day did you begin assisting

20 in that investigation?

21   A.  I began assisting in that investigation at about one

22 o'clock in the afternoon.

23   Q.  Do you recall approximately what time you arrived in

24 the area of 5372 North Linwood?

25   A.  I think it was around four or five o'clock in the

1    afternoon.

2        Q.   And anything you recall of significance about the

3    conditions that day, clear, raining?

4        A.   From what I recall, it was fairly clear that day, it

5    was not raining.

6        Q.   Okay.  What areas -- did you actually as part of your

7    surveillance observe the front and the back of the residence at

8    5372 North Linwood?

9        A.   Yes, I did.

10       Q.   Officer Westbay, I am going to show you Government's

11   Exhibits 32 through 36, a series of photographs.  Do you

12   recognize what is shown in those photographs?

13       A.   Yes, I recognize them as being the residence and the

14   property adjacent to 5372 North Linwood.

15       Q.   Is that a fair and accurate depiction of how that

16   residence and the area surrounding the outside of that residence

17   looked on May 2nd of 2008?

18       A.   Yes, it is.

19            MR. WESTPHAL:  At this time we move to admit

20   Government's Exhibit 32 through 36.

21            MR. DUSTHIMER:  No objection.

22            THE COURT:  Received.

23   BY MR. WESTPHAL:

24       Q.   Government's Exhibit 32, what does that show in

25   relation to this investigation?

1     A.   That shows the east facing side of 5372 North Linwood.

2     Q.   And could you maybe -- and if you tap the screen it

3 should show up, show which one is 5372 North Linwood?

4     A.   Right there.  (Indicating)

5     Q.   Government's Exhibit Number 32 -- I'm sorry, 33, what

6 does that show?

7     A.   It also shows the east facing side of 5372 Linwood.

8     Q.   And again, the actual door to 5372 would be where?

9     A.   (Indicating)

10     Q.   Government's Exhibit Number 35, what does that show?

11     A.   That shows the west facing side sliding glass door and

12 deck to 5372 North Linwood.

13     Q.   And again, just so we are clear, can you mark or touch

14 the screen where the rear door is to 5372?

15     A.   Yes.  (Indicating.)

16     Q.   Were you present when a Volkswagen Passat arrived at

17 this residence?

18     A.   I was present.

19     Q.   And do you recall, were you conducting surveillance on

20 the front or the back of the residence at that point in time?

21     A.   I was in the area of the residence.  I did not observe

22 the silver Volkswagen arrive.

23     Q.   At some point in time did that -- did you see anyone

24 get out of that Volkswagen and go into the residence?

25     A.   No, I did not.

1    Q.   At some point in time were you made aware that that

2  Volkswagen Passat had left the residence?

3    A.   Yes, I was.

4    Q.   Were you one of the officers that followed that?

5    A.   No, I was not.

6    Q.   What did you do?

7    A.   I remained at the residence conducting surveillance on

8  the west side of the residence from approximately half a block

9  to the west.

10    Q.   And from a half a block to the west what part of the

11  residence are you looking at?

12    A.   The rear sliding glass door and the deck area along

13  with the garages that are along the backside of the residence.

14    Q.   After the Passat had left did you see anything in

15  relation to the back area of that residence?

16    A.   Yes, I did.  I observed a male black subject wearing a

17  black or a blue sweatshirt over a white shirt exit the sliding

18  glass door carrying a white trash bag which appeared to be full.

19  The subject walked off the deck and to the trash -- the City of

20  Davenport trash receptacle which is located right on the curb,

21  place the white trash bag in the trash receptacle and wheeled it

22  to the garage which is located directly behind the residence.

23    Q.   And what did you see take place next?

24    A.   I observed the male black subject disappear from my

25  view for just a couple seconds then reappear in my view and walk

1   back into the sliding glass door on the west side of 5372.  At

2   that time that male black subject was not carrying the trash

3   bag.

4       Q.   Now, Government's Exhibit 32, can you see where that

5   trash can would originally have been at when he put the bag and

6   it was at the curb?

7       A.   Yes, I do.

8       Q.   Can you maybe again tap the screen and show

9   approximately where it was at?

10      A.   (Witness complied.)

11      Q.   So you observed a subject put the bag in the trash

12  receptacle at that location?

13      A.   Yes, I did.

14      Q.   And then you saw him take that trash receptacle

15  somewhere else?

16      A.   Yes, I did.

17      Q.   What is shown in Government's Exhibit 36?

18      A.   These are the garages which are directly to the west,

19  directly behind the address of 5372 Linwood.

20      Q.   And does this photograph show where you saw that

21  individual take that trash receptacle?

22      A.   Yes, it does.

23      Q.   And again can you indicate on the screen where you

24  would have seen him take it?

25      A.   (Witness complied.)

1    Q.   Now, it looks like there's a trash receptacle in this

2    photograph.  Is that in the same location as where you saw him

3    wheel it to?

4    A.   Yes, it is.

5    Q.   At some point in time were you requested to enter and

6    secure the residence at 5372 North Linwood?

7    A.   Yes, I was advised by Sergeant Smull to secure the

8    residence.

9    Q.   And did any other officers assist you in doing that

10   entrance?

11   A.   Yes, Corporal Hutcheson, Detective Lansing, and

12   Detective -- or Sergeant Sbertoli with the Department of

13   Narcotics.

14   Q.   Were there any individuals that you -- when you

15   entered the residence how many occupants did you see?

16   A.   I saw three.

17   Q.   And were those occupants identified?

18   A.   Yes, they were.

19   Q.   Who were they identified as?

20   A.   Gilarime Mueller, Jeremy Canady, and Renata Wilson.

21   Q.   Approximately what time did you and these other

22   officers enter and secure this residence?

23   A.   We were in and secure at 5:19, approximately 5:19 p.m.

24   Q.   Did you conduct a search of the person of the

25   individual identified as Gilarime Mueller?

1      A.    Yes, I did, with his consent I searched his pockets.

2      Q.    Inside this envelope -- inside that envelope is an

3  item marked as Government's Exhibit 25.  Do you recognize what

4  that exhibit is?

5      A.    Yes, I do.

6      Q.    What do you recognize that as?

7      A.    The cell phone that I collected from Gilarime

8  Mueller's pockets.

9            MR. WESTPHAL:  At this time we move to admit

10 Government's Exhibit 25.

11           MR. DUSTHIMER:  No objection.

12           THE COURT:  It is received.

13 BY MR. WESTPHAL:

14     Q.    When you entered the residence to secure it, which

15 door did you use?

16     A.    Used the sliding glass door on the west side of the

17 residence.

18     Q.    The door shown in Government's Exhibit 35?

19     A.    Yes.

20     Q.    Okay.  Where did you first see Mr. Mueller?

21     A.    I saw -- first saw Mr. Mueller when I entered the

22 kitchen, after he opened the blind and allowed us entry into the

23 residence.

24     Q.    So the first room you enter is the kitchen off that

25 door?

1    A.    That's correct.

2    Q.    And that's the first spot you saw Mr. Mueller?

3    A.    Yes.

4    Q.    That same day, May 2, 2008, was a search warrant

5    obtained for 5372 North Linwood?

6    A.    Yes, it was.

7    Q.    And did you actually, as far as the documents, get

8    that search warrant signed?

9    A.    Yes, I did.

10    Q.    Approximately what time was that search begun?

11    A.    The search warrant was signed at approximately 7:58

12    p.m.  I notified officers after -- directly after the search

13    warrant was signed that it was signed and at that point the

14    search began.

15    Q.    Did you go to the residence and assist in the search?

16    A.    Yes, I did.

17    Q.    What areas did you assist in searching?

18    A.    I assisted in searching the upstairs east bedroom.

19    Q.    Describe what you saw in that bedroom.

20    A.    I met with Lieutenant Sikorski and Detective Lansing

21    who located an amount of currency in the bedroom.  I then

22    observed 17 bundles of cash laid out on the bed in the bedroom.

23    Q.    Did you see what those -- where that cash was at

24    before it was laid out on the bed?

25    A.    No, I did not.

1    Q.    Handing you Government's Exhibit 56 and 57, do I have

2  those numbers correct?

3    A.    56 and 57, correct.

4    Q.    Do you recognize what is shown in those photographs?

5    A.    Yes, I do.

6    Q.    What do you recognize that from?

7    A.    The upstairs east bedroom of 5372 Linwood.

8    Q.    So those photographs show what it looked like when you

9  first saw that money?

10    A.    Yes.

11        MR. WESTPHAL:  At this time move to admit Government's

12  Exhibits 56 and 57.

13        MR. DUSTHIMER:  No objections.

14        THE COURT:  They are received.

15  BY MR. WESTPHAL:

16    Q.    Government's Exhibit 56 shows what?

17    A.    Shows the bundles of money laid next to a pillowcase

18  on the bed at the east bedroom at 5372 Linwood.

19    Q.    That's where you first saw it?

20    A.    Yes.

21    Q.    Exhibit 57, what does that show?

22    A.    It shows the same bundles of currency laid out to show

23  the 17 separate bundles.

24    Q.    Did you assist in the count of that money?

25    A.    Yes, I did, I counted and recounted the money.

1     Q.   How much was there?

2     A.   $16,980 of United States currency.

3     Q.   My math, approximately $20 short of 17,000?

4     A.   That's correct.

5     Q.   Approximately how much is in each of those

6   rubberbanded-together bundles?

7     A.   Approximately $1,000.

8     Q.   At the Davenport Police Department when money of this

9   amount is seized, what happens to the money after it is seized?

10    A.   The money is transported to the police department at

11   which time a property and evidence custodian is called.  They

12   will actually respond to the station if we bring in anything

13   over $10,000, they will take custody of the money and deposit it

14   into an account.

15    Q.   Is the money itself kept as an exhibit, the actual

16   bills?

17    A.   No, it was deposited into an account.

18    Q.   So that -- those actual bills we see in Government's

19   57, that is not in evidence somewhere?

20    A.   Correct.

21    Q.   When you are going through and counting this money,

22   what type of denominations of bills did you see?

23    A.   Twenties, fifties, that's all I can remember.

24    Q.   Let's go back and ask you one more thing about your

25   securing the residence.  After you entered and secured the

1  inside of the residence, did you go back outside and do

2  something?

3      A.    Yes, I did.

4      Q.    What did you do?

5      A.    I walked out the west door, walked to the trash

6  receptacle which was located along the garages being the

7  furthest north receptacle on the northwest end of the garage,

8  opened the trash receptacle and observed a white trash bag with

9  a yellow drawstring and clearly visible through the top hole of

10  the drawstring ties I observed a blue bag consistent with that

11  what officers told me earlier --

12          MR. DUSTHIMER:  Objection.  Hearsay.

13          THE COURT:  Sustained.

14  BY MR. WESTPHAL:

15      Q.    What did you do with the bag?

16      A.    Took the bag in the kitchen, secured it.

17      Q.    Did you search it at that time?

18      A.    No, I did not.

19      Q.    Handing you Government's Exhibit 59 which is a

20  photograph, do you recognize what is shown in that photograph?

21      A.    Yes, I do.

22      Q.    What is shown in that photograph?

23      A.    The trash bag which I collected from the trash

24  receptacle behind the residence.

25      Q.    And when you placed it in the kitchen, is that how it

1  looked?

2      A.  Yes, it is.

3          MR. WESTPHAL:  At this time we move to admit

4  Government's Exhibit 59.

5          MR. DUSTHIMER:  No objection.

6          THE COURT:  Received.

7  BY MR. WESTPHAL:

8      Q.  On the screen in front of you is Government's Exhibit

9  59.  When you opened and took that trash bag out of the

10  receptacle, is that how it looked?

11     A.  Yes, it is.

12     Q.  Is that what you could see looking at the trash bag

13  without opening it?

14     A.  Yes, that's what I could see.

15         MR. WESTPHAL:  One second.

16         (An off-the-record discussion was held.)

17         MR. WESTPHAL:  I think those are my questions for now.

18  Thank you.

19         THE COURT:  Mr. Dusthimer?

20         MR. DUSTHIMER:  I believe I would have less than 15

21  minutes of questions, if I may.

22         THE COURT:  Go ahead.

23                      EXAMINATION

24  BY MR. DUSTHIMER:

25     Q.  Officer Westbay, you told us that you have been

1  involved in drug investigations as part of your career with the

2  Davenport Police Department, is that correct?

3      A.   Yes, that is correct.

4      Q.   And in that regard have you had opportunities to

5  observe buys and sells?

6      A.   Yes, I have.

7      Q.   And in that regard have you seen $50 rocks being sold

8  or bought?

9      A.   Yes, I have.

10     Q.   Every time a $50 rock has been sold has a $50 bill

11 been used?

12     A.   I wouldn't say every time.

13     Q.   Are there other denominations available?

14     A.   Yes, there are.

15     Q.   What would they be?

16     A.   Tens, twenties, fives, ones.

17     Q.   But your testimony was in what you saw there in your

18 counting of that money you didn't see anything other than

19 twenties and fifties, is that your testimony?

20     A.   I don't recall the exact denominations.

21     Q.   I am sorry.  I thought you said you saw nothing but

22 twenties and fifties.  Did I hear you wrong?

23     A.   I did see twenties and fifties.  I don't recall what

24 the other denominations of currency were.

25     Q.   That Exhibit 59, the photograph of the garbage can or

1    the garbage bag, I'm sorry, do you remember that?

2        A.    Yes, I do.

3        Q.    Did it look like it was garbage from inside a house?

4        A.    It appeared to be a trash bag full of --

5        Q.    Trash?

6        A.    -- trash, correct.

7        Q.    Down on the bottom right-hand corner, is that a box of

8    cereal?  Do you have that available?

9        A.    No, I do not.

10       Q.    Can you tell what this is down here?  (Indicating)

11       A.    I can't tell exactly what it is, no.

12       Q.    Does it look like it reads, "25 percent free?"

13       A.    Yes.

14       Q.    Something about three in one or something like that?

15       A.    Yes.

16       Q.    Garbage?

17       A.    It appears to be that in this, yes.

18       Q.    Would you expect to find fingerprints on that?

19       A.    Depending on what material it is made out of.

20       Q.    It looks like a cardboard box, doesn't it?

21       A.    Yes.

22       Q.    Would you expect to find fingerprints on that?

23       A.    Someone trained in fingerprint processing could

24    probably find fingerprints on that.

25       Q.    Would you expect there to be fingerprints actually on

1    that pack, that item?

2        A.    Yes, if someone took it to the garbage and put it in

3    the garbage, I assume there would be fingerprints on it.

4        Q.    If there were multiple people in the household, could

5    it be multiple people used that particular item?

6        A.    That is possible.

7        Q.    And if multiple people use that item, would there be

8    multiple sets of fingerprints on that item?

9        A.    That is possible, yes.

10        Q.    That Exhibit 25, do you have it in front of you?

11        A.    I do not have any exhibits in front of me.

12        Q.    Did you look at that Exhibit 25 for the purposes of

13    determining what the telephone number was in it?

14        A.    Exhibit 25 being the cell phone?

15        Q.    The cell phone, yes.

16        A.    I don't believe I did any cell phone logs.

17        Q.    But that's the cell phone number you seized from Mr.

18    Mueller?

19        A.    That is the cell phone I seized from Mr. Mueller, yes.

20        Q.    Any other cell phone?

21        A.    No, sir.

22        Q.    Sometimes I get a little nit-picky.  Is it your

23    testimony today that that back glass door on the back of this

24    residence in the 5300 block of Linwood is a sliding door?

25        A.    Yes, that is my testimony.

1      Q.   And if it was not a sliding door, is that just because

2 you are remembering things wrong or someone else has -- do you

3 have any photographs of that door being used?

4      A.   The photograph which I pointed out earlier shows that

5 door to be a glass door.

6      Q.   But as far as whether or not it is a regular hinged

7 door or sliding door, you don't have any photographs of that,

8 correct?

9      A.   No.

10      Q.   You testified that you helped prepare a search warrant

11 for that property, is that correct?

12      A.   That is correct.

13      Q.   And in that regard there has been other testimony that

14 basically you prepare a document, you review the document for

15 accuracy, and then you submit that written document to the Judge

16 for purposes of hoping the Court will allow you to go someplace

17 you would not otherwise be allowed to go, is that a fair

18 summary?

19      A.   That is fair.

20      Q.   And in that regard do you make the best

21 representations as far as what you believe to be true or

22 accurate in that document?

23      A.   Yes, I do.

24      Q.   Do you recall in your preparation of the search

25 warrant documentation how many people you swore under oath came

1  out of that residence along with Mr. Canady when he left?

2      A.    Three.

3      Q.    Besides Mr. Canady I think is what my question was.

4      A.    I'm sorry.  Two besides Mr. Canady.

5      Q.    It was Mr. Canady plus two others?

6      A.    That's correct.

7      Q.    Was that your personal observation or the observation

8  of others?

9      A.    The observations of others.

10     Q.    And something you relied upon?

11     A.    That is correct.

12     Q.    Did you talk to the other officers who actually saw

13  that or did some other officers tell you that that was accurate?

14     A.    I believe I spoke with the officer that actually

15  observed that.

16     Q.    Do you remember who that was?

17     A.    Detective Hutcheson.

18     Q.    I am not finding the image so I am going to ask you,

19  when you indicated on Exhibit 36 which was the car, garages, and

20  the garbage cans, you put an X on the garbage can closest to the

21  lens of the camera, that that was in the center part of the

22  photograph, is that correct?

23     A.    That is correct.

24         MR. DUSTHIMER:  Thank you.  That's all the questions I

25  have.

1    THE COURT:  Anything else, Mr. Westphal?

2    MR. WESTPHAL:  No, Your Honor.

3    THE COURT:  Thanks.  You are excused.  Okay.  Members

4  of the jury, we will take our noon recess.  We are going to

5  begin again at 1:30.  I could be just a few minutes late because

6  I start another hearing upstairs at one o'clock.  I think I can

7  get it done in a half an hour, but I am just telling you I could

8  be a couple minutes late.

9    Remember the admonitions that have been earlier given,

10  not to discuss this case amongst yourselves or remain within

11  earshot of anyone discussing it.  Keep an open mind.  Wait till

12  you hear all the evidence, the arguments, and the instructions

13  of the law before finally making up your mind.  With that, thank

14  you, and we will see you at 1:30.

15    (A recess was taken from 12:08 p.m. until 1:37 p.m.)

16    (In the presence of the jury.)

17    THE COURT:  Please be seated.  Call your next witness.

18    THE COURT:  I call John Hutcheson.

19                    JOHN HUTCHESON,

20  witness herein, called as a witness by the government, after

21  having been first duly sworn, was examined and testified as

22  follows:

23    THE COURT:  When you are comfortably seated there,

24  state your name and spell your last name for us.

25    THE WITNESS:  John Hutcheson, H-u-t-c-h-e-s-o-n.

EXAMINATION

BY MR. WESTPHAL:

Q.    Good afternoon.  What is your current occupation?

A.    Police officer with the City of Davenport.

Q.    How long have you been a City of Davenport Police
Officer?

A.    24 years.

Q.    On May 2nd of 2008 did you assist in some surveillance
in relation to an investigation?

A.    Yes.

Q.    Where did you go first on that day?

A.    The vicinity of the 2300 block of Linwood Avenue.

Q.    What type of location was the focus of the
surveillance?

A.    Matthew Canady, his residence at 2319 Linwood.

Q.    From where you were at initially could you actually
see the residence?

A.    Yes.

Q.    Did you from 2319 North Linwood assist in surveillance
at another location?

A.    Yes.

Q.    Where next?

A.    Enterprise Rent-a-Car.

Q.    And again Enterprise Rent-a-Car, could you actually
see the activity that was going on at the rent-a-car place?

1    A.    No, I could not.

2    Q.    And from the rent-a-car place where did you go next?

3    A.    Back to the 2319 Linwood Avenue address.

4    Q.    Did you actually see any vehicles that arrived back in

5    the area of that address at the same time?

6    A.    Yes.

7    Q.    What vehicles did you see?

8    A.    A silver Grand Prix I believe it was and a Volkswagen

9    -- sort of Volkswagen that they rented at Enterprise.

10    Q.    Now, was there a third vehicle involved in this

11    investigation, a Denali?

12    A.    Yes.

13    Q.    At some point did you see that vehicle as part of your

14    surveillance?

15    A.    Yes, I did.

16    Q.    And where did you see that vehicle at?

17    A.    I seen that vehicle in the garage behind the residence

18    with Matt Canady and one of the children.

19    Q.    So you saw -- did you see how it got in the garage?

20    A.    No.  When I came -- I was coming north through the

21    alley, I seen him in the garage with the vehicle.

22    Q.    At some point in time did a vehicle leave the area of

23    2319 North Linwood and go to another location?

24    A.    Yes.

25    Q.    Did you actually see that vehicle leave?

1    A.    Yes, I did.

2    Q.    And where did that vehicle -- which vehicle left?

3    A.    The silver Volkswagen.

4    Q.    And where did that vehicle or where was that vehicle

5    observed to go?

6    A.    To 5372 North Linwood.

7    Q.    Did you actually see where that vehicle parked?

8    A.    Yes, I did.

9    Q.    Describe for us the area where that vehicle parked at

10   5372.

11   A.    5372 is a row of townhouses, the vehicle parked at the

12   rear of that to the north of the garages.

13   Q.    Government's Exhibit 36, do you recognize what is

14   shown in that exhibit?

15   A.    Yes.

16   Q.    In relation to the -- well, what do you recognize that

17   as?

18   A.    That is the garages behind the residence on North

19   Linwood.

20   Q.    Did the Volkswagen Passat park near this set of

21   garages?

22   A.    Yes, it did.

23   Q.    Would it be shown on this photograph or the

24   approximate location on this photograph?

25   A.    Roughly where -- roughly where this blue car is.

1  (Indicating)

2      Q.   Can you maybe tap the screen and --

3           THE COURT:  Tap it a little harder.  There you go.

4  BY MR. WESTPHAL:

5      Q.   Where you put the arrow, that is where the Passat

6  parked?

7      A.   Roughly in that area.

8      Q.   Now, from your vantage point could you see someone get

9  out of the Volkswagen Passat?

10     A.   Yes.

11     Q.   And how many people got out?

12     A.   One.

13     Q.   And describe for us what you saw when that individual

14 got out of the Passat.

15     A.   He got out of the vehicle, he was carrying a blue

16 shopping type of a bag, plastic type bag, walked directly into

17 the back door of 5372 North Linwood.

18     Q.   Do you know approximately what time this was when this

19 individual arrived and went inside?

20     A.   Approximately 5:18.

21     Q.   Government's Exhibit Number 35, do you recognize what

22 is shown on that photograph?

23     A.   Yes.

24     Q.   And is the door visible in that photograph where you

25 saw the subject go in?

1      A.   Yes, it is.  (Indicating)

2      Q.   Just so we are clear, can you tap -- there you go.

3  Right there?

4      A.   Right there.  (Indicating)

5      Q.   Did you remain in that area conducting surveillance?

6      A.   Yes, I did.

7      Q.   Did you see that same subject come back out of the

8  residence?

9      A.   Yes, I did.

10      Q.   How much time had passed between the time you first

11  saw him go in and the time he came back out?

12      A.   I believe he came out around -- it was roughly an hour

13  and a half.

14      Q.   Do you remember approximately what time he came back

15  out?

16      A.   I believe it was 4:59.

17      Q.   And what did you see that subject do when he came back

18  out?

19      A.   He came out of the back door of the residence with two

20  other subjects who walked toward the vehicle.

21      Q.   Did you see how many subjects got in the vehicle?

22      A.   No.

23      Q.   When he came back out of the residence did you see any

24  of those subjects -- let's start with the -- did you see the

25  subject you saw enter the residence come back out?

1      A.    Yes.

2      Q.    Did he have anything in his hands when he came back

3  out?

4      A.    Not that I could see.

5      Q.    Did the second subject or the third subject have

6  anything in their hands when they came out?

7      A.    No.

8      Q.    Did you actually see the Passat drive away?

9      A.    Yes, I did.

10     Q.    Once they drove away what was your job at that point?

11     A.    When they came out, I drove toward the residence to

12  see what they were doing.  At that time the Passat was coming

13  out of the driveway.  I then followed it over to an area of 54th

14  and Pine while terminating my surveillance of it and terminated

15  it and back to the residence.

16     Q.    When you went back to the residence what vantage point

17  did you take?

18     A.    I took up surveillance in front of the residence.

19     Q.    At some point in time were you asked to go and secure

20  the residence?

21     A.    Yes.

22     Q.    Where did you go to attempt to enter the residence?

23     A.    The back door of the residence.

24     Q.    Describe for us what you did when you got to the back

25  door.

1     A.   Myself and Special Agent Sbertoli with DNE went up

2 onto the back porch, I knocked at the back door, a subject who

3 was later identified as Gilarime Mueller asked who it was.  I

4 told him at that time it was UPS to attempt to gain entry

5 through that door.

6     Q.   What happened next?

7     A.   He came to the door, opened up the blind on the door,

8 I identified myself as a police officer, at that time I was

9 wearing a police T-shirt that says police across the front of it

10 and I had a badge on as well.

11    Q.   And what was his response?

12    A.   He responded by locking the door and shutting the

13 blind.

14    Q.   What did you do next?

15    A.   I then told him to open the door several times and

16 then began to attempt to force the door open.

17    Q.   And what happened next?

18    A.   Then he returned to the door, unlocked it, and opened

19 it.

20    Q.   A subject from the inside returned to the door,

21 unlocked it, and opened it?

22    A.   Yes, Gilarime Mueller did.

23    Q.   At this point in time who all was at the back door as

24 far as law enforcement officers?

25    A.   Myself, Special Agent Sbertoli, and Corporal Westbay.

1    Q.   Did you and other officers enter the residence at that

2    time?

3    A.   Yes.

4    Q.   The subject that answered the door, did you see him

5    when you went inside?

6    A.   Yes.

7    Q.   And where was he at when you went inside?

8    A.   Standing just inside the door.

9    Q.   Was that individual later identified?

10   A.   Yes.

11   Q.   Who was he identified as?

12   A.   Gilarime Mueller.

13   Q.   How many individuals were inside the residence when

14   you and the other two officers entered?

15   A.   Three adults and one infant.

16   Q.   Were the other individuals inside the residence

17   identified?

18   A.   Yes.

19   Q.   Who were they identified as?

20   A.   Jeremy Canady, Renata Wilson, and her infant daughter.

21   Q.   If you saw the Gilarime Mueller that was inside that

22   residence on May 2, 2008, again, would you recognize him?

23   A.   Yes.

24   Q.   Do you see him in court anywhere here this afternoon?

25   A.   Yes, I do.

1    Q.    Can you describe where he is at so we know who you are

2    talking about?

3    A.    He is seated next to Mr. Dusthimer.

4    Q.    Did you remain with the occupants inside 5372 North

5    Linwood while a search warrant was obtained?

6    A.    Yes.

7    Q.    Approximately what time was the search warrant signed?

8    A.    I believe it was roughly 7:58.

9    Q.    Once you -- how were you advised the search warrant

10   was signed?

11   A.    By phone.

12   Q.    Once you learned the search warrant was signed did you

13   begin to search the residence?

14   A.    Yes, we did.

15   Q.    What areas of the residence did you search?

16   A.    I searched the kitchen area of the residence.

17   Q.    And what items did you find in the kitchen -- well,

18   let me ask you this first.  Do you recall anything at all about

19   how the kitchen was laid out, what was in the kitchen?

20   A.    As soon as you came in the back door, went into the

21   kitchen area, had little bar area set up directly in front of

22   that leading into the living room.  Off to the right was a

23   kitchen table.

24   Q.    So what items did you find in your search of the

25   kitchen area?

1      A.    On top of the cupboard along the north wall was a

2 black digital scale.

3      Q.    Did you find anything else?

4      A.    Yes.

5      Q.    What else did you find?

6      A.    A Pyrex bowl in the northwest cupboard, in the dish

7 rack was a plastic measuring cup, in the drawer, the bottom

8 drawer of the cupboard next to the refrigerator were several

9 plastic shopping type bags.

10      Q.    Did you search a trash bag?

11      A.    Yes.

12      Q.    What items were collected out of that trash bag?

13      A.    Directly on top of that trash bag was a bag similar to

14 the type that Matt Canady carried into the residence.

15      Q.    Was anything else collected out of that trash bag?

16      A.    Yes.

17      Q.    What else?

18      A.    Well, that was a yellow shopping type of a bag,

19 grocery bag.

20      Q.    I just handed you Government's Exhibits 59 through 64

21 which is a series of photographs, is that correct?

22      A.    Yes.

23      Q.    Do you recognize what those photographs depict?

24      A.    Yes, 59 through 62 are the trash bag and the bag

25 seized from within that.

1     Q.   And 62 through 64?

2     A.   63 is a -- the black digital scale on top of the

3 cupboard.  64 is the dish rack which contained the measuring

4 cup.

5     Q.   Did you take those photographs?

6     A.   Yes.

7     Q.   Those are taken on May 2, 2004, in the kitchen of 5372

8 North Linwood?

9     A.   Yes.

10     MR. WESTPHAL:  At this time we move to admit

11 Government's Exhibits 59 through 64.

12     MR. DUSTHIMER:  No objection.

13     THE COURT:  59 through 64 are received.

14 BY MR. WESTPHAL:

15     Q.   What is shown in Government's Exhibit 59?

16     A.   That is the trash bag which Corporal Westbay retrieved

17 from the trash can and brought back into the residence.

18     Q.   Where is that located in the house?

19     A.   That is in the kitchen next to the stove.

20     Q.   Is that how that bag looked before you opened it?

21     A.   Yes.

22     Q.   What is shown in Government's Exhibit 60?

23     A.   It shows the blue bag that's on top of the trash as I

24 opened the bag.

25     Q.   Government's Exhibit Number 61, what does that show?

1      A.    That is a yellow grocery shopping bag which was

2  underneath the blue bag.

3      Q.    So these photographs, 60, you would have removed that

4  blue bag, this is what was immediately underneath it?

5      A.    Yes.

6      Q.    Exhibit 62, what does that show?

7      A.    That is the front of the blue bag which is a Barkan's

8  bag, shopping bag.

9      Q.    Government Exhibit 63, what does that depict?

10     A.    The digital scale on top of the cupboard.

11     Q.    How did you find that up there?

12     A.    Climbed on top of the cupboards.

13     Q.    Could you see it standing on the floor of the kitchen?

14     A.    No.

15     Q.    Government's Exhibit 64, what does that depict?

16     A.    That is the dish rack which contains the measuring

17  cup.

18     Q.    Were those items shown in those photographs collected

19  as evidence?

20     A.    Yes.

21     Q.    You are familiar with how evidence is gathered,

22  collected, and entered into evidence at the Davenport Police

23  Department, is that correct?

24     A.    Yes, I am.

25     Q.    Handing you Government's Exhibit 17 along with a bag.

1  Can you tell from looking at those two items together whether or

2  not the normal procedures for collecting and entering evidence

3  were followed in relation to that exhibit?

4       A.   Yes.

5       Q.   Do you recognize Government's Exhibit 17?

6       A.   Yes, I do.

7       Q.   Does it appear to be an object that you observed on

8  May 2, 2008, in the kitchen of this residence?

9       A.   Yes.

10      Q.   Does it appear to be in the same or substantially same

11 condition as when you last saw it?

12      A.   After being fingerprinted, yes.

13           MR. WESTPHAL:  We move to admit Government's Exhibit

14 17.

15           MR. DUSTHIMER:  No objection.

16           THE COURT:  It is received.

17 BY MR. WESTPHAL:

18      Q.   Showing you Government's Exhibit 19, can you tell from

19 looking at the envelope and the exhibit whether or not the

20 proper procedures were followed for collecting and entering that

21 into evidence?

22      A.   Yes.

23      Q.   Do you recognize Government's Exhibit 19?

24      A.   Yes, I do.

25      Q.   Does it appear to be in the same or substantially same

1    condition as when you last saw it in the kitchen of this

2    residence?

3         A.    Yes.

4               MR. WESTPHAL:  Move to admit Government's Exhibit 19.

5               MR. DUSTHIMER:  No objection.

6               THE COURT:  Received.

7    BY MR. WESTPHAL:

8         Q.    Handing you a bag, Government's Exhibit 16, can you

9    tell from looking at those two items whether the proper

10   procedures for entering evidence were followed?

11        A.    Yes.

12        Q.    Do you recognize Government's Exhibit 16?

13        A.    Yes, I do.

14        Q.    Does it appear to be in the same or substantially same

15   condition as when you last observed it at this residence?

16        A.    Yes, except for it was fingerprinted for prints.

17        Q.    Okay.

18              MR. WESTPHAL:  Move to admit Government's Exhibit 16.

19              MR. DUSTHIMER:  No objection.

20              THE COURT:  Received.

21   BY MR. WESTPHAL:

22        Q.    What is Government's Exhibit 16?

23        A.    A Pyrex bowl.

24        Q.    We forgot to say what is Government's Exhibit 17?

25        A.    Measuring cup.

1    Q.    Government's Exhibit 19?

2    A.    Scale, digital scale.

3    Q.    Handing you what is marked as Government's Exhibit 18

4    which is a paper sack, can you open that for us?  Can you look

5    inside the bag and see what's inside there?

6    A.    Yes.

7    Q.    Looking at the bag and the items inside does it appear

8    that the proper procedures were followed for collecting and

9    placing that item into evidence?

10    A.    Yes.

11    Q.    Does it appear to be the same items you seized on May

12    2, 2008?

13    A.    Yes.

14         MR. WESTPHAL:  At this time we move to admit

15    Government's Exhibit 18.

16         MR. DUSTHIMER:  No objection, Your Honor.

17         THE COURT:  18 is received.

18    BY MR. WESTPHAL:

19    Q.    What is Government's Exhibit 18?

20    A.    It is a yellow plastic shopping bag that was taken

21    from the trash bag.

22    Q.    Handing you a bag and an item marked as Government's

23    Exhibit 21, can you tell from looking at the bag and that item

24    if the same proper procedures were followed for collecting and

25    putting that into evidence?

1    A.   Yes.

2    Q.   Do you recognize that item?

3    A.   Yes, I do.

4    Q.   Do you recognize that item from seeing it in the

5  kitchen on May 2nd of 2008 at this residence?

6    A.   Yes.

7    Q.   Does it appear to be in the same or substantially same

8  condition as where you last saw it?

9    A.   Yes, it is.

10        MR. WESTPHAL:  Move to admit Government's Exhibit 21.

11        MR. DUSTHIMER:  No objection.

12        THE COURT:  Received.

13  BY MR. WESTPHAL:

14   Q.   Government's Exhibit 22 is a sealed bag.  Can you open

15  that, please?  Can you just look inside the bag?

16   A.   (Witness complied.)

17   Q.   Can you tell from looking at the bag and the item if

18  the proper procedures were used entering that item into

19  evidence?

20   A.   Yes.

21   Q.   Do you recognize that item from seeing it inside the

22  kitchen on May 2, 2008?

23   A.   Yes, I do.

24   Q.   Does it appear to be in the same or substantially same

25  condition?

1      A.   Yes.

2           MR. WESTPHAL:  We move to admit Government's Exhibit

3      22.

4           MR. DUSTHIMER:  Let me see.  No objection.

5           THE COURT:  It is received.

6      BY MR. WESTPHAL:

7      Q.   Government's Exhibit 23 again is a sealed bag.  Can

8      you open that for us, please?  Did you look inside?  Can you

9      tell looking at the bag and the items inside again if the proper

10     procedures were followed for entering that item and collecting

11     it and putting it into evidence?

12     A.   Yes.

13     Q.   Do you recognize those items?

14     A.   Yes.

15     Q.   Do they appear to be in the same condition as when you

16     saw them inside the kitchen on May 2nd of 2008?

17     A.   Yes.

18          MR. WESTPHAL:  At this time I move to admit

19     Government's Exhibit 23.

20          MR. DUSTHIMER:  No objection.

21          THE COURT:  Received.

22     BY MR. WESTPHAL:

23     Q.   Can you tell us what Exhibit 23 is?

24     A.   Several plastic shopping bags which were taken from

25     the lower kitchen cupboard drawer next to the refrigerator.

1    Q.   And back to 22, can you just identify for us what was

2    in that bag?

3    A.   That is the blue Barkan's shopping bag which was on

4    top of the trash bag.

5    MR. WESTPHAL:   I think those are my questions for now,

6    Detective Hutcheson.   Thank you.

7    THE COURT:   Mr. Dusthimer?

8    MR. DUSTHIMER:   Thank you.

9                          EXAMINATION

10   BY MR. DUSTHIMER:

11   Q.   Tell us more, please, Exhibit 23, what is it?

12   A.   It is plastic grocery shopping bags.

13   Q.   And about how many?   I don't need an exact count, but

14   I don't know if there's five or 10 or 50 in there.   Just

15   roughly.

16   A.   There's several of them in there.   Do you want me to

17   count them for you?

18   Q.   Just give me a rough quick ball park.   I don't want

19   you to sit here and count out loud for each one of us.

20   A.   More than five.

21   Q.   That's fine.

22   A.   Okay.

23   Q.   How long have they been underneath the kitchen

24   cupboard?

25   A.   I have no idea, sir.

1    Q.    Who put them there?

2    A.    Excuse me?

3    Q.    Who put them there?

4    A.    I have no idea.

5    Q.    Were any of those tested for fingerprints?

6    A.    Not to my knowledge, no.

7    Q.    Exhibit -- which one is it -- 18 is the plastic sack

8    which was taken out of the garbage right underneath the blue bag

9    which I think is Exhibit 22.  If I tell you that that's Exhibit

10   18, do you have any problems working with it in that fashion?

11   A.    I have no problem with that.

12   Q.    That is the yellow one that you found in the garbage

13   can itself or in the garbage bag itself?

14   A.    That's right.

15   Q.    How long had that been in there?

16   A.    I have no idea, sir.

17   Q.    How many fingerprints were on there?

18   A.    I didn't fingerprint it, sir.

19   Q.    How many different people could have touched that bag?

20   A.    There again, I couldn't tell you.

21   Q.    Over what period of time?

22   A.    I couldn't tell you, sir.  It was taken out of the

23   house while we were there.

24   Q.    You wouldn't be surprised if you went in 95 percent of

25   households and found a measuring cup in there, would you?

1        A.    No.

2        Q.    Same with a Pyrex bowl?

3        A.    No.

4        Q.    Same with baking soda?

5        A.    No.

6        Q.    Baking soda, was there any indication -- I'm sorry.

7   Was there any indication to you that that had been touched

8   lately or used in the recent past?

9        A.    It was an open box.

10       Q.    Help me understand.  What does that mean?  Was it on

11  the countertop or was it in the cabinet?

12       A.    It was in a cabinet above the stove I believe.

13       Q.    Any idea how long it had been there since it was last

14  used?

15       A.    No.

16       Q.    You mention different items and I don't remember which

17  ones that look substantially similar to when you saw them last

18  except they appear to have been fingerprinted, do you recall

19  that testimony?

20       A.    Yes.

21       Q.    Did the scale appear to be fingerprinted?  You can

22  look at it now if you want.

23       A.    I'm not sure if the scale was fingerprinted or not.

24       Q.    Then I think that was Exhibit 19 if that will help.  I

25  have a tendency of jumping around, but I always try to help you

1   make sure you understand.  When you approach the door, you

2   knocked and you said what?

3         A.    UPS.

4         Q.    Is that for United Parcel Service?

5         A.    Yes.

6         Q.    You didn't mind telling a fib to get somebody to the

7   door?

8         A.    No.

9         Q.    After Mr. Mueller looked out and closed the blind, how

10  did he lock the door?

11        A.    Locked the dead bolt.

12        Q.    So was this a door that swung open?

13        A.    Swung open.

14        Q.    We're talking about a door you can see here?

15        A.    Yes.

16        Q.    On Exhibit 35 would you tap the door, please?

17        A.    (Witness complied.)

18        Q.    There.  It is not showing up on this screen.  I'm

19  sorry.  You are talking about the plain door, first level by the

20  porch, in the brown section of the building, correct?

21        A.    That's correct.

22        Q.    It is not a sliding door?

23        A.    It is not.

24        Q.    When Mr. Mueller hit the dead bolt, pulled the blind,

25  did you hear anything?

1    A.   No.

2    Q.   So you didn't -- you had been -- you have approached

3 houses before, correct?

4    A.   That's correct.

5    Q.   You have approached houses in your official

6 capacity --

7    A.   Yes.

8    Q.   -- when you are wanting to get inside the building,

9 when you want to get inside?  Is that a yes?

10    A.   Yes.

11    Q.   Okay.  And sometimes when you knock and you announce

12 police you will hear people screaming inside, won't you?

13    A.   Sometimes you do, sometimes you don't.

14    Q.   Sometimes it is not very kind words regarding police?

15    A.   Right.

16    Q.   Sometimes it's -- they're here, maybe flush the stuff

17 or words like that?

18    A.   Sometimes you hear things, sometimes you don't.

19    Q.   And you didn't hear anything here?

20    A.   No, I did not.

21    Q.   Have there been times where you had been to houses and

22 you have subsequently found out that someone inside the house

23 who had just left had just smoked some marijuana?

24    A.   Yes.

25    Q.   Okay.  Have there been times when the other people in

1    the house were able to detect the odor of marijuana after the

2    person who smoked it left?

3          A.    Yes.

4          Q.    Have there been times when you have gone in a

5    residence after someone has smoked marijuana and left and you

6    were able to detect it?

7          A.    Yes.

8          Q.    If the person who had just left after they smoked

9    marijuana and other people are still in the house, do sometimes

10   those people get nervous because the police are at the door?

11         A.    People get nervous for different reasons.

12         Q.    Is it sometimes because police are at the door and

13   somebody else just committed a crime inside?

14         A.    I can't tell what they get nervous for.

15         Q.    How many cell phones do you remember finding inside

16   the residence?

17         A.    I seized one.

18         Q.    Which one was that?  Do you remember?

19         A.    The one on the kitchen table I believe.

20         Q.    In your professional experience have there been times

21   where you have seen end users have scales, digital scales?

22         A.    Excuse me?

23         Q.    Have there been times where in an arrest or in an

24   investigation people who are consuming drugs have for their use

25   a digital scale?

1    A.   Yes, but not that often.

2    Q.   But you have seen it, correct?

3    A.   Yes.

4    Q.   And, in fact, down in the basement of this house you

5    found a marijuana cigar, is that correct?

6    A.   I did not, no.

7    Q.   Are you aware that one was found in the basement?

8    A.   I am not, no.

9    Q.   When you went in was there anything else that you

10   smelled or is there anything that you smelled when you went into

11   the house?

12   A.   I didn't smell anything when I went into the house.

13   Q.   You didn't smell any marijuana odor?

14   A.   No.

15   Q.   You did not smell any vinegar odor?

16   A.   No.

17   Q.   Did you see any vinegar inside the house?

18   A.   I didn't look for any, no.

19        MR. DUSTHIMER:  Thank you.  That's all.

20                    FURTHER EXAMINATION

21   BY MR. WESTPHAL:

22   Q.   Gilarime locked the dead bolt on the door, was that

23   before or after he looked outside?

24   A.   It was after.

25   Q.   When he looked outside at that point where were you

1  at?

2       A.   I was standing to the -- as you are facing the back

3  door, I was to the left of it.

4       Q.   Were there other officers up on that porch with you?

5       A.   Yes.

6       Q.   In your -- how many years have you been a Davenport

7  police officer?

8       A.   24.

9       Q.   How many of those years have you focused on narcotics

10  type investigations?

11       A.   Approximately nine.

12       Q.   And in those nine years, actually in those 24 years

13  you have come into contact with individuals that use crack

14  cocaine?

15       A.   Yes.

16       Q.   How common is it for them to carry around a digital

17  scale?

18       A.   Not very common at all.

19            MR. WESTPHAL:  Those are my questions.

20            THE COURT:  Anything else?

21            MR. DUSTHIMER:  None.  Thank you.

22            THE COURT:  Thank you.  You are excused.

23            MR. WESTPHAL:  I am going to call Scott Lansing.

24

25                           SCOTT LANSING,

1    witness herein, called as a witness by the government, after

2    having been first duly sworn, was examined and testified as

3    follows:

4         THE COURT:  When you are comfortably seated there,

5    state your name and spell your last name for us.

6         THE WITNESS:  Scott Lansing, L-a-n-s-i-n-g.

7                    EXAMINATION

8    BY MR. WESTPHAL:

9         Q.  Good afternoon.  Can you tell us your occupation for

10   the record?

11        A.  I'm a vice detective with the Davenport Police

12   Department.

13        Q.  How long have you been with Davenport Police

14   Department?

15        A.  Just over seven years.

16        Q.  On May 2nd of 2008 did you assist in the search of a

17   residence at 5372 North Linwood Avenue?

18        A.  I did.

19        Q.  And what areas of that residence did you assist in

20   searching?

21        A.  Primarily the upstairs master bedroom.

22        Q.  When you first went into the master bedroom what did

23   you see?

24        A.  Walked in, there's a corner bedroom, the door is off

25   to the right corner, and you walked in, there's a dresser right

1   here, (Indicating) the bed was just on that wall, (Indicating)

2   there's a dresser drawers with a mirror on top of it, and then

3   an end table on the far side of the bed (Indicating) with a

4   closet in that corner (Indicating) of the room.

5       Q.   What items in that room were you involved in

6   searching?

7       A.   Found a little bit of marijuana in the top drawer --

8   in the top drawer and on top of the dresser, there was also 17

9   -- just shy of $17,000 that was found in a pillowcase of the

10  bed.

11      Q.   Where was that pillowcase at?

12      A.   It was sitting on that nightstand on the far side of

13  the bed.

14      Q.   The pillowcase or a pillow in a pillowcase?

15      A.   There was a pillowcase with a pillow and cash inside.

16      Q.   Did you take pictures of that upstairs master bedroom

17  before items were actually collected?

18      A.   Yes, I did.

19      Q.   I have just handed you a series of photographs, 53

20  through 58.  Do you recognize those photographs?

21      A.   Yes, I do.

22      Q.   Are they the ones that you took on May 2, 2008, of

23  that upstairs master bedroom?

24      A.   Yes, sir.

25           MR. WESTPHAL:  At this time we move to admit

1  Government's Exhibits 53 through 58.

2          MR. DUSTHIMER:  No objection.

3          THE COURT:  53 through 58 are received.

4  BY MR. WESTPHAL:

5      Q.    That is Government's Exhibit 53 on the screen,

6  correct?

7      A.    Correct.

8      Q.    What is shown in that photograph?

9      A.    That's the top of the dresser.  When you walk in it is

10  just right -- to the right of the door.

11      Q.    Did you seize an item that looks like it is in the

12  middle of that picture?

13      A.    On top of the Kleenex box there's a pink I think it is

14  a Motorola RAZR phone which was sitting on top of that blue box.

15      Q.    I will show you what's marked -- an envelope what is

16  marked as Government's Exhibit 86.  Can you identify what that

17  is?

18      A.    Yup, that's the phone that was sitting there on top of

19  the Kleenex.

20      Q.    Are you the individual that seized and placed that

21  item into evidence?

22      A.    Correct.

23      Q.    Does that appear to be the same phone you saw in this

24  upstairs bedroom on May 2, 2008?

25      A.    Yes, sir.

1          MR. WESTPHAL:  Move to admit Government's Exhibit 86.

2          MR. DUSTHIMER:  No objection.

3          THE COURT:  Received.

4     BY MR. WESTPHAL:

5          Q.   Government's Exhibit 54, what does that show?

6          A.   It's an overview of the closet of that bedroom.

7          Q.   Government's Exhibit 55, what does that show?

8          A.   That's the end table in the far corner of the room

9     with the pillow where the money was located.

10         Q.   Exhibit 56, what does that show?

11         A.   That's after I removed the pillow and I dumped the

12    contents of the pillowcase out.

13         Q.   What are those contents?

14         A.   It's 17 individually wrapped -- I think it was about a

15    thousand dollars each, I think there was one bundle that was $20

16    short of $1,000, but there's 17 bundles total.

17         Q.   That's all the contents that were in that pillow that

18    you dumped out?

19         A.   Yes, sir.

20         Q.   Government's Exhibit 58, what is shown in that

21    photograph?

22         A.   That's from the top drawer of that first dresser, it's

23    cash, I think it was a total of $200.

24         Q.   The dresser in Government's Exhibit 53?

25         A.   Yes, sir.

1      Q.   Handing you an envelope and an item marked as

2   Government's Exhibit 24, do you recognize that item?

3      A.   Yes, sir.

4      Q.   And is that something you seized out of this upstairs

5   bedroom on May 2nd of 2008?

6      A.   Yes, sir.

7      Q.   And does it appear to be the same item that you seized

8   and placed into evidence?

9      A.   Yes, it is.

10          MR. WESTPHAL:  I move to admit Government's Exhibit

11  24.

12          MR. DUSTHIMER:  No objection.

13          THE COURT:  24 is received.

14  BY MR. WESTPHAL:

15      Q.   What is Government's Exhibit 24?

16      A.   It is a receipt from Western Union with Gilarime

17  Mueller's name on it and signature.

18      Q.   Where did you find that?

19      A.   That was in the top drawer along with the $200, that

20  same dresser.

21      Q.   The bag that is marked Government Exhibit 20, do you

22  recognize those items?

23      A.   Yes, I do.

24      Q.   Are those items that you seized out of this upstairs

25  bedroom on May 2, 2008?

1      A.   Yes.

2      Q.   Does it appear to be in the same or substantially the

3 same condition as when you seized it?

4      A.   Yes, sir.

5           MR. WESTPHAL:  We move to admit Government's Exhibit

6 20.

7           MR. DUSTHIMER:  20?  No objection.

8           THE COURT:  Sustained.  Received.

9 BY MR. WESTPHAL:

10      Q.   What is Government's Exhibit 20?

11      A.   It is a pillowcase for the pillow where the cash was

12 found.

13           MR. WESTPHAL:  I think those are my questions for now.

14 Thank you.

15           THE COURT:  Mr. Dusthimer?

16                    EXAMINATION

17 BY MR. DUSTHIMER:

18      Q.   I see you brought some papers with you.

19      A.   Yes, sir.

20      Q.   Are those the various reports that helped you refresh

21 your recollection for today?

22      A.   Yes, sir.

23      Q.   Was part of your function in this investigation

24 checking the various phone records and cross linking them to

25 telephones?

1      A.   I checked one of the phones that was sitting on the

2   confidential informant's end table that day, yes.

3      Q.   Do you know which phone that is as you sit here today?

4      A.   It's none of the exhibits I was shown today.

5      Q.   Did you look through the various amounts of money?

6      A.   I pulled out the cash, I put it in little rows and

7   everything.

8      Q.   We saw a picture of that.

9      A.   Yes, that's all I did.  Corporal Westbay is the one

10   that actually counted it out.  I did not count it.

11      Q.   So you don't know what kind of denominations there

12   were?

13      A.   No, sir.

14            MR. DUSTHIMER:  Thank you.  That's all.

15            THE COURT:  Anything else?

16            MR. WESTPHAL:  Nothing else.

17            THE COURT:  Thank you.  Call your next witness.

18            MR. WESTPHAL:  We call Tara Loose.

19                        TARA LOOSE,

20   witness herein, called as a witness by the government, after

21   having been first duly sworn, was examined and testified as

22   follows:

23            THE COURT:  When you are comfortably seated there,

24   state your name and spell your last name for us.

25            THE WITNESS:  Tara Loose, L-o-o-s-e.

1          THE COURT:  Go ahead.

2                        <u>EXAMINATION</u>

3     BY MR. WESTPHAL:

4          Q.    Good afternoon.  Can you tell us your occupation?

5          A.    I am a crime scene evidence technician with the

6     Davenport Police Department.

7          Q.    And how long have you been employed by the Davenport

8     Police Department?

9          A.    Approximately three years.

10         Q.    Are you considered a police officer, law enforcement

11    officer?

12         A.    No, I am not.

13         Q.    What does an evidence technician do?

14         A.    We go to -- we respond to crime scenes, collect

15    evidence, we process evidence, photograph scenes.

16         Q.    Have you received some type of specialized education

17    and training in how to process items for fingerprints?

18         A.    In the beginning my training came from another

19    evidence technician.  I did ride along as he trained me to do

20    all the basics for fingerprinting, photographing, then I was

21    trained through a 40-hour course on basic crime scene.

22         Q.    And is there any type of testing or anything upon

23    completion of that course?

24         A.    No, there is not.

25         Q.    And in addition to the education you have had actually

1  on-the-job training by someone that is also familiar with how to

2  process items, is that correct?

3      A.   Yes, I did.

4      Q.   What are some of the most common items at Davenport

5  you process for fingerprints?

6      A.   We do a lot of baggies, we also process guns,

7  ammunition, any miscellaneous items, anything you could get

8  fingerprints off of.

9      Q.   How common is it to find fingerprints on plastic

10  packaging?

11      A.   It depends on the size of the bag, the condition the

12  bag is in.  Not real common.  I have found several.

13      Q.   If you find a print on a plastic baggie, what is the

14  term you refer to the found print as?

15      A.   We either refer to it as ridge detail or latent

16  fingerprint.

17          MR. DUSTHIMER:  Is that ridge?

18          THE WITNESS:  Yes.

19  BY MR. WESTPHAL:

20      Q.   Describe for us the process that you use if you

21  process a plastic baggie to look for fingerprints.

22      A.   Okay.  The process we use, we place it into a gluing

23  chamber which is then -- the glue is heated up on a hot plate

24  and the fumes will stick to any type of oils or residue on the

25  baggie then we remove it, we spray it with a solution that is

1    called Rhodamine 6G, it turns any fingerprints pink, we then

2    observe it underneath a crime light without -- usually a green

3    crime light with orange goggles and it highlights the

4    fingerprints and then we photograph them.

5         Q.   How do you photograph them?

6         A.   We use a digital photo -- we use a digital camera,

7    photograph them, and we use the same green crime light with a

8    red filter.

9         Q.   What is the purpose of using the filter and the light?

10        A.   It makes a better contrast.

11        Q.   This process that you use is the one that you have

12   received training in and use at the Davenport Police Department,

13   is that correct?

14        A.   Yes, that's correct.

15        Q.   Is that a process that is generally recognized by

16   others in the field of fingerprint processing to use for plastic

17   baggies?

18        A.   Yes, it is.

19        Q.   How do you as an evidence technician become involved

20   in an investigation where items collected are requested to be

21   processed for fingerprints?

22        A.   The items that are collected are submitted into our

23   property and evidence system.  The property and evidence

24   custodians then distribute them amongst the evidence technicians

25   to have them processed for fingerprints.

1     Q.   When you remove an item to process it, what method do

2  you use to preserve the integrity of the item for fingerprints?

3     A.   We use gloves.

4     Q.   You have in front of you what is Government's Exhibits

5  18 and 22.  I believe they're an item -- in your tracking system

6  items number 26 and 35, is that correct?

7     A.   That's correct.

8     Q.   Are these two items that you processed for

9  fingerprints as part of this investigation?

10     A.   Yes, they are.

11     Q.   And how can you tell that?

12     A.   Because I have my evidence seal where I sealed it back

13  up after I was done processing.

14     Q.   Do you know if you found any latent prints on

15  Government's Exhibit 18 once you processed it?

16     A.   Yes, I did.

17     Q.   Can you remove Government's Exhibit 18 out of the bag

18  and show us where you found prints?

19     A.   (Indicating)

20     Q.   Maybe just stand up so we can see.

21     A.   (Indicating)

22     Q.   There is an item that looks like it is circled.  Is

23  that the print that you found?

24     A.   Yes, it is.

25     Q.   Okay.  Can you place that back in there?

1          A.    (Witness complied.)

2          Q.    Government's Exhibit Number 22, did you find any

3     latent fingerprints on that exhibit?

4          A.    Yes, I did.

5          Q.    Can you remove that from the bag and show us the

6     prints you found?

7          A.    There's one (Indicating) and there's the other one.

8     (Indicating)

9          Q.    And you actually label them as one and two?

10         A.    I label them as one and two if I have more than one.

11         Q.    At what point in the process do you find the prints

12    you just pointed out?

13         A.    After I am done spraying it with the Rhodamine 6G

14    solution.

15         Q.    Once you find fingerprints that look suitable, do you

16    take photographs of them, is that the next step?

17         A.    Yes.

18         Q.    When you take photographs, those are digital

19    photographs?

20         A.    Yes, they are.

21         Q.    How are those preserved as an item of evidence?

22         A.    They are actually labeled in a folder under that case

23    number, we put them into our 2008 file with all of our

24    photographs and then we also burn a copy to a CD and then place

25    that into evidence.

1    Q.    I have handed you an envelope.  Inside is Government's

2  Exhibit 76.  Do you recognize what Government's Exhibit 76 is?

3    A.    Yes, I do.

4    Q.    What is it?

5    A.    It's the CD with the photographs of the fingerprints

6  that I found.

7    Q.    Are you the person that placed that into evidence?

8    A.    Yes, I am.

9    Q.    And those would include digital photos of the prints

10  you found on Government's Exhibits 18 and 22, correct?

11    A.    That's correct.

12        MR. WESTPHAL:  At this time we move to admit

13  Government's Exhibit 76.

14        MR. DUSTHIMER:  No objection.

15        THE COURT:  76 is received.

16  BY MR. WESTPHAL:

17    Q.    I will show you Government's Exhibit 17 which appears

18  to be an exhibit that has a darker black color.  Do you know

19  what caused it to have that color?

20    A.    Yes, I do.

21    Q.    What caused it to have that color?

22    A.    With an item like that we glue them the same way we do

23  baggies then we dust them with a black graphite powder and that

24  would be the substance that's on that cup.

25    Q.    You have in front of you Government's Exhibits 2 and

1     4, two plastic bags that have been entered into evidence.

2     There's some discoloration on there, pink in color.  Do you know

3     what that came from?

4        A.  That came from the Rhodamine 6G solution we spray on

5     them.

6        Q.  That would be -- these weren't pink bags, is that

7     right?

8        A.  No, they were not.

9        Q.  From your knowledge of prints would an item that was

10     exposed to water, would that have any effect on whether or not a

11     print would remain?

12        A.  Yes, it would.

13        Q.  How would that affect it?

14        A.  A lot of times when something is submerged in water or

15     even rinsed with water, the oils from the fingerprints would be

16     gone.

17        Q.  What if something is washed with soap and water, would

18     that have any effect on there being any prints on it?

19        A.  That would affect it even more, less of a chance that

20     you would get latent fingerprints off of it.

21        Q.  Once they -- you identify latent prints on items, are

22     you the person that does the comparison of those prints?

23        A.  No, I am not.

24        MR. WESTPHAL:  I believe those are my questions for

25     now.  Thank you.

1    THE COURT:  Mr. Dusthimer?

2                    EXAMINATION

3    BY MR. DUSTHIMER:

4       Q.   Would you do us a favor, do me a favor, stand up and

5    take a look at the table in front of the Judge where all of the

6    other exhibits are and tell me if there is anything else there

7    that you were asked to process.

8       A.   How did you want me to --

9       Q.   I guess to begin with, do you believe there's more

10   things there that you did, in fact, process or you're not sure?

11      A.   I believe there is just from looking at the first

12   item.

13      Q.   Okay.  Go ahead and have a chair back then.  Is it

14   also your recollection that you were asked to process other

15   items as part of this investigation?

16      A.   Yes, it is.

17      Q.   And as part of your professional training and

18   experience are you allowed to make at least some preliminary

19   calls as to whether or not any found partial ridge detail would

20   be sufficient in which to do a comparison?

21      A.   No, I'm not.

22      Q.   So if you found any type of ridge detail at all, your

23   responsibility is to preserve it the best you can and then

24   provide it to the person who does the comparison?

25      A.   Yes, it is.

1      Q.   I guess I want to make sure I understand what you

2  said.  You said that you will expose the item to the glue fumes

3  probably under some type of hood I assume?

4      A.   Yes, that's correct.

5      Q.   And then it is the chemical spray that reacts to the

6  leftover residue of the glue fumes, is that correct?

7      A.   That's correct.

8      Q.   Anything that you found at least a partial print on,

9  you pointed it out to someone else for comparison?

10     A.   That's correct.

11     Q.   In your training and experience can you tell me how

12  long a fingerprint might last?

13     A.   That is not known.

14     Q.   Help the jury understand by not known.  Is that not

15  known because --

16     A.   We can't put a time frame on fingerprints.

17     Q.   I am not asking you to date it, I am just asking you

18  how long is the longest you've ever -- you're aware of one

19  lasting and yet still be readable in the future.

20     A.   Well, that's why we do the gluing process because that

21  preserves them for a longer period of time.

22     Q.   Once again, I am not asking for how long you can

23  preserve the fingerprint after you have processed it.  How long

24  does it last if I put my hand down here on this table, how many

25  years later can we possibly read my handprint assuming that it

1  hasn't otherwise been tampered with?

2     A.   That I don't know.

3     Q.   Is it years?

4     A.   I don't know.

5     Q.   Well, is there any limitation of time on a preserved

6  crime scene after which you cannot try to test for fingerprints?

7     A.   No, there's not.

8     Q.   So does that tell you that they might last for a

9  while?

10    A.   Yes, it does.

11    Q.   In perfect conditions?

12    A.   Yes, it does.

13    Q.   In most times in your responsibility you don't get the

14 perfect, complete image as if you are rolling your finger and

15 leaving a complete fingerprint, is that correct?

16    A.   That's correct.

17    Q.   You get what is called partials, is that correct?

18    A.   That's correct.

19    Q.   And the partials that I may leave may be smaller in

20 size, like a partial that a baby may leave just because of the

21 way the fingerprint image is left on the surface area, is that

22 correct?

23    A.   That's correct.

24    Q.   So when you are looking at partials, you can't tell

25 the size of the person unless you have a partial bigger than the

1  finger itself?

2      A.   That's correct.

3           MR. DUSTHIMER:  That is all the questions I have.

4                      FURTHER EXAMINATION

5  BY MR. WESTPHAL:

6      Q.   Did you record somewhere all the items you processed

7  for prints in relation to certain investigations?  Let me ask

8  that better.  When you process items, do you do it according to

9  a case number?

10     A.   That's correct.

11     Q.   And do you record even whether or not you find prints

12 or not all the items you process for fingerprints?

13     A.   Yes, I do.

14     Q.   And did you do that in this case?

15     A.   Yes, I did.

16     Q.   Do you know how many items in relation to this case

17 you actually processed?

18     A.   17.

19     Q.   And out of those items how many did you find latent

20 prints on?

21     A.   I have to refer to my notes for that.

22     Q.   Go ahead.

23     A.   Eight.

24     Q.   When you say items with -- Government's Exhibits 18

25 and 22, there would be two items?

1    A.    Yes, that's correct.

2    Q.    And just because you find latents doesn't necessarily

3 mean that they are identified, is that correct?

4    A.    That's correct.

5         MR. WESTPHAL:  Those are my questions.

6                    FURTHER EXAMINATION

7 BY MR. DUSTHIMER:

8    Q.    I am showing you Exhibit 23 which is a number or

9 series of plastic bags inside another bag.  Did you test each of

10 those bags inside this evidence bag?

11    A.    Yes, I did.

12    Q.    Do you have a count there as to how many bags there

13 are?  And if you don't, that's fine.

14    A.    Seven bags.

15         MR. DUSTHIMER:  Thank you.  That's all the questions I

16 have.

17         THE COURT:  Anything else?

18         MR. WESTPHAL:  No.

19         THE COURT:  Thank you.  Call your next witness,

20 please.

21         MR. WESTPHAL:  Matt Schwarz.

22                    MATTHEW THOMAS SCHWARZ,

23 witness herein, called as a witness by the government, after

24 having been first duly sworn, was examined and testified as

25 follows:

1    THE COURT:  When you are comfortably seated, state

2    your name and spell your last name for us, please.

3    THE WITNESS:  Matthew Thomas Schwarz, S-c-h-w-a-r-z.

4    EXAMINATION

5    BY MR. WESTPHAL:

6    Q.    Good afternoon.

7    A.    Good afternoon.

8    Q.    What is your current occupation?

9    A.    I am an Identification Bureau manager for the

10    Davenport, Iowa, Police Department.

11    Q.    How long have you been employed at that position?

12    A.    Since January of 2006.

13    Q.    Prior to January 2006 do you have any prior law

14    enforcement experience?

15    A.    Yes, I do.  I have been employed in law enforcement

16    since August of 1992 where I was a police officer for the City

17    of Keithsburg, Illinois, until October of '93.  I was a

18    part-time Mercer County Sheriff's Deputy from January of '93

19    until January of '94.  In January '94 until January of 2006 I

20    was with the Muscatine, Iowa, Police Department where I worked

21    as patrol officer, corporal, I was also on the Drug Task Force,

22    and I was a detective during my time there.

23    Q.    What do you do in your capacity as the Identification

24    Bureau manager?

25    A.    I command the Identification Bureau at the Davenport

1  Police Department which consists of the crime lab, crime scene

2  technicians, property and evidence, identification records,

3  supply, AFIS and IAFIS, and all shoe and entire footwear

4  examinations.

5      Q.    You also have some job duties in relation to the

6  evidence technicians themselves?

7      A.    Excuse me?

8      Q.    Do the evidence technicians, do you have any -- what

9  is your relationship to them?

10     A.    I command the identification techs or the evidence

11 techs, they all work in the Crime Scene Unit or the crime lab.

12     Q.    Now, are you familiar with the commonly accepted

13 methods for processing items for fingerprints?

14     A.    Yes, I am.

15     Q.    And are you also familiar with the commonly accepted

16 methods for fingerprint comparison?

17     A.    Yes, I am.

18     Q.    Can you describe for us your educational and training

19 background as it relates to processing and comparing of

20 fingerprints?

21     A.    Well, since being in law enforcement -- I have

22 approximately two years of college, I am a graduate of the Iowa

23 and Illinois Law Enforcements Academies with honors, I have 4.0,

24 I was valedictorian in the Iowa academy.  I have received over

25 3,200 contact hours in training in law enforcement related

1  investigation techniques, forensic techniques, and other law

2  enforcement related courses.

3          During this time I have always trained in a very

4  detailed and rigid program, one on one with the certified

5  latents fingerprint examiners for eight months where I learned

6  my basic and latent fingerprints examination, I then apprenticed

7  under another latent fingerprint examiner until I took my

8  certification test in September of 2007 which I passed and I

9  became a certified latent fingerprint examiner through the

10  International Association of Identification.  Currently there's

11  approximately 800 people in the world that hold that

12  certification.

13      Q.   Can you describe for us the general method that you

14  use to compare found latent prints with known prints in your

15  capacity as Identification Bureau?

16      A.   As in the scientific process or work flow?

17      Q.   Describe for us first the scientific process.

18      A.   The scientific process we use is called ACEV, it

19  stands for analyze, compare, evaluate, and then verification.

20          The first stage, we analyze evidence to see if there's

21  enough there, if it is suitable for identification.  If it is,

22  we move on to the second part which is the C for compare and at

23  that point in time we would compare evidence against known

24  prints of suspects involved in the case or through electronic

25  search through AFIS.

1          Then the third stage would be evaluate, where we

2    evaluate the evidence and our comparisons and then if we came

3    with an identification or an individualization of a latent

4    fingerprint to a known subject, we would move on to the last

5    stage which is verification process where another examiner would

6    take my work, sit down with it, and review all my work to see if

7    they agreed or not.

8          Q.   Now, you have -- if you get a latent print, are you

9    the only person presently at the Davenport Police Department

10   that will compare a latent print to known prints?

11         A.   I am the only current -- currently the only full-time

12   person.  We have one contract employee who is a retired

13   lieutenant with the Bettendorf, Iowa, Police Department who is

14   also a certified latent fingerprint examiner.  He does the V

15   part of my ACEV or he does all the verifications and sometimes

16   he actually comes in when we get a backlog or I'm busy with

17   other cases and he will do the entering and I will do the

18   verification of his work.

19         Q.   Now, your database for known prints is this -- it

20   starts out as an electronic search of a database that has

21   numerous known prints in it, is that accurate?

22         A.   Yes.

23         Q.   Okay.  Describe for us the methodology that you use

24   when you get something that has a latent print on it or that has

25   been identified as a latent print and you are seeking to compare

1  it, describe for us the steps you go through.

2      A.   The first step would be the latent fingerprint would

3  be developed then the latent fingerprint would be turned into

4  evidence by the person that developed it whether it was a crime

5  scene tech or an officer that is trained as a crime scene tech.

6  That latent fingerprint evidence would be sent to our property

7  and evidence section where it would be routed to the

8  Identification Bureau where it would come to me.

9          At that point in time I would review the latent print

10  evidence to see if it was of value.  If there was enough

11  information there to identify this latent fingerprint.  If it

12  is, at that point in time we take those latent fingerprints that

13  are of value and we enter them in AFIS and do a search.

14          Sometimes we get requests from detectives or

15  prosecutors to do a manual comparison where there's already a

16  known suspect in the case and will be given a name and a date of

17  birth of a person.  In those situations we will go to the

18  fingerprint files we have at the Davenport Police Department, we

19  will pull that person's known fingerprint card and will compare

20  their card versus the latent fingerprints in that case.

21      Q.   And at Davenport if one of the evidence technicians

22  gets on or finds a latent print on a package, do they take some

23  type of digital photograph of that, is that correct?

24      A.   Yes.

25      Q.   And do you review that digital photograph and how do

1   you use that digital photograph in your comparison?

2        A.    The digital photograph, the work flow is the same as

3   like a latent print lifted with tape and powder you have seen

4   put on a car.  There's just a couple steps added.  They would

5   take the photograph of the latent print with a scale in a raw

6   format which is a lot less compressed image where there's no

7   compression of the digital image, it is a true and accurate

8   reflection of it.  What they would do is they would download

9   those images to the server, we have a secured server at the

10  police department.

11        Once they have put their images on it, they cannot be

12  deleted, renamed, nothing can be done to it so they will put a

13  copy of the original images into that server so we have one copy

14  there under the year and case number.  They would also take

15  those same images and burn them to a DVD or CD depending on

16  which one it would actually fit on and then seal that into an

17  envelope and place that into evidence.

18        That CD with those digital images would get routed

19  through property and evidence just like latent lift cards would

20  and will come to me usually the next day after it has been

21  processed and I will get that piece of evidence and instead of

22  opening it up and evaluating it because it is going to be a CD

23  in there, I already know if they have done the steps of the

24  process correctly, there should be a folder on the server with

25  this same information so we leave that sealed.  That's just an

1    original hard copy, we just leave sealed.  What I will do on

2    that evidence envelope is I will mark notes if there was prints

3    that were suitable and if I entered them in AFIS or I did any

4    comparisons.

5          At that point in time I will go into the secured

6    server, I will look for the fingerprints that they captured

7    digitally, I will look at them for suitability, and if they are

8    suitable, I will take the whole folder and I will copy it to a

9    working folder so the original still stays on the folder, it has

10   never been altered or touched, we take a copy of it, move it to

11   a working folder in an area where I can work on it, and at that

12   point in time I will calibrate the images so they are made to

13   the original size, I will drop background colors out, I will

14   reverse color if the colors are reversed if it is an alternate

15   light source print so the background is light or at least a gray

16   so we have some contrast and once that is done, the image will

17   be done as a grade scale so it is a smaller file and fit in the

18   AFIS system without hooking up the system.  You put too much

19   information in there, you are going to clog up the system so we

20   enter it digitally through a thumb drive or a CD.

21        Q.   I would like to talk about fingerprints in general.

22   When you use the term fingerprint, what is a fingerprint?

23        A.   A fingerprint would be a known print of a person.  A

24   latent print would be -- latent is Latin for latens, it would be

25   a print that we have to develop with a chemical or powder or

1    some kind of process to make it visible.  It is not readily

2    visible.  A patent print which is a third term you will hear a

3    lot of times is like a print in blood or a print in dust, a

4    print you can see, but it is not made from the conventional

5    method of ink.

6         Q.   How is a fingerprint normally created on an item?

7         A.   Well, it's -- because of oils and the sweat and

8    sebaceous materials, amino acids and lipids that you secrete

9    through your pores, that leaves fingerprints when you touch a

10   surface that is suitable to leave fingerprint evidence on.

11        Q.   Every time you touch something do you leave a

12   fingerprint?

13        A.   No.

14        Q.   If someone leaves a fingerprint -- what are some of

15   the factors that will affect whether or not the fingerprint will

16   remain for a period of time?

17        A.   Oh, there's several factors that deal with

18   fingerprints.  First you have to start with the person

19   themselves, the donor we will call them.  That would be the

20   first phase.  Was there someone suitable to leave a fingerprint

21   on the surface at the time or were they wearing gloves?

22             Another thing you have to keep in consideration is

23   like in the wintertime, January, February, March when your house

24   gets all cooped up, humidity gets really low, our skin gets

25   really dry and crackily, when your skin is like that, you can

1  touch a really nice surface like glass and not leave

2  fingerprints because you don't have the sweat, sebaceous

3  materials, the oils, your skin is so dry so you are not going to

4  leave any fingerprint, if any at all, so the person has a big

5  consideration.

6         Some people leave really good fingerprints, some

7  people don't.  Myself, I'm a really good donor so when we're

8  doing test prints and we are going to try to validate a process

9  we are going to use in a lab, if I touch something, we are going

10 to develop a print, I guarantee you my fingerprints are going to

11 be on there.   I leave some pretty oily, greasy fingerprints.

12 Other people don't have that ability.  Use the same piece of

13 paper, same chemical process, won't have a print that is

14 suitable.

15        The second thing is the surface itself.  Okay.  Is the

16 surface a clean, smooth object like glass or plastic bag that's

17 really nice and pristine or is it dirty and dusty; is it a

18 semiporous surface like paper?  Great example, you could be a

19 great person at leaving fingerprints and were dealing with

20 paper, every time you touch paper, if you look at paper under a

21 microscope, it kind of looks like cotton all wove together.

22 Well, that's rubbing off those oils and that sweat and sebaceous

23 material and the more you touch the paper, the less you have and

24 your skin is not reproducing it quick.  As you go and you get

25 through the papers, about five, six sheets down you are going to

1  start seeing the fingerprints decrease, if not disappear all

2  together, even though they're still touching them and they were

3  leaving fingerprints the first couple of sheets.

4          And then the last thing you have to keep in mind is

5  what happened to the object after the fingerprints were

6  deposited on it.  Okay.  Did some kind of abrasive action happen

7  to the surface where the fingerprint was left, was it left out

8  in the environment, how was it handled, so you've got several

9  different factors in those three different areas that can all

10  affect if a fingerprint will stay or will not stay.

11      Q.   Will a substance like a plastic being in water have

12  any effect on the potential of a fingerprint remaining on there?

13      A.   It wouldn't be helpful, but it also is not terminal to

14  finding fingerprints.  We find fingerprints when it is raining

15  out.  You leave -- especially like myself again, you leave good,

16  greasy fingerprints on a glass window and it rains on the car,

17  some of that is oils and what does oil do, it repels water and

18  you can see a fingerprint if you look in the rain, you left a

19  good fingerprint and spray it with water, you will see your

20  fingerprint where water will disperse differently over those

21  areas and we have developed fingerprints like that.  It can be

22  done, it is not helpful, but it can be done.

23      Q.   At Davenport in your capacity when you get an item or

24  items with latent fingerprints on them, every time you get a

25  latent fingerprint on something are you able in comparison to

1  identify it to a specific known individual?

2     A.   No.

3     Q.   How common is it not to be able to identify latent

4  prints even if you find them?

5     A.   Best example I can give you is basically our numbers

6  from the last year, '07.  We did a little over 3,000 latent

7  fingerprints in the AFIS system throughout the state of Iowa.

8  We did about 65 percent of all the latent entries here in the

9  state of Iowa here in Davenport through our terminal.  Out of

10  those 3,000 some entries, we only identified around 200 some

11  prints from that AFIS search.  Now we identified another 200

12  some after that manually and we totaled just a little over 500

13  fingerprints identified so that would give you kind of a rough

14  estimate of how many we identified and how many we searched.

15     Q.   Now, do you know -- in front of you are Government's

16  Exhibits 18 and 22 which also has a case number on it for

17  Davenport.  Do you know, did you compare -- do a comparison of

18  latent prints found on these items with known prints in relation

19  to this case?

20     A.   Yes, sir.

21     Q.   A folder with a series of documents and items in it,

22  Government's Exhibits 78 through 84.  Are those documents the

23  result of your at least in general analysis of latent prints

24  found on Government's Exhibits 18 and 22?

25     A.   Yes, these are notes, digital images, printouts, and

1  known fingerprints used during this investigation.

2      Q.   So all these documents were produced as a result of

3  your comparison of these items, is that correct?

4      A.   Yes, sir.

5           MR. WESTPHAL:  At this time we move to admit

6  Government's Exhibits 78 through 84.

7           MR. DUSTHIMER:  No objection.

8           THE COURT:  78 through 84 are received.

9  BY MR. WESTPHAL:

10     Q.   Government's Exhibit 78, can you tell us generally

11 what we are looking at?

12     A.   On my screen I can't see the smaller numbers that I

13 need to identify it.

14     Q.   Let's do it the old-fashioned way.

15     A.   Okay.  Thank you.  Your question again?

16     Q.   What generally is that and how is that produced as

17 part of your comparison in this case?

18     A.   This is a screen shot from the AFIS system that I use

19 to do my initial search showing the latent fingerprint developed

20 in this case against the respondent that I identified as

21 matching that latent fingerprint.

22     Q.   Let's go through 80 and 81, can you tell us what those

23 are as well?

24     A.   Can I see that one again, please?

25     Q.   Absolutely.  Sorry.

1   A.   Again here in 81, this image here (Indicating) in the

2   upper left-hand corner as you look at it is the latent

3   fingerprint developed and this one here (Indicating) next to it

4   is the one that is the match.

5   Q.   81?

6   A.   That was 81.

7   Q.   I am sorry.  80.

8   A.   Number 80, same thing, latent print here (Indicating)

9   in the left-hand side, next to it is the responding known

10   fingerprint that matches it.

11   Q.   For example, in Government's Exhibit 78, initially

12   this computer database will give you some potential for

13   comparison in the latent print, is that accurate?

14   A.   That's correct.  Unlike you have probably seen on TV,

15   the machine won't do it for you.  It is a logarithm program that

16   AFIS works off of and it is looking for different

17   characteristics in different geographical locations in reference

18   to each other so the program is measuring those characteristics

19   we mark out on latent.  All the machine sees is those

20   characteristics with no background.  We see the latent print, we

21   see the lines, the ridge flow, the nuances of the latent print.

22        We can see -- here (Indicating) you see a circle or

23   pattern in there.   The computer doesn't see that.  It just sees

24   dots certain distances apart so it is going to go through the

25   database and it is going to look for those characteristics that

1 are certain distances apart.  No matter what the ridges show, it

2 is just looking for characteristics so it will give us the

3 number of respondents we ask for.

4          In our basic search at Davenport we usually ask for 20

5 respondents for fingerprints.  We ask for the top 20

6 respondents.  It is up to the actual individual latent

7 fingerprint examiner to go through and you can see on the bottom

8 of that the five images there, those are all respondent.  You

9 have to click on each one of them and look at each one of them

10 until you've been through all 20 and there's no match or you

11 have found a match and then you move on to your comparison stage

12 at that time.

13     Q.    That is Exhibit 80.  We will have -- they are more

14 visible on the left latent.  On the right composite, there's a

15 series of blue dots on these computer printouts.  What are those

16 blue dots?

17     A.    Those are the characteristics that I found that

18 matched the latent fingerprint versus the known fingerprints.

19     Q.    Do you visually compare them on the computer screen?

20     A.    Yeah, in this program in the upper left-hand side

21 there there's a tool where I can actually mark those

22 characteristics with a blue dot so when I am doing my

23 examination, I can look at the characteristic, it is kind of

24 like putting a punch pin on a paper so I don't lose my spot.  It

25 is electrically me keeping track of where I was and counting

1  ridges over, counting the ridge flow, and keeping track when I

2  do my examination.

3  　　Q.　So if there's prints or blue dots on the left-hand

4  side of the latent print, those are put there by you?

5  　　A.　That's correct.

6  　　Q.　And the blue dots on the right composite, you put

7  those as well, back and forth?

8  　　A.　Absolutely.

9  　　Q.　This on the screen bears Exhibit 79 and the top

10  photograph, tell us first what this top photograph is of.

11  　　A.　That's a paper printout from the digital images

12  developed by CST Loose and the top one is image 1053 which is

13  the calibrated image that's had the color taken out of it

14  prepared for AFIS entry and that is the one identified as being

15  made by the right middle finger of Matthew Canady.

16  　　Q.　Government's Exhibit 82 at the top has another latent

17  print and at the bottom another one, again are these latent

18  prints that you reviewed as part of this comparison?

19  　　A.　That is correct.

20  　　Q.　Okay.　Now, once you identified -- identify a

21  potential respondent off the computer program, do you actually

22  do a manual visual comparison yourself?

23  　　A.　Yes, I do.

24  　　Q.　Do you do that to the known prints of whatever

25  respondent you decide to pick?

1       A.    Which respondent matches the fingerprint, yes.

2       Q.    And do you do that by getting a set of the known

3    prints of that respondent?

4       A.    That's correct.

5       Q.    Government's Exhibit 83, is that a copy of the known

6    prints for the Gilarime Mueller that you used in your

7    comparison?

8       A.    Yes, sir.

9       Q.    And Government's Exhibit Number 84, is that a copy of

10   the known prints of Matthew Canady that you used in your

11   comparison?

12      A.    Yes, sir.

13      Q.    Government's Exhibit 18 which I believe is item 26 in

14   your system, were you able to match and identify the latent

15   print found on that exhibit?

16      A.    Yes, I was.

17      Q.    And who were you able to identify that latent print

18   to?

19      A.    Gilarime Mueller.

20      Q.    And you did that by comparing your latent to the known

21   prints of Gilarime Mueller, is that correct?

22      A.    Yes, sir.

23      Q.    Government's Exhibit Number 22, item 35, there were

24   two areas, one and two found on that exhibit.  Were you able to

25   identify those fingerprints?

1    A.   Yes, sir.

2    Q.   And who did you identify those fingerprints to?

3    A.   To Matthew Canady.

4         MR. WESTPHAL:  I believe those are my questions for

5    now.  Thank you.

6         THE COURT:  Mr. Dusthimer?

7                          EXAMINATION

8    BY MR. DUSTHIMER:

9    Q.   You mentioned AFIS and IAFIS.  Is it fair to say those

10   are databases federal and here in Iowa which accumulate from

11   other -- from all sources fingerprints?

12   A.   Yes, sir.

13   Q.   Fingerprint records and data from that?

14   A.   Yes, sir.

15   Q.   And when you talked about the logarithms and you

16   talked about the patterns and I think you said loops and swirls,

17   I think you may have mentioned those words.

18   A.   Whorl.

19   Q.   Whorl?

20   A.   Yes, sir.

21   Q.   Those are points that the computer looks at the image

22   of the fingerprint and then makes a mathematical number or

23   numbers for them?

24   A.   Well, the whorl would be the pattern so that is like

25   the circular pattern you saw.  The actual points the computer is

1   looking at would be the Galton points or the level two detail

2   which would be the ridge bifurcations, ridge endings or dots

3   which would be found within that pattern.

4       Q.    But anyway, the computer generates a mathematical

5   score or scores and then when you plug in your subject item,

6   that will create hopefully some type of mathematical score that

7   you can compare in AFIS or IAFIS, is that fair?

8       A.    Yes.

9       Q.    How long do fingerprints last?

10      A.    That depends on every situation, from the donor to the

11  object it is placed on, and what's happened to the object

12  afterwards.

13      Q.    What is a common length of time in which a fingerprint

14  can last?

15      A.    There really is no standard length of time.  I mean,

16  you can go as far back as the USS I think it was America, they

17  have had some discussion about it all the gold bullion that was

18  found off of California, the ship sunk and there's patent prints

19  on those gold coins from back in the early 1900s, underwater.

20          Then there's been cases like in Australia where they

21  had a crime where -- a scene of crime officer which they call

22  them in Australia, scene of crime officer went and processed the

23  scene and helped some people get in their house or something and

24  went through a basement window.  Several years later after he

25  was transferred to the far other side of Australia, there was a

1  violent crime at that house, they developed fingerprints on

2  their basement window, they were his, and this window was

3  exposed to the outside for all these years and I want to say it

4  was like three to five years that these fingerprints were there,

5  but then there's been other cases where I have done studies

6  myself or I've watched people touch stuff, we've developed it

7  with a chemical, and nothing.

8      Q.   Fortunately I think you and I are the same, we leave

9  it in pretty much any time and any way.  I was going to show you

10  the image but I think I can talk about it for the jury.  Those

11  images that you had on 82, the ones that you identified as Mr.

12  Mueller's --

13      A.   Yes, sir.

14      Q.   -- when were they left?

15      A.   I can't tell you that.  It would have been some date

16  before the time the evidence would have been collected.

17      Q.   How were they left?

18      A.   By touching that object.

19      Q.   In any special fashion?

20      A.   That ridge detail would have come in contact with that

21  object in that location.

22      Q.   But I mean could it be putting the garbage bag into a

23  garbage bag receptacle?

24      A.   It can be in any way where those ridge details came in

25  contact with that surface.

1    Q.   Could it have been when the groceries came home from

2    the grocery store six months before the garbage bag got put

3    underneath the kitchen sink?

4    A.   Could be.

5    Q.   Do you have an opinion professionally as to when it

6    was in relationship to when the image was taken?

7    A.   No, other than it happened before the time we

8    collected it.

9    Q.   Could have been two seconds or many years from what it

10   sounds like?

11   A.   Well, we also have to take into fact when the product

12   that was touched was manufactured.

13   Q.   Sure.

14   A.   When was it made.

15   Q.   If we are looking at a 2009 car we probably couldn't

16   get prints off of it from 1980?

17   A.   That's correct.

18        MR. DUSTHIMER:  Thank you.  That's all.

19        THE COURT:  Anything else, Mr. Westphal?

20        MR. WESTPHAL:  No.

21        THE COURT:  Thank you, sir.  Call your next witness.

22                   AMANDA FROHWEIN,

23   witness herein, called as a witness by the government, after

24   having been first duly sworn, was examined and testified as

25   follows:

1    THE COURT:  When you are comfortably seated there,

2  state your name and spell your last name.

3    THE WITNESS:  Amanda Frohwein, F-r-o-h-w-e-i-n.

4                    EXAMINATION

5  BY MR. WESTPHAL:

6    Q.    Good afternoon.

7    A.    Hi.

8    Q.    What is your current occupation?

9    A.    I am a criminalist with the Iowa Division of Criminal

10  Investigation crime lab.

11    Q.    How long have you been employed at the crime lab?

12    A.    I've been employed there for two years and four

13  months.

14    Q.    What is the general nature of your duties there?

15    A.    I work as a drug analyst in the drug identification

16  section and as a crime scene technician.

17    Q.    Handing you Government's Exhibit 68, do you recognize

18  what that is?

19    A.    Yes, I do.

20    Q.    And what is Government's Exhibit 68?

21    A.    It is my resume.

22    Q.    That includes your educational and training background

23  in relation to your duties at the crime lab?

24    A.    Yes, it does.

25    MR. WESTPHAL:  Move to admit Government's Exhibit 68.

1          MR. DUSTHIMER:  No objection.

2          THE COURT:  Received.

3   BY MR. WESTPHAL:

4      Q.   Maybe just focus on your past experience in drug

5   analysis.  Besides the DCI crime lab have you worked at any

6   other occupations that were -- where you have done that same

7   type of duty?

8      A.   For drug analysis I worked for the Drug Enforcement

9   Administration at their special testing and research outside of

10  Dulles, Virginia.  There I also analyzed drugs, specifically I

11  was in the heroin intelligence program there.

12     Q.   At the Iowa DCI criminalistics laboratory when an item

13  comes -- when a substance comes in and is going to be tested for

14  what type of drug it is, when an item is first brought in, how

15  is it entered in at the DCI lab?

16     A.   An item is brought in, it is either sent in the mail

17  or it is brought in by the police department agency

18  representative.  It is entered into our system through the

19  evidence room and we have a bar code system where every piece of

20  evidence is given a bar code label and then it is tracked within

21  our laboratory so when it comes into the laboratory, it is given

22  the bar code, it is put in a secure vault location, and it waits

23  there to be assigned to a criminalist to work.

24          When I would check out a case to work it, then I have

25  a bar code and that evidence is scanned to me, I keep it in a

1    secure location locked in our laboratory until I am done with

2    it, then it is scanned back to the evidence vault then it is

3    scanned back to the police department and brings it back to

4    their location.

5        Q.   When you take an item out of your evidence for

6    analysis, describe for us the steps you go through to analyze a

7    substance for a type and weight of substance.

8        A.   When I check out a piece of evidence, I will first

9    note packaging and after I remove all of the packaging, I will

10   take a weight, if it is a powder material or some form of powder

11   or chunks, and after I take that weight I will do a color test

12   that will indicate what type of drug it is and then that points

13   me in the direction of the rest of the analysis that I do.

14       Q.   If you are testing an item, color test and the --

15   well, what -- how would the color test come out if an item might

16   be cocaine or cocaine base?

17       A.   If an item is cocaine -- usually just by appearance

18   you can tell a lot of what the drugs are.  That's what directs

19   you to which color test to use so if I think it may be cocaine,

20   I would use a color test called the acid cobalt thiocyanate test

21   and that would turn blue if it indicated that it was cocaine.

22       Q.   Will the color test determine whether or not it is

23   cocaine or cocaine base?

24       A.   No, it will not.

25       Q.   Generally what is the difference between cocaine and

1  cocaine base?

2      A.    Cocaine in the salt form is usually a -- just a nice

3  powdered form, typically -- it isn't always, but it typically

4  is, and typically cocaine base is going to be a chunkier,

5  rock-like material.

6      Q.    If the color test shows that the item is cocaine, what

7  is the next step?

8      A.    If it indicates cocaine, then I go on to a series of

9  four more tests, first I have taken the weight always, then the

10  color test, and then after the color test I will do a thin layer

11  chromatography test and that separates if there's any extra

12  items in the mixture, say there's two compounds in the powder,

13  it would separate the two.

14          After that I would go to a gas chromatography mass

15  spectrometry analysis and this is the instrumental test that

16  will positively confirm what that substance is and it is

17  uniquely specific to that substance so this tells us exactly

18  what it is, it doesn't just indicate, it positively ID's it.  I

19  will also do a form test that will tell me if it would be

20  cocaine base or if it would be a salt form of cocaine.

21      Q.    The gas chromatography mass spectrometry test, what is

22  it comparing to match up?

23      A.    What I would do is I would run a standard of cocaine

24  so there is a known sample of cocaine that we bought from a

25  manufacturer and it would tell me a retention time, it sweeps

1    through the instrument, and it will come past a detector at a

2    specific time and then that instrument breaks apart the

3    molecule, kind of like breaking apart a puzzle, and it shows us

4    those puzzle pieces broken apart and they go back together to

5    form just one specific molecule so I would take the sample from

6    the case and then a known standard and if that time matches and

7    if that spectra of all the different peaks or the puzzle pieces

8    matches, then I know that it is the same compound.

9        Q.    Do you take any steps after that?

10       A.    After that just the form test to determine what type

11   of cocaine it would be.

12       Q.    Okay.  And describe how the form test would work.

13       A.    The form test is a color test, it also works with

14   solubility.  Cocaine in the base form is soluble in ether and in

15   the salt form is not soluble in ether so the first thing you

16   would do is you would put a small sample of the powder or chunk

17   into ether and then you would put a small amount of couple drops

18   of that liquid into a -- into another color test and if it turns

19   blue, then that is going to indicate that you have cocaine base.

20           Next water is added because the salt form is soluble

21   in water, but the base form is not soluble in water so then you

22   would put a couple drops of that water solution into another

23   chemical.  If it turns blue it would indicate that it is the

24   salt form.  So in this case if it's blue in the first one, it is

25   base.  If it is blue in the second one, it is salt.

1    Q.    Any other steps in your analysis after that?

2    A.    No, that's it.

3    Q.    Placed in front of you is Government's Exhibits 1 and

4    3.  Can you tell from looking at them if you opened and reviewed

5    those items for analysis?

6    A.    Yes, I can.  They each have my initials, the case

7    number, and the date on them.

8    Q.    And based on that and the case number do you know did

9    you conduct the testing that you just described on Government's

10   Exhibits 1 and 3?

11   A.    Yes, I did.

12   Q.    And did you report the results of those -- did you

13   record the results of those tests in any written report?

14   A.    Yes, I did.

15   Q.    Handing you Government's Exhibit Number 69, can you

16   recognize what that is?

17   A.    Yes, I do.

18   Q.    What is that?

19   A.    There is the report for a controlled substance

20   investigation that I issued in this case.

21         MR. WESTPHAL:  At this time we move to admit

22   Government's Exhibit 69.

23         MR. DUSTHIMER:  No objection.

24         THE COURT:  It is received.

25   BY MR. WESTPHAL:

1     Q.   When you get an item at the lab do you give it an item

2  letter or number?

3     A.   Yes, the evidence room when they first receive it from

4  the police department, they will give each thing a DCI item

5  number designation, it goes A all the way through the alphabet

6  repeating if it needs to.

7     Q.   And do you record the item number on the packaging of

8  the substance that you test?

9     A.   That's correct.

10     Q.   Government's Exhibit 1, can you tell is that item A or

11  item B?

12     A.   That would be item A.

13     Q.   And based on your report what was Government's Exhibit

14  Number 1, based on your analysis what did you determine it to

15  be?

16     A.   It was an off-white, rock-like substance, 13.4 grams,

17  and it was found to be cocaine base.

18     Q.   Government's Exhibit Number 3, does that have a

19  corresponding item number?

20     A.   That would be B on my report.

21     Q.   And what did you determine Exhibit B was?

22     A.   It was an off-white, rock-like substance, 26.14 grams,

23  and it was also cocaine base.

24         MR. WESTPHAL:  Those are my questions.  Thank you.

25         THE COURT:  Mr. Dusthimer?

<u>EXAMINATION</u>

BY MR. DUSTHIMER:

    Q.    When you do those weights is it the product only or is it also packaging?

    A.    It is just the substance, no packaging.

    Q.    And you do it on a beam?

    A.    No, a calibrated electronic scale.

    Q.    And you have no knowledge or appreciation as to where it came from or how it was handled, just that it got to you and then you stripped the bag?

    A.    That's correct.

                MR. DUSTHIMER:  Thank you.  That's all.

                THE COURT:  Anything else?

                MR. WESTPHAL:  Nothing further.

                THE COURT:  Thank you.

                                THOMAS W. CARNAHAN,

witness herein, called as a witness by the government, after having been first duly sworn, was examined and testified as follows:

                THE COURT:  When you are comfortably seated, state your name and spell your last name.

                THE WITNESS:  My name is Thomas W. Carnahan, that is spelled C-a-r-n-a-h-a-n.

EXAMINATION

BY MR. WESTPHAL:

Q.    Good afternoon.

A.    Good afternoon.

Q.    Can you tell us your occupation?

A.    Yes, I'm an investigator for the State of Iowa, I work specifically for Iowa Work Force and Development.

Q.    And how long have you worked for Iowa Work Force and Development?

A.    About 31 years.

Q.    And what -- Iowa Work Force and Development, what is its business?

A.    Well, one of the components that I work for is the unemployment division and we -- we administer the payment and recoupment of any unemployment benefits and also the taxes collected from employers that are -- that pay into the unemployment system.

Q.    If an employer -- what -- are employers supposed to submit information to Iowa Work Force and Development?

A.    If an employer is what we call covered or one that has to pay the unemployment taxes in Iowa, they are obligated to submit to the State of Iowa what we call quarterly reports and this lists all of the individuals that they employ both by name and by Social Security number and then they are supposed to pay unemployment taxes based on the earnings that any individuals

1   that they list had.

2       Q.   When they submit these quarterly reports, is that

3   information saved in some type of database in Iowa Work Force

4   and Development?

5       A.   Yes, it is.

6       Q.   Now, quarterly report, how much time is a quarter

7   report supposed to cover?

8       A.   Well, for example, this is the quarter that we just

9   finished which would have been the third quarter which is July,

10  August, and September, that report was due to us on October the

11  31st.

12      Q.   Quarterly reports are essentially reports for every

13  three-month period?

14      A.   That is correct.

15      Q.   Now, you said a covered employer.  What does -- what

16  are the requirements for an employer to be considered a covered

17  employer?

18      A.   Well, there are several, but the basic requirements is

19  that if they either are a -- if they're a sole proprietorship or

20  a partnership, then anyone that they employ that earns a minimum

21  of $1,500 in a quarter or works there for 20 consecutive weeks

22  is what we deem as a covered -- or as an individual that has to

23  be covered under the unemployment tax system.

24      Q.   Required by statute?

25      A.   It would be under Chapter 96 of the Iowa law.

1     Q.   And a covered employer, do they have to somehow

2  register with Iowa Work Force and Development once they become

3  covered?

4     A.   Well, yes, they do.  What we require is that they

5  submit to us their federal ID number and then we set up what we

6  call an unemployment account on their behalf.

7     Q.   Are they also filed by name?

8     A.   Yes, there is a search engine that you can look at

9  their -- both under the individual or the business owner's name

10  and also under the business name or corporation.

11     Q.   In your duties with Iowa Work Force and Development

12  are you authorized to have access to these unemployment records?

13     A.   Yes, I am, sir.

14     Q.   And if you want to check whether or not an individual

15  with a certain Social Security number has covered wages, what do

16  you do to check that database?

17     A.   I have two ways to get in, the first way is if I know

18  what the individual's Social Security number is because all of

19  the wages that are reported on behalf of an individual are done

20  so by Social Security number.  There's also an engine that you

21  can -- search engine that you can use that you can go in by

22  their name.

23     Q.   Are there different databases that you can search,

24  different types of data that can be searched?

25     A.   Well, there's -- for the -- for the individual or what

1  we call the claimant there is a search engine called a Wage-C

2  that goes back 17 quarters.

3          MR. DUSTHIMER:  What was that last word?

4          THE WITNESS:  Wage-C as in the letter C, and then

5  there's another search engine called a Wage-A that only goes

6  back six quarters.

7  BY MR. WESTPHAL:

8      Q.   What type of information would be in the Wage-C?

9      A.   It would be the individual's Social Security number

10  and then it would list all wages reported by account number of

11  any business that the individual would have worked for in the

12  last 17 quarters.

13      Q.   And the Wage-A, what is the difference between Wage-A

14  and Wage-C?

15      A.   Well, Wage-A is used to compute unemployment benefits.

16  In other words, if an individual comes in and wants to file an

17  unemployment claim, this search engine readily tells the claim

18  taker how much money that they're eligible for and what their

19  maximum benefit amount is.

20      Q.   So an employee to show up in this system has to make

21  $1,500, is that what you said, per quarter?

22      A.   In a quarter or work 20 consecutive weeks.

23      Q.   Is there any yearly requirement, you make so much

24  money in one year?

25      A.   Well, all of the wages that they earn in a given

1    quarter are reported and as the gross pay, it is before taxes.

2    As far as unemployment is concerned, we only consider the first

3    23,000.

4        Q.    As part of this case were you requested to do a search

5    of your database in relation to a certain Social Security

6    number?

7        A.    Yes, I was, sir.

8        Q.    And when you do a search can you print out a copy of

9    the results of your search?

10       A.    Yes, I am able to.

11       Q.    Government's Exhibit Number 85, is that in reference

12   to your search for a -- under a specific Social Security number?

13       A.    That is correct.  This is what they call a State

14   Identification Inquiry and what this does is that when you put

15   the Social Security number into the system, it will tell you if

16   that Social Security number, if there were any wages reported on

17   this number's behalf in all the states except for Hawaii.

18       Q.    And what Social Security number did you use to search?

19       A.    It is 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.

20       Q.    And were the results of your search recorded in

21   Government's Exhibit 85?

22       A.    Yes, they were, sir.

23       Q.    And that is from a database in Iowa Work Force and

24   Development, correct?

25       A.    Right, that's correct.

1          MR. WESTPHAL:  Move to admit Government's Exhibit 85.

2          MR. DUSTHIMER:  No objection.

3          THE COURT:  85 is received.

4    BY MR. WESTPHAL:

5       Q.   What were the results of your search for that Social

6    Security number?

7       A.   There were no wages reported from any state and that

8    would include Iowa as well.

9       Q.   And you talked about these different Wage-C reports.

10   Did you do that, is that report --

11      A.   I also did a Wage-C which is exclusive to Iowa and

12   that's the one that goes back 17 quarters.

13      Q.   What did that show?

14      A.   The results were that there was no information on that

15   Social Security number, there was no wages reported.

16      Q.   And Wage-C covers how much of a time approximately?

17      A.   That would have been the last 17 quarters, probably

18   starting from the third quarter of 2008.

19          MR. WESTPHAL:  Those are my questions for now.

20          THE COURT:  Mr. Dusthimer?

21          MR. DUSTHIMER:  Thank you.

22                         EXAMINATION

23   BY MR. DUSTHIMER:

24      Q.   31 years?

25      A.   Yes, sir.

1  Q. So you have been through the various changes and

2 Social Security Administration management of Social Security

3 numbers?

4  A. I've been around them, yes, sir.

5  Q. Okay.  You are aware that, in fact, it used to be that

6 Social Security numbers were issued in part based upon your year

7 of birth or your location of birth?

8  A. To my knowledge, yes.

9  Q. And do you know that the Social Security numbers were,

10 in fact, issued with different sets of numbers or different

11 codings based upon whether or not an individual was a natural

12 citizen or a -- one who was sworn in and became a citizen?

13  A. Well, I am not an expert in Social Security numbers,

14 but there's -- I mean, individuals -- in order for them to file

15 an unemployment claim, they need a valid Social Security number

16 in Iowa.

17  Q. But are you aware that at least it used to be the

18 practice that non-natural U.S. citizens, that is people not born

19 in the United States, received a different type of Social

20 Security number than natural born United States citizens?

21  A. I have no knowledge of that.

22  Q. When you looked at this number that you put in and

23 compared, did you study it at all for purposes of your knowledge

24 base and experience as to what type of Social Security number

25 this was?

1      A.    No, I didn't.  That is not -- wasn't pertinent to my

2   search.

3      Q.    Do you know whether or not it is a valid Social

4   Security number?

5      A.    According to the state identification inquiry it

6   indicated that it was invalid.

7      Q.    Do you know whether or not the Social Security number

8   you received was transposed in any way?

9      A.    Not to my knowledge.

10     Q.    Let's change topics for a little bit.  As far as

11  various reports, the reports that you receive, they're different

12  than the withholding reports done by employers for purposes of

13  withholding taxes, is that correct?

14     A.    That is correct.

15     Q.    And withholding taxes, there are certain exemptions

16  and exclusions regarding family members.  Are you aware of that?

17     A.    Yes, I am.

18     Q.    Are there similar types of exceptions or exclusions

19  for your type of Work Force and Development reports regarding

20  family members?

21     A.    Yes, there are.

22     Q.    So if it is a family member are they required to

23  report?

24     A.    It depends.

25     Q.    Help us understand.

1  A.  Okay.  If the family member is an immediate family

2  member --

3  Q.  How do you define immediate family member?

4  A.  That would be a spouse or a child or children --

5  Q.  Okay.

6  A.  -- in the case of children if they are -- if they are

7  not -- if they are not adults, then they're not required to be

8  reported; but once they reach 18 then it is a requirement that

9  any monies that are earned in the business are required to be

10  reported to the unemployment system.

11  Q.  Next question, next area.  Are you familiar with

12  people who are having problems obtaining Social Security numbers

13  because of their immigration status?

14  A.  No, I am not.

15  Q.  So do you know whether -- what is an individual or

16  what is an employer supposed to do or required to do if the

17  employee does not have a valid Social Security number?

18  A.  No, that would be a matter with immigration.

19  Q.  But how are they supposed to report it through you?

20  A.  They can -- there is provisions in the -- okay.

21  There's provisions in the law that a pseudo number can be

22  created.

23  Q.  Do you know whether or not there was a -- any type of

24  pseudo number created for Mr. Gilarime Mueller?

25  A.  Well, according to the information that I received,

1    that he supposedly worked for his mother in his mother's

2    business and I also ran a search and she did not have an

3    account.

4         Q.   Did she have a Social Security number?  I am not

5    asking you what it was, but did she have a Social Security

6    number?

7         A.   None to my knowledge.

8         Q.   Do you know how long they have been in the United

9    States, if at all?

10         A.   I have no idea.

11         Q.   And you are not aware of any kind of -- in your 31

12    years in this business you are not aware of the type of manner

13    or length of delay in issuing of Social Security numbers for

14    people who are becoming U.S. citizens?

15         A.   No, I have no idea.

16         MR. DUSTHIMER:  Thank you.  That's all I have.

17         THE COURT:  Anything else?

18         MR. WESTPHAL:  No.

19         THE COURT:  Thank you, sir.  You are excused.

20    Counsel, can I see you just at the bench?

21         (An off-the-record discussion was held.)

22         THE COURT:  Members of the jury, I have hearings at

23    4:00 and 4:30 that I have to conduct because as I said, there is

24    no other Judge in the building today.  This is something that's

25    hard to predict because it has to do with when people get

1  arrested and we just don't know so we didn't have a break this

2  afternoon, we are going to knock off now, I would -- I wanted to

3  visit with the lawyers and see if we are still on track for

4  tomorrow and they tell me that we are.  To make sure I would

5  prefer to start at 8:30 tomorrow morning.

6          Now, I know some of you come from a fair distance so

7  when you go back to the -- to your room right now, would you

8  discuss it amongst yourselves and if someone has a serious

9  problem with starting at 8:30, we will start at 9:00 again; but

10 otherwise I would like to start at 8:30.  Tell the Court

11 Security Officer what you decide, but I will let you control

12 that; but I would like to start at 8:30.

13         Now, we are getting closer to the end of the trial,

14 but we are not there yet so you have to fight that natural

15 tendency that we all have to want to make up our mind.  We have

16 to wait and keep an open mind, listen to all the evidence, the

17 arguments, and my Instructions of Law before deciding how this

18 case should be resolved.

19         Please do not listen to any radio or news or

20 television broadcasts that might be published about the case,

21 don't view any -- read any newspaper accounts about it.  We will

22 see you hopefully at 8:30, but if you say 9:00, I am happy with

23 9:00.  Good night.

24         (Outside the presence of the jury.)

25         THE COURT:  Be seated.  Mr. Dusthimer, the things that

1   you wanted to talk about, do they need to be on the record?

2             MR. DUSTHIMER:  No.

3             MR. DUSTHIMER:  Good.  I am going to excuse the court

4   reporter, she has gone a long time without a break.

5             (Proceedings concluded at 3:49 p.m., November 19,

6   2008.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, the undersigned, a Certified Shorthand Reporter of
the State of Iowa, do hereby certify that I was called in the
5  capacity of a Certified Shorthand Reporter to report the
foregoing proceedings in the above-captioned matter and that
6  same was taken down by me in stenotype and later reduced to
Computer-Aided Transcription under my supervision and direction,
7  and that the foregoing Partial Transcript of Proceedings is a
true record of the testimony given and all objections interposed
8  and rulings made thereon.

9

          I further certify that I am neither attorney or
10  counsel for, nor related to or employed by any of the parties to
the action in which these proceedings were had, and further,
11  that I am not a relative or employee of any attorney or counsel
employed by the parties hereto or financially interested in the
12  action.

13

          Dated at Davenport, Iowa, this 13th day of July,
14  2009.

15

16                         _____
                          Certified Shorthand Reporter
17                         and Notary Public
                          Linda Faurote-Egbers
18                         Notarial Seal
                          Commission Number 223944
19                         My Commission Expires 8-10-11

20

21

22

23

24

25