1          IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF IOWA
2                DAVENPORT DIVISION

3
UNITED STATES OF AMERICA,          )
4                                  )
          Plaintiff,               )
5                                  )
          -vs-                     )  CRIMINAL NO. 3:08-cr-54
6                                  )
GILARIME MUELLER,                  )  PARTIAL TRANSCRIPT
7                                  )  OF PROCEEDINGS
          Defendant.               )  TRIAL DAY THREE
8                                  )

9

10        PARTIAL TRANSCRIPT OF PROCEEDINGS, held before the

11  Honorable John Jarvey, at the Federal Courthouse, Davenport,

12  Iowa, commencing at 8:31 a.m., November 20, 2008, reported by

13  Linda Faurote-Egbers, Certified Shorthand Reporter and Notary

14  Public for the State of Iowa.

15

16                        APPEARANCES

17  Plaintiff by:            RICHARD D. WESTPHAL
                             Assistant United States
18                           Attorney
                             131 East Fourth Street
19                           Davenport, IA  52801

20
    Defendant by:            JACK E. DUSTHIMER
21                           Attorney at Law
                             1503 Brady Street
22                           Davenport, IA  52801

23

24  Reported by:

25  Linda Faurote-Egbers
    Certified Shorthand Reporter

## INDEX

| Witness | Attorney | Page |
|---|---|---|
| Heather Vanhoosier | Mr. Westphal | 358 |
| | Mr. Dusthimer | 365 |
| | Mr. Westphal | 368 |
| Nicky Hill | Mr. Westphal | 370 |
| | Mr. Dusthimer | 374 |
| | Mr. Westphal | 376 |
| | Mr. Dusthimer | 377 |
| Damar Hampton | Mr. Westphal | 379 |
| | Mr. Dusthimer | 397 |
| | Mr. Westphal | 403 |
| Terry Clark | Mr. Westphal | 405 |
| | Mr. Dusthimer | 411 |
| Matthew Allers | Mr. Westphal | 418 |
| | Mr. Dusthimer | 434 |
| | Mr. Westphal | 444 |
| | Mr. Dusthimer | 446 |
| | Mr. Westphal | 447 |
| | Mr. Dusthimer | 448 |

| Government's Exhibits | Offered | Received |
|---|---|---|
| 47 - Photo - Kitchen Counter (2319 Linwood) | 434 | 434 |
| 48 - Photo - Digital Scales (2319 Linwood) | 434 | 434 |
| 58 - Photo - Currency (5372 Linwood) | 434 | 434 |
| 72 - Damar Hampton's Plea Agreement | 396 | 396 |
| 75 - Phone Records - 563-571-7763 | 426 | 426 |
| 91 - Phone Records - 563-499-3808 | 426 | 426 |
| 92 - Terry Clark's Plea Agreement | 410 | 410 |
| 93 - Phone Activity on 5-2-08 | 433 | 434 |

| Closing Arguments | |
|---|---|
| Mr. Westphal | 455 |
| Mr. Dusthimer | 471 |
| Mr. Westphal | 484 |

| | |
|---|---|
| Certificate of Shorthand Reporter | 498 |

LINDA FAUROTE-EGBERS, FCRR, RMR, RPR, CSR IA (622) IL (3715)
131 East Fourth Street, Davenport, IA  52801  563-884-7737

1          (In the presence of the jury.)

2          THE COURT:  Please be seated.  Members of the jury,

3    good morning.  Continuing on in the matter of United States

4    versus Gilarime Mueller.  Mr. Westphal, call your next witness.

5                         HEATHER VAN HOOSIER,

6    witness herein, called as a witness by the government, after

7    having been first duly sworn, was examined and testified as

8    follows:

9          THE COURT:  When you are comfortably seated there,

10   pull up nice and close to the microphone.  Tell us your name and

11   spell your last name.

12         THE WITNESS:  Heather Van Hoosier, V-a-n,

13   H-o-o-s-i-e-r.

14         THE COURT:  Go ahead.

15                         EXAMINATION

16   BY MR. WESTPHAL:

17     Q.   Good morning.

18     A.   Good morning.

19     Q.   How old are you, Ms. Van Hoosier?

20     A.   30.

21     Q.   How far have you been in school?

22     A.   I've got my CNA certificate and my medical assistant

23   certificate.

24     Q.   Do you know an Andrew Sullivan?

25     A.   Yes.

1    Q.   And how do you know him?

2    A.   He was my boyfriend for four years.

3    Q.   And do you and Mr. Sullivan have any children

4    together?

5    A.   Yes, we have a three-year-old daughter.

6    Q.   Presently what is the status of your relationship with

7    Mr. Sullivan?

8    A.   We are not together, but we do speak because we have a

9    child.

10   Q.   In 2007 did you live at a residence on Fair Avenue in

11   Davenport?

12   A.   Yes, I did.

13   Q.   Do you recall what the address was at that residence?

14   A.   2713 Fair Avenue.

15   Q.   Do you recall what time period you would have lived

16   there?

17   A.   From April of '07 till April of this year.

18   Q.   During that time period how often was Andrew Sullivan

19   at your residence?

20   A.   He was there up until about October of '07.

21   Q.   Was he living there?

22   A.   He was supposed to be, but he wasn't there all the

23   time.

24   Q.   While he was there did you observe Andrew Sullivan in

25   possession of crack cocaine?

1    A.   Yes, I did.

2    Q.   How often was that?

3    A.   At least a couple times a week.

4    Q.   How much would you see?

5    A.   I don't know quantities, but I've seen small

6    quantities, I've seen bigger quantities.

7    Q.   What was it normally in?

8    A.   A baggie.

9    Q.   Did Andrew Sullivan have a job during this time

10   period?

11   A.   No, he did not.

12   Q.   Did he have cash to spend?

13   A.   Yes.

14   Q.   During this time period at the Fair Avenue residence

15   did you ever see Andrew Sullivan cooking crack cocaine?

16   A.   Yes, I did.

17   Q.   How often would that take place?

18   A.   Maybe once a week.

19   Q.   Describe for us a little bit this residence on Fair

20   Avenue.  Is this a house or an apartment?

21   A.   It is a duplex.

22   Q.   And how many rooms are there?

23   A.   Three.

24   Q.   Three bedrooms?

25   A.   Yes.

1    Q.    Is there a living room?

2    A.    Yes.

3    Q.    Kitchen?

4    A.    Yes.

5    Q.    Where would Andrew Sullivan be cooking the crack

6  cocaine?

7    A.    In the kitchen.

8    Q.    How big is the kitchen?  Is it a big kitchen?

9    A.    No, it is a smaller kitchen.

10    Q.    Do you recall some of the items he would use when he

11  cooked crack cocaine?

12    A.    A Pyrex bowl, a spoon, sometimes he'd use a blender.

13    Q.    Did he clean up after?

14    A.    I'm sorry?

15    Q.    Would he clean up after he was done?

16    A.    Most of the time.

17    Q.    Did you ever have to clean up after he was done?

18    A.    Yes.

19    Q.    Did you see what Andrew Sullivan did with the crack

20  after he cooked it?

21    A.    They would break it down, put it in the baggies and

22  then leave with it.

23    Q.    You say they, there would be other people involved

24  with Mr. Sullivan in breaking it down?

25    A.    Most of the time.

1      Q.   Do you know Damar Hampton?

2      A.   Yes.

3      Q.   Was Damar Hampton involved with Mr. Sullivan in

4 relation to the drug activity?

5      A.   Yes.

6      Q.   How often was -- was Damar Hampton over at your

7 residence on Fair Avenue?

8      A.   Usually as many times as Andrew was there.

9      Q.   Do you know a Gilarime Mueller?

10     A.   Yes.

11     Q.   How long have you known Mr. Mueller?

12     A.   Probably about a year, year and a half.

13     Q.   During this time period from April of 2007 to April

14 2008 would you see Gilarime Mueller at your residence on Fair

15 Avenue?

16     A.   Yes.

17     Q.   Was he there to see you?

18     A.   No.

19     Q.   Who was he there to see?

20     A.   Andrew.

21     Q.   Did you know a Matt?

22     A.   Yes.

23     Q.   Did you know what his last name was?

24     A.   No, I didn't, till the other day.

25     Q.   Would Matt be there at the same time as Gilarime

1    Mueller?

2         A.   Yes.  Sometimes Matt would come by himself.

3         Q.   How would you normally know Andrew Sullivan was

4    cooking crack cocaine?

5         A.   Because I would see it.

6         Q.   Would you be in the same room while he was doing it?

7         A.   Sometimes, not all the time.

8         Q.   During the times when Andrew Sullivan was cooking

9    crack cocaine was Gilarime Mueller there?

10        A.   Yes.

11        Q.   Where would he be at?

12        A.   In the kitchen.

13        Q.   That's where Andrew Sullivan was cooking the crack

14   cocaine?

15        A.   Yes.

16        Q.   Did you see him doing anything in the kitchen?

17        A.   I don't remember.

18        Q.   How many times when Andrew Sullivan was cooking crack

19   cocaine would Gilarime Mueller be present?

20        A.   Probably at least five.

21        Q.   And how many of those five times would you see him in

22   the kitchen at the same time as the crack cocaine being cooked?

23        A.   Probably all the five.

24        Q.   Were -- for those five cooks did you see what happened

25   to the crack after it was done being cooked?

1    A.    They would break it down, put it in baggies, separate

2  it.

3    Q.    Where would they do that at?

4    A.    In the kitchen.

5    Q.    Is there a specific spot in the kitchen they would --

6    A.    On the counter.

7    Q.    When you say they, who would you see in there involved

8  in breaking it down?

9    A.    Just depended on who was there.

10    Q.    What about the times when Gilarime Mueller was there?

11    A.    He would be over by the counter with Andrew.

12    Q.    Would Andrew Sullivan make frequent trips to Chicago?

13    A.    Yes.

14    Q.    How often?

15    A.    I'd say at least probably three, four times a week.

16    Q.    During any of those trips when he would come back

17  would you see him at the Fair Avenue house with drugs?

18    A.    Yes.

19    Q.    How much -- when he would make a trip would he come

20  back to Fair Avenue with drugs?

21    A.    Maybe once or twice a week.

22    Q.    During this time period were you involved with Andrew

23  Sullivan in relation to his crack cocaine activity?

24    A.    There was some times that I had given some to Damar

25  Hampton for him.

1  Q. Anything else?

2  A. No.

3  Q. Were you using any drugs during this time?

4  A. No.

5  Q. Do you have any prior felony convictions?

6  A. No, I do not.

7  Q. If you saw this Gilarime Mueller again would you

8 recognize him?

9  A. Yes.

10  Q. Do you see him anywhere in court here this morning?

11  A. Yes.

12  Q. Can you describe where he is at so we know who you are

13 describing?

14  A. He is off to the right sitting over there (Indicating)

15 in the blue shirt.  My right.  I'm sorry.

16  MR. WESTPHAL:  Thank you.  I think those are my

17 questions.

18  THE COURT:  Mr. Dusthimer?

19  MR. DUSTHIMER:  Thank you.

20        <u>EXAMINATION</u>

21 BY MR. DUSTHIMER:

22  Q. You testified that Mr. -- you understood Mr. Sullivan

23 would go to Chicago three to four times a week and once or twice

24 a week he'd come back with drugs?

25  A. Well, to my house he would.  He didn't always come to

1  my house with it.

2      Q.  How long have you known Mr. Mueller?

3      A.  It's been about a year, year and a half.

4      Q.  You mentioned your three-year-old child, is that

5  correct?

6      A.  Yes.

7      Q.  You have another child though, correct?

8      A.  I have two other children.

9      Q.  And one of the children's father is a friend of Mr.

10  Mueller's?

11      A.  Yes, but I did not -- I knew of Gilarime, but I didn't

12  really know Gilarime until within the past year so I've known

13  him longer, yes, than a year, year and a half.

14      Q.  And that other child that is fathered by Mr. Mueller's

15  friend, how old is that child?

16      A.  He's seven.

17      Q.  So obviously you have known Mr. Mueller's friends for

18  at least seven plus years?

19      A.  Yes.

20      Q.  And who -- is it Mike Jackson?

21      A.  Yes.

22      Q.  Is that the father?

23      A.  Yes.

24      Q.  And you used to take his child over to others' house?

25      A.  What do you mean?

1    Q.   Well, was there times when the child was younger that

2    you would be in the same household as Mr. Mueller because you

3    were visiting the father?

4    A.   Honestly I don't remember.  It could have been, but I

5    don't remember.

6    Q.   And sometimes you'd do that at Mr. Jackson's house,

7    sometimes you would do it at Mr. Jackson's mother's house?

8    A.   Where I take my child over there?

9    Q.   When you would, yes.

10   A.   Yes.

11          MR. DUSTHIMER:  Can I visit with counsel?

12          (An off-the-record discussion was held.)

13   BY MR. DUSTHIMER:

14   Q.   As I understand it you said that sometimes you were in

15   the kitchen and you would watch this cook?

16   A.   Yes.

17   Q.   And sometimes Mr. Mueller was in the kitchen and

18   sometimes Mr. Mueller watched this cook?

19   A.   Yes.

20   Q.   You testified that sometimes you helped clean up?

21   A.   Yes, I did.

22   Q.   And you testified sometimes that Mr. Mueller was in

23   there standing over by the counter?

24   A.   Yes.

25   Q.   And you have not been charged?

1    A.    No.

2    Q.    Did you ever take any of those trips to Chicago or was

3 that just what Mr. Sullivan said?

4    A.    I've never taken any trips to Chicago with him for

5 that.

6         MR. DUSTHIMER:  Thank you.  That's all.

7         THE COURT:  Anything else, Mr. Westphal?

8                    FURTHER EXAMINATION

9 BY MR. WESTPHAL:

10    Q.    Did you ever help -- sit down at the table and help

11 them break down the crack cocaine?

12    A.    No.

13    Q.    Did you ever help them actually cook the crack

14 cocaine?

15    A.    No.

16    Q.    Did you ever give any cash to Andrew Sullivan to use

17 for the purchase of cocaine?

18    A.    It was his cash.

19    Q.    Did you ever see Mr. Mueller with any cash?

20    A.    Yes.

21    Q.    At the Fair Avenue address?

22    A.    Yes.

23    Q.    How much cash would he have?

24    A.    I couldn't tell you how much it was.

25    Q.    Where did he have it?

1        A.    I'm sorry?

2        Q.    Where did he have it at?   Where did you see it at?

3        A.    In the dining room.

4        Q.    Did he have it on him or --

5        A.    Yes, he had it on him.

6        Q.    How did he have it -- what did he have it in?

7        A.    Usually -- they usually had it wrapped up with a

8    rubber band around it.

9        Q.    Did you see what he did with that money?

10       A.    He would give it to Andrew.

11             MR. WESTPHAL:  Thank you.

12             THE COURT:  Anything else, Mr. Dusthimer?

13             MR. DUSTHIMER:  None.  Thank you.

14             THE COURT:  Thank you.  You are excused.  Call your

15   next witness.

16             MR. WESTPHAL:  The government calls Nicky Hill.

17                         NICKY HILL,

18   witness herein, called as a witness by the government, after

19   having been first duly sworn, was examined and testified as

20   follows:

21             THE COURT:  Bring that microphone right in front of

22   your mouth, tell us your name and spell your last name, please.

23             THE WITNESS:  Nicky Hill, H-i-l-l.

24             THE COURT:  Go ahead, Mr. Westphal.

25

1          EXAMINATION

2    BY MR. WESTPHAL:

3       Q.    Good morning.  How old are you, Miss Hill?

4       A.    24.

5       Q.    How far have you been in school?

6       A.    Graduated from high school.

7       Q.    Are you presently employed?

8       A.    Yes.

9       Q.    What type of work do you do?

10      A.    CNA.

11      Q.    How long have you done that?

12      A.    It will be six years next month.

13      Q.    Do you know a Matthew Canady?

14      A.    Yes.

15      Q.    How long have you known Mr. Canady?

16      A.    Almost nine years.

17      Q.    In May of 2008 where were you living?

18      A.    2319 North Linwood.

19      Q.    Was anyone living there with you?

20      A.    Yes.

21      Q.    Who was living there with you?

22      A.    My children.

23      Q.    Was Matthew Canady at that address?

24      A.    He was there and other places.

25      Q.    Did he keep personal items at 2319 North Linwood?

1    A.   Yes.

2    Q.   Did he stay overnight there?

3    A.   Yes.

4    Q.   In May of 2008 was Matthew Canady working anywhere?

5    A.   No.

6    Q.   On May 2nd of 2008 do you recall a search warrant

7  being conducted at your residence on Linwood Avenue?

8    A.   Yes.

9    Q.   Was there some money seized out of your residence?

10   A.   Yes.

11   Q.   Do you know where that money was found at?

12   A.   In my dresser drawer.

13   Q.   Was that money yours?

14   A.   No.

15   Q.   Who did it belong to?

16   A.   Matt.

17   Q.   On May 2nd of 2008 do you remember going somewhere and

18  renting a vehicle?

19   A.   Yes.

20   Q.   Where did you go?

21   A.   Enterprise.

22   Q.   Who went with you?

23   A.   Matt and the kids.

24   Q.   And whose idea was it to rent the car?

25   A.   Matt's.

1    Q.   Did he say why he wanted to rent a car?

2         MR. DUSTHIMER:  Objection.  Hearsay.

3         THE COURT:  Overruled.  Answer the question.

4         THE WITNESS:  Oh, yeah.

5  BY MR. WESTPHAL:

6    Q.   Why did he want to rent a car?

7    A.   Because he felt like he was being watched.

8    Q.   Did he have another car at your residence that day?

9    A.   No, besides the truck.

10   Q.   Okay.  The truck, what kind of truck was this?

11   A.   A Yukon.

12   Q.   Was it a Denali?

13   A.   Yes.

14   Q.   Did Matt Canady drive that Denali?

15   A.   Yes.

16   Q.   Was he concerned on May 2nd about driving the Denali?

17   A.   Yes.

18   Q.   Do you know a Gilarime Mueller?

19   A.   Yes.

20   Q.   How long have you known Mr. Mueller?

21   A.   I really can't say how long.  A while.

22   Q.   Did he -- did Gilarime Mueller ever come over to your

23  house on Linwood?

24   A.   Yes.

25   Q.   How often would he be over there?

1      A.    Not very often, maybe once or twice a week.

2      Q.    During your contact with Matthew Canady have you ever

3  seen him in possession of crack cocaine?

4      A.    Yes.

5      Q.    How many times?

6      A.    Several.

7      Q.    Did you see him in possession of crack cocaine at the

8  residence at 2319 North Linwood?

9      A.    Yes.

10     Q.    How many times there?

11     A.    Several.

12     Q.    Where would you see it at?

13     A.    In the kitchen.

14     Q.    During any of those times was Gilarime Mueller

15  present?

16     A.    Yes.

17     Q.    Did you ever see Matthew Canady cooking crack cocaine

18  at your residence?

19     A.    Yes.

20     Q.    Did you see him cooking at the 2319 North Linwood

21  residence?

22     A.    Yes.

23     Q.    How many times?

24     A.    Several.

25     Q.    Was Gilarime Mueller ever present during those cooks?

1     A.   Yes.

2     Q.   How many of them?

3     A.   Several.

4     Q.   Did you see any of the items they used to cook up the

5 crack cocaine?

6     A.   Yes.

7     Q.   What kind of items would they use?

8     A.   A pot and baking soda.

9     Q.   What kind of pot?

10    A.   A glass pot.

11    Q.   During those times did you ever assist Mr. Canady in

12 cooking up the crack cocaine?

13    A.   No.

14    Q.   Did you ever assist him in breaking down the crack

15 cocaine and packaging it up?

16    A.   No.

17    Q.   Do you have any prior felony convictions?

18    A.   No.

19        MR. WESTPHAL:  Those are my questions.  Thank you.

20        THE COURT:  Mr. Dusthimer?

21                  EXAMINATION

22 BY MR. DUSTHIMER:

23    Q.   This isn't the first time you have testified under

24 oath regarding this matter, is that correct?

25    A.   Correct.

1    Q.   The first time you talked to investigators regarding

2  this matter, is that correct?

3    A.   Correct.

4    Q.   Have you previously said something like Officer Matt

5  told me if I didn't tell them what they wanted to hear you would

6  be in big trouble?

7    A.   Yes.

8    Q.   Was that a time when you were under oath or was that a

9  different time?

10   A.   When I was under oath.

11   Q.   Did you also testify under oath that you had made up

12  different stories?

13   A.   Yes.

14   Q.   You made some stuff up?

15   A.   Yes.

16   Q.   You were under oath at that time too?

17   A.   Yes.

18   Q.   In fact, you testified that you -- first you testified

19  that you had never seen Mr. Canady cook crack cocaine and then

20  you clarified and said you saw Mr. Canady cook crack cocaine one

21  time, is that correct?

22   A.   Correct.

23   Q.   That was under oath?

24   A.   Yes.

25   Q.   You told the police that you thought Mr. Canady

1    received -- was receiving his money from his family?

2         A.    No.

3         Q.    You don't remember saying that?

4         A.    No.

5         Q.    Do you remember telling the police that the money that

6    was found in the dresser drawer was because you were two months

7    behind in your mortgage?

8         A.    No, I said it was for my mortgage.

9         Q.    And that you had never seen Matt Canady with drugs?

10        A.    Yes.

11              MR. DUSTHIMER:  May I visit with counsel?

12              (An off-the-record discussion was held.)

13              MR. DUSTHIMER:  Thank you.  That's all the questions I

14   have.

15              THE COURT:  Mr. Westphal?

16                       FURTHER EXAMINATION

17   BY MR. WESTPHAL:

18        Q.    Miss Hill, you referred to Officer Matt.  Do you

19   recognize this officer?

20              THE COURT:  You have to answer yes or no.

21              THE WITNESS:  Yes.

22   BY MR. WESTPHAL:

23        Q.    Is that the officer you were referring to?

24        A.    Yes.

25        Q.    He told you that you had to tell truth, isn't that

1  correct?

2      A.   Yes.

3      Q.   And you know today that you have to tell the truth?

4      A.   Yes.

5      Q.   Is that what you have done?

6      A.   Yes.

7           MR. WESTPHAL:  Thank you.

8           THE COURT:  Mr. Dusthimer, anything else?

9           MR. DUSTHIMER:  May I approach the witness?

10          THE COURT:  Yes.

11                     FURTHER EXAMINATION

12  BY MR. DUSTHIMER:

13      Q.   Miss Hill, I am going to ask you to read to yourself a

14  couple pages, I am going to represent to you that it is part of

15  the transcript of your prior testimony.  You can take a look at

16  that if you'd like and then I am going to ask you questions

17  after you are done reading it to yourself.  Is that okay?

18      A.   Yes.

19      Q.   That's where it shows your name, starting on page 14,

20  go ahead and start on line one, you just read all of that page

21  to yourself and then I am going to ask you some more questions.

22           Have you done so?  You were asked a question, at the

23  very top it says, "That is what you told them?"  And your answer

24  was, "Yeah, but it wasn't a true statement."

25           Question, "So you lied to them?"  Answer, "Yes."  Did

1    I read that part correctly?

2        A.   Yes.

3        Q.   And then, question, "A lie that --"

4            MR. WESTPHAL:  Excuse me, Mr. Dusthimer.  You are

5    supposed to ask her about the statements and she can say if she

6    recalls saying it or not rather than just to read it.

7            THE COURT:  Is that an objection?

8            MR. WESTPHAL:  Yes, improper impeachment.

9            THE COURT:  It is sustained.  It is improper

10   impeachment.  Ask her the question first and then impeach her

11   with any prior inconsistent statement.

12   BY MR. DUSTHIMER:

13       Q.   Did you testify under oath that the officer sat on my

14   couch, just told me I had to tell -- that if I didn't tell what

15   they wanted to hear, that me and my family would be in big

16   trouble?

17       A.    They told me that -- one of the officers told me that

18   they were going to get me for money laundering when I was seen

19   walking out to the car.

20       Q.   Did you tell them that if they didn't -- if you didn't

21   tell them what they wanted to hear, that me and my family would

22   be in big trouble, did you tell them that?

23       A.   Yes.

24       Q.   And you and your family would be you and your

25   children?

1       A.   Yes.

2       Q.   How many children?

3       A.   Two.

4            MR. DUSTHIMER:  Thank you.  That's all the questions I

5   have.

6            THE COURT:  Anything else, Mr. Westphal?

7            MR. WESTPHAL:  Nothing.

8            THE COURT:  You are excused.  Call your next witness.

9            MR. WESTPHAL:  Call Damar Hampton.

10                           DAMAR HAMPTON,

11  witness herein, called as a witness by the government, after

12  having been first duly sworn, was examined and testified as

13  follows:

14           THE COURT:  When you are comfortably seated there,

15  tell us your name and spell your last name, please.

16           THE WITNESS:  Damar Hampton, H-a-m-p-t-o-n.

17           THE COURT:  Go ahead.

18                           EXAMINATION

19  BY MR. WESTPHAL:

20      Q.   Good morning, Mr. Hampton.  How old are you, sir?

21      A.   27.

22      Q.   How far have you been in school?

23      A.   Got my GED.

24      Q.   You are presently in federal custody, is that correct?

25      A.   Yes, sir.

1    Q.    And have you pled guilty to a federal drug charge?

2    A.    Yes, sir.

3    Q.    What charge have you pled guilty to?   Do you recall?

4    A.    Conspiracy to distribute crack cocaine.

5    Q.    And have you been sentenced yet?

6    A.    No, sir.

7    Q.    How long have you been in custody?

8    A.    Since April 11th of '08, this year.

9    Q.    In 2007 did you know Gilarime Mueller?

10   A.    Yes, sir.

11   Q.    How did you meet him?

12   A.    Through Andrew Sullivan.

13   Q.    Where did you first meet him at?

14   A.    If I'm not mistaken, Heather's house, Andrew

15   Sullivan's baby's mother.

16   Q.    Do you know where that house is at?

17   A.    It is in Davenport.  I don't know the exact address.

18   Q.    What part of Davenport?

19   A.    Northern part I would say.

20   Q.    Did you -- how often were you over at that address?

21   A.    Quite a bit.

22   Q.    Almost daily?

23   A.    Just about, yes, I would say so.

24   Q.    Did you ever see Mr. Sullivan?

25   A.    Yes.

1      Q.   Do you know a Matt Canady?

2      A.   Yes, sir.

3      Q.   In 2007 did you know Matt Canady?

4      A.   Yes, sir.  Yes, sir.

5      Q.   Did you ever see him over at the residence on Fair

6 Avenue?

7      A.   Yes, sir.

8      Q.   How did you meet Mr. Canady?

9      A.   Through Andrew Sullivan.

10     Q.   Now, were you involved with Mr. Sullivan in obtaining

11 drugs from Chicago and bringing them back to the Quad Cities?

12     A.   Yes, sir.

13     Q.   What type of drugs were you bringing back?

14     A.   Cocaine, powder cocaine.

15     Q.   And what specifically were you doing in relation to

16 bringing it back?

17     A.   Mostly transporting, it was transporting.

18     Q.   Transporting it, how would you transport it?

19     A.   In the car, put it in the trunk.

20     Q.   Drive up there?

21     A.   Yeah, we'd drive up there, get the package, drive

22 back.

23     Q.   Would you have money with you on the way up?

24     A.   Yes.

25     Q.   Would anyone go with you on these trips?

1    A.    Mostly, yes, all the time.

2    Q.    Did you ever go by yourself?

3    A.    No.

4    Q.    Did Andrew Sullivan go with you on these trips?

5    A.    Most of them.

6    Q.    Did Gilarime Mueller ever go with you on any of these

7    trips?

8    A.    Yes.

9    Q.    What about Matt Canady?

10   A.    Yes.

11   Q.    How many trips did Gilarime Mueller go with you?

12   A.    At least three that I can recall.

13   Q.    How about Matt Canady?

14   A.    About the same amount.

15   Q.    If Gilarime Mueller went with you would Matt Canady

16   also be going with you?

17   A.    Yes.

18   Q.    Who would give you the money for payment for these

19   trips?  Let me ask this.  Who would give you money to pay for

20   the drugs on these trips?

21   A.    It was pretty much a group thing, but I would get

22   personally myself from Andrew or they'd put it in the car.

23   Q.    Did you ever see anyone giving Andrew money that he

24   gave you?

25   A.    Yes.

1     Q.   Have you ever seen Gilarime Mueller give Andrew

2   Sullivan money?

3     A.   I don't believe so.  I don't believe I ever seen him

4   give him any money, no.

5     Q.   Have you ever seen Matt Canady give him any money?

6     A.   Yes.

7     Q.   Now, when you would go up and return driving back the

8   drugs, where would you normally take that when you got back?

9     A.    In the beginning there was quite a few places we went,

10  but normally Andrew's house.

11     Q.   When you would get back to Andrew's house with the

12  drugs, was Gilarime Mueller ever present?

13     A.   Yes.

14     Q.   Matt Canady?

15     A.   Yes.

16     Q.   What type of drugs were you bringing back?

17     A.   Crack cocaine -- cocaine powder.

18     Q.   Crack cocaine and powder cocaine?

19     A.   Normally powder.

20     Q.   How much normally would you be bringing back?

21     A.   A key at least.

22     Q.   And when you say a key, what weight would that refer

23  to normally?

24     A.   I'm not sure exactly how many grams it is or -- a

25  kilo, a kilo.

1    Q.    One kilogram would be a normal trip?

2    A.    On average at least, yes.

3    Q.    What is the largest amount you brought back?

4    A.    As far as to my knowledge, three to four.

5    Q.    Kilograms?

6    A.    Yes.

7    Q.    Of powder or crack?

8    A.    Powder.

9    Q.    What is the most common amount of money you would take

10   on these trips?

11   A.    At least 20,000 on average.

12   Q.    When the powder cocaine was brought back, was one of

13   the locations brought back to the Fair Avenue house?

14   A.    Can you explain that, say that again?

15   Q.    Yes.  When you were at the Fair Avenue residence, is

16   that one of the places the powder cocaine was brought back to?

17   A.    Yes.

18   Q.    Fairly often?

19   A.    I'd say majority of the time.

20   Q.    When powder cocaine was brought back there do you know

21   what happened to it?

22   A.    It was cooked up and made into crack cocaine.

23   Q.    Who have you seen at Fair Avenue cook up the powder

24   into crack?

25   A.    Andrew Sullivan, Michael Coleman, Gilarime, Matt

1  Canady.

2      Q.   How many times have you seen Gilarime Mueller involved

3  in cooking crack cocaine at the Fair Avenue residence?

4      A.   At the Fair Avenue residence, at least once.

5      Q.   And where at the Fair Avenue residence would the

6  cooking take place?

7      A.   In the kitchen.

8      Q.   And what specifically did you see Gilarime Mueller

9  doing that one time on Fair Avenue?

10     A.   Making sure the proper measurements be made and put it

11 in the bowl and stirring and add water.

12     Q.   Was he doing -- was he the only one there doing it?

13     A.   The times I seen him do it, Andrew was actually

14 helping him because my understanding he didn't know how to do

15 it, so Andrew was showing him how to do it.

16     Q.   Do you recall approximately how much drugs, the powder

17 cocaine he was cooking up?

18     A.   I would -- I would say no less than a 63, 63 grams.

19     Q.   Did you see what happened to the crack cocaine once it

20 was cooked up by Gilarime Mueller?

21     A.   Yeah, it was cut up out of the bag and packaged I

22 guess, took away.

23     Q.   There on Fair Avenue?

24     A.   Yes.  I didn't see him like put it in little-bitty

25 baggies, just big baggies.

1          Q.    Where would they do that at?

2          A.    In the kitchen.

3          Q.    Is there somewhere in the kitchen they would do that

4    at?

5          A.    On the counter by the sink.

6          Q.    Do you know approximately when you would have seen

7    Gilarime Mueller cooking crack over at Fair Avenue?

8          A.    I couldn't give dates.  I don't know the dates.

9          Q.    Were you involved in an incident on October 9th of

10    2007?

11          A.    Yes.

12          Q.    And that involved you being arrested, correct?

13          A.    Yes.

14          Q.    How long prior to that could you estimate was this

15    cook at Fair Avenue?

16          A.    I would have to say probably around June or July for

17    that.

18          Q.    Now, you said you have seen Gilarime Mueller cook

19    crack cocaine at another location besides Fair Avenue?

20          A.    Yes.

21          Q.    Was that in 2007 as well?

22          A.    Yes.

23          Q.    Where was that at?

24          A.    Right off of Harrison I believe the street is.

25          Q.    In Davenport?

1    A.    Yes.

2    Q.    And why were you there that day?

3    A.    We just got back in from Chicago with the package.

4    Q.    The package of what?

5    A.    Crack cocaine -- or powder cocaine.

6    Q.    And who all was there that day?

7    A.    The owner of the -- the owner of the house, me,

8    Andrew, and Gilarime that I can remember.

9    Q.    Where were they cooking the crack?  Is that an

10   apartment or a house?

11   A.    A duplex.

12   Q.    A duplex?  Where were they cooking the crack cocaine?

13   A.    In the kitchen, in the kitchen.

14   Q.    Did you see specifically what Gilarime Mueller was

15   doing on that day?

16   A.    Pretty much the same thing he was doing at the house.

17   Q.    Was Andrew Sullivan there as well?

18   A.    Yes.

19   Q.    Was that before or after this cook at Fair Avenue?

20   A.    I believe it was after.  I'm not sure, but I believe

21   so.

22   Q.    Did you see what happened to the crack cocaine that

23   was cooked up on that occasion?

24   A.    Once again, it was cut into the proper portions that

25   he needed and bagged.

1        Q.    Was Gilarime Mueller involved in that part of the

2    process?

3        A.    Yeah, he did that hisself.

4        Q.    What were you -- were you involved at all in cooking

5    up the crack cocaine?

6        A.    No.

7        Q.    Did you assist in breaking it down or packaging it up?

8        A.    Yes, sometimes.

9        Q.    Do you recall an incident where you and Matt Canady

10   were at Fair Avenue and he was upset with you?

11       A.    Yes, I do.

12       Q.    And what did he do?

13             MR. DUSTHIMER:  Objection.  Relevance.

14             THE COURT:  Overruled.  Answer the question.

15             THE WITNESS:  He pulled a pistol on me.

16   BY MR. WESTPHAL:

17       Q.    And who all was there that day?

18       A.    Me, one of my friends, Andrew, Gilarime, Matt, and

19   Mike Light, Michael Coleman.

20       Q.    What had you been doing earlier that day?   What

21   happened that day?

22       A.    We had made a trip to Chicago.

23       Q.    Was there something about that trip to Chicago -- did

24   Matt Canady say why he was upset?

25       A.    Supposedly there was some money missing.

1    Q.    Did anything happen during the trip that he said he

2    was upset about?

3    A.    The money came up short.

4    Q.    Did -- did you take money from him that day?

5    A.    No, sir.

6    Q.    Did Matthew Canady go with you on that trip?

7    A.    Matt Canady?

8    Q.    Yes.

9    A.    Yes, sir.

10   Q.    Did Gilarime Mueller go with you on that trip?

11   A.    Yes, sir.

12   Q.    Have you seen Matt Canady cooking up crack cocaine --

13   A.    Yes, sir.

14   Q.    -- at the Fair Avenue residence?

15   A.    Yes.

16   Q.    How many times do you think you have seen him cooking

17   up crack cocaine?

18   A.    About at least twice.

19   Q.    Would anyone be assisting him in cooking it up?

20   A.    No.

21   Q.    Were you involved in relation to a trip where some

22   cocaine was possibly lost?

23   A.    I wasn't involved in the trip where they took the

24   cocaine, no.

25   Q.    Were you involved in later looking for that cocaine?

1    A.    Yes.

2    Q.    How did you become involved in that?

3    A.    Andrew called me and told me --

4          MR. DUSTHIMER:  Objection.  Hearsay.

5          THE COURT:  Your response?

6          MR. WESTPHAL:  Co-conspirator.

7          THE COURT:  Overruled.  Answer the question.

8          THE WITNESS:  Andrew called, asked me to come over,

9    once I came, explained the situation to me and a couple of us

10   got together and went to look for it.

11   BY MR. WESTPHAL:

12   Q.    What did he tell you was the situation?

13   A.    That basically I guess on the way back from I believe

14   it was Chicago they got pulled over, whoever was coming back

15   with a certain amount of crack cocaine, powder, and he ran out

16   the car into a cornfield.

17   Q.    And what did Mr. Sullivan ask you to do?

18   A.    Basically either go to the cornfield and look around

19   for the coke.

20   Q.    Did anyone go with you to look?

21   A.    Yes.

22   Q.    Who went with you?

23   A.    Me, a guy named John, Gilarime, and Matt Canady.

24   Q.    And where did you go to look?

25   A.    I'm not sure of the town, it's about an hour and a

1   half away I'd say.

2       Q.   Did -- when you got there what did you do?

3       A.   We went to the cornfield and crawled around for about

4   four hours looking for cocaine.

5       Q.   Who all went to the cornfield to look?

6       A.   Same people.

7       Q.   Tell us who again.

8       A.   Me, Andrew -- me, Matt Canady, Gilarime, and John.

9       Q.   Did you find anything?

10      A.   No.

11      Q.   Did Gilarime Mueller make any statements about what

12  you were looking for or how much you were looking for?

13      A.   Probably did, but not that I can recall word for word.

14      Q.   In your involvement with this group did you deliver

15  crack cocaine for Andrew Sullivan?

16      A.   Yes.

17      Q.   Did you ever deliver crack cocaine to Matt Canady?

18      A.   Not directly personally, no.

19      Q.   What does that mean?

20      A.   I'd go pick up a package, drop it off at Andrew's

21  house, and I seen him, you know, get his cut out of the package,

22  but I didn't personally hand it to him.

23      Q.   Let's talk about that.  You would get a package and

24  bring it over to what house?

25      A.   The house on Fair Street.

1    Q.   Heather's house?

2    A.   Yes, Heather's house.

3    Q.   And how much would you bring over?

4    A.   It was the -- a key or so that we came in town with.

5    Q.   Powder cocaine or crack cocaine?

6    A.   Powder.

7    Q.   And it would get broken up somehow?

8    A.   Yeah, they'd split it their ways, I don't know

9    specifically which way they would separate it, but they'd split

10   it.

11   Q.   Who would be splitting it up?

12   A.   Matt, Lenny, Shorty, or Andrew.

13   Q.   And would you see Matt Canady leave with some of that?

14   A.   Yes.

15   Q.   And this was in powder form at that point?

16   A.   Sometimes it was both.

17   Q.   Did you see Gilarime Mueller leave with any?

18   A.   Yes.

19   Q.   Did you ever deliver any crack cocaine directly to

20   Gilarime Mueller?

21   A.   Pretty much the same way as with Matt.

22   Q.   Bring over a package and get divided up?

23   A.   Yes, and it would get divided up.

24   Q.   Have you yourself ever purchased any crack cocaine

25   from Gilarime Mueller?

1      A.    Yes.

2      Q.    Approximately when would that have been?

3      A.    Probably around June or July as well.

4      Q.    And how many times have you purchased from Gilarime

5  Mueller?

6      A.    At least twice.

7      Q.    What type of quantities?

8      A.    It was at least seven -- 3.5 to seven grams each time.

9      Q.    And where would those transactions take place at?

10     A.    In an alley right off of Washington Street.

11     Q.    In what town?

12     A.    Davenport.

13     Q.    How would you get ahold of him to ask for crack

14  cocaine, Gilarime Mueller?

15     A.    I had his number.

16     Q.    Did you ever see Gilarime Mueller with cash?

17     A.    Not that I can recall.

18     Q.    During this time period in 2007 were you using any

19  drugs?

20     A.    Yes.

21     Q.    What drugs were you using?

22     A.    Marijuana, ecstasy, liquor.

23     Q.    How often were you using drugs?

24     A.    Depended on how long of a trip I had to take or so and

25  take some ecstasy to keep me up.

1     Q.   How about marijuana, how often were you using that?

2     A.   Every -- not too often.

3     Q.   You have some prior convictions for felony offenses,

4 is that correct?

5     A.   Yes, sir.

6     Q.   Do you have a 2001 conviction for theft?

7     A.   Yes, sir.

8     Q.   You have a 2000 conviction for burglary?

9     A.   Yes, sir.

10    Q.   Now, initially on your federal charges you were on

11 supervised release, is that correct?

12    A.   Yes, sir.

13    Q.   And your supervised release was revoked?

14    A.   Yes, sir.

15    Q.   What was the nature of the violations that caused it

16 to be revoked?

17    A.   Driving offenses and I got caught in Illinois.

18    Q.   Was that a felony conviction?

19    A.   No conviction.

20    Q.   The driving offenses, did you get tickets or convicted

21 on those?

22    A.   I may have been convicted on one or two I believe.  I

23 had tickets.

24    Q.   Pursuant to your plea of guilty on these federal

25 conspiracy charges did you sign a written Plea Agreement?

1    A.    Can you say that again?

2    Q.    Did you sign a written Plea Agreement on your federal

3    drug charges?

4    A.    Yes, sir.

5    Q.    Handing you what is marked as Government's Exhibit 72,

6    do you recognize what that is?

7    A.    Yes.

8    Q.    What is that?

9    A.    It's my Plea Agreement.

10   Q.    On page 13 of that agreement do you see any signatures

11   you recognize?

12   A.    Yes.

13   Q.    Whose signature do you recognize?

14   A.    Mine and my attorney's.

15   Q.    On the last page, page 17 of that agreement, do you

16   see any signatures you recognize?

17   A.    Yes.

18   Q.    Whose signatures do you recognize?

19   A.    Mine, my attorney's, and yours.

20   Q.    What date did you sign that?

21   A.    The 29th of October.

22   Q.    Of what year?

23   A.    Of '07.

24   Q.    Does that appear to be the Plea Agreement that you

25   signed?

1   A.   Yes.

2        MR. WESTPHAL:  At this time we move to admit

3   Government's Exhibit 72.

4        MR. DUSTHIMER:  No objection.

5        THE COURT:  72 is received.

6   BY MR. WESTPHAL:

7   Q.   As part of your written Plea Agreement did you agree

8   to cooperate with the government?

9   A.   Yes, sir.

10  Q.   What is your understanding of what that means?

11  A.   To answer any questions that they may have or ask to

12  the -- as fully and truthfully as I can.

13  Q.   Does it matter who asks the questions?

14  A.   No, sir.

15  Q.   Are you allowed to protect anyone?

16  A.   No, sir.

17  Q.   Are you allowed to falsely accuse anyone?

18  A.   No, sir.

19  Q.   What happens if you do that?

20  A.   My Plea Agreement will be revoked.

21  Q.   In return for your cooperation are you expecting

22  something in return?

23  A.   Possibly.

24  Q.   Possibly what could happen?

25  A.   Lesser sentence hopefully.

1    Q.   Is there something called substantial assistance in

2    your Plea Agreement?

3    A.   Yes.

4    Q.   What is your understanding of how that works?

5    A.   If my information is credible I guess, I may be

6    eligible to get a cut in my time.

7    Q.   Who files that Motion?

8    A.   You.

9    Q.   The government?

10   A.   The government.

11   Q.   Okay.  I am a member.  Who decides whether or not to

12   grant that Motion?

13   A.   The Judge.

14   Q.   Who decides how much, if any, reduction you get?

15   A.   The Judge.

16        MR. WESTPHAL:  I think those are my questions for now,

17   Mr. Hampton.  Thank you.

18        THE COURT:  Mr. Dusthimer?

19                       EXAMINATION

20   BY MR. DUSTHIMER:

21   Q.   That Exhibit 72 that you have in front of you, who

22   wrote it up?

23   A.   The government I guess.

24   Q.   Anywhere in that document that you have in front of

25   you, is Mr. Mueller's name there?

1       A.    I don't believe so.

2       Q.    And you are telling us you were coming back from

3   Chicago on a regular basis with at least one kilo?

4       A.    Yes.

5       Q.    Turn for me to -- on page three of the agreement,

6   Paragraph 6A.  It talks about at least 150 grams of mixture

7   regarding cocaine base, is that correct?

8       A.    Yes.

9       Q.    Who is Justin Harris?

10      A.    That's an alias I used before.

11      Q.    So it is you?

12      A.    Yes.

13      Q.    When did you use it about?

14      A.    Maybe '98.

15      Q.    Why did you use it?

16      A.    I got arrested, didn't want to get arrested.

17      Q.    You told the officers a different name?

18      A.    Yes.

19      Q.    How long did that name last for you?

20      A.    What do you mean?

21      Q.    Did they ever figure out during that arrest or that

22  process --

23      A.    I am not sure.  I believe it was right at that moment

24  pretty much they found out it was a bogus name.

25      Q.    Who is Marcus Harris?

1    A.    That's my cousin.

2    Q.    Have you used his name?

3    A.    No.

4    Q.    Let me see if I understand this correctly regarding

5    your bond violation allegations.  Do you remember those?  Is

6    that a yes?

7    A.    Yes.

8    Q.    Okay.  When were you arrested for this offense in

9    Federal Court?

10   A.    April 11th.

11   Q.    So a little more than a year ago, April of '07,

12   correct?

13   A.    Yes.

14   Q.    And when were you released?

15   A.    No, no, no, sorry, that would be April of '08.

16   Q.    Let me see if I can help you.  You pled guilty, you

17   signed the Plea Agreement that you have in front of you, it

18   appears to be dated October 29th of '07.

19   A.    Yes.

20   Q.    Feel free to look if you like.

21   A.    I know.

22   Q.    Were you released after you signed this Plea

23   Agreement?

24   A.    I pretty much signed it right there and then.  I never

25   made it to the county jail.

1    Q.    But when you signed this in October of '07, were you

2    released from federal custody after you signed your Plea

3    Agreement?

4    A.    Yes, sir.

5    Q.    If you would turn to page two, Paragraph 5.  It talks

6    about mandatory detention for people that have been found guilty

7    or pled guilty to these types of offenses, is that correct?

8    A.    Yes, sir.

9    Q.    So even though this document talked about mandatory

10   detention, you were released after you pled guilty?

11   A.    The plea wasn't taken at that time, but I had signed

12   it.  Afterwards, no.

13   Q.    If you are confused, take your time.

14   A.    It was -- when I got arrested I got released.  I got a

15   lawyer.  The plea was presented to me.  I signed the plea.

16   Q.    So to go back to where we were, it was April of '07 --

17   A.    April of '07 is when I was taken into custody.

18   Q.    And then you were released shortly after that?

19   A.    I've been in since.

20   Q.    How did the bond violations occur if you were not out

21   on bond?

22   A.    That happened before April 11th.

23   Q.    Were you placed on bond about a year ago in November

24   of '07?

25   A.    I guess.

1    Q.    Does that sound about right?

2    A.    I guess so.

3    Q.    And then less than a month later you were arrested in

4    Illinois?

5    A.    Possibly.

6    Q.    Less than a month after that you were arrested again

7    in Illinois?

8    A.    Possibly.

9    Q.    And less than two weeks after that you were arrested

10    again in Illinois?

11    A.    Possibly.

12    Q.    And less than a month after that you were arrested in

13    Illinois or you were found without a seat belt in Illinois?

14    A.    Possibly.

15    Q.    And a month after that you were arrested in Illinois

16    for battery and domestic battery?

17    A.    I'm not sure of the month, but I know the charge.

18    Q.    And then two days later you were caught driving again

19    in Illinois?

20    A.    Possibly.  I thought I had my license after that, but

21    possibly.

22    Q.    I am sorry.  Operating uninsured vehicle and failure

23    to wear a seat belt.

24    A.    That's most likely.

25    Q.    And then if I do my math right, 11 days later is when

1  you were charged with the felony offense?

2      A.   I'm not sure of the time frame, but --

3      Q.   Does it sound about right?

4      A.   Yes.

5      Q.   When you were released on bond here in Federal Court

6  did you have to sign a bond contract?

7      A.   Possibly.

8      Q.   Did the bond contract say that you were not supposed

9  to violate any more federal, state, or local laws?

10     A.   I do remember hearing that.

11     Q.   And if you were released on November 29th and less

12 than a month you were caught for traffic matters?

13     A.   Yes, sir.

14     Q.   Did you consider that to be a violation of the

15 document that you signed in front of a Federal Magistrate?

16     A.   I guess it would be.

17     Q.   Did you know at that time you didn't have a driver's

18 license?

19     A.   I believe so.

20     Q.   And when did you get your driver's license back?

21     A.   I'm not sure of the date.

22     Q.   But you kept on driving anyway?

23     A.   Yeah.

24     Q.   Even though you signed that paperwork to the Federal

25 Judge in your case that you were not going to violate any more

1  laws?

2       A.   Yes, sir.

3            MR. DUSTHIMER:  May I have a minute?

4            (An off-the-record discussion was held.)

5            MR. DUSTHIMER:  Thank you.  That's all the questions I

6  have.

7            THE COURT:  Anything else, Mr. Westphal?

8                      FURTHER EXAMINATION

9  BY MR. WESTPHAL:

10      Q.   Mr. Hampton, to clarify about the sequence of things,

11 on October 29, 2007, you signed your Plea Agreement, correct?

12      A.   Yes.

13      Q.   Did you actually plead guilty that day?

14      A.   No.

15      Q.   You pled guilty after that?

16      A.   Yes.

17      Q.   When you mention the April date, is that the date you

18 pled guilty?

19      A.   April 11th, yes.

20      Q.   Of what year?

21      A.   '08.

22      Q.   Even though you signed your Plea Agreement in October

23 you did not actually plead until April 2008?

24      A.   True.

25      Q.   Also at that time your supervised release was revoked?

1    A.   Yes.

2    Q.   Now, the violations that Mr. Dusthimer is going

3  through, are most of those traffic violations?

4    A.   Say that again.

5    Q.   Most of the supervised release violations Mr.

6  Dusthimer was talking about, were most of those traffic

7  violations?

8    A.   All but two of them, yes.

9         MR. WESTPHAL:  Thank you.

10        THE COURT:  Anything else, Mr. Dusthimer?

11        MR. DUSTHIMER:  None.  Thank you.

12        THE COURT:  You are excused.  Mr. Westphal?

13        MR. WESTPHAL:  Call Terry Clark.

14                    TERRY CLARK JR.,

15  witness herein, called as a witness by the government, after

16  having been first duly sworn, was examined and testified as

17  follows:

18        THE COURT:  When you are comfortably seated, pull

19  right up to the microphone, tell us your name and spell your

20  last name.

21        THE WITNESS:  Terry Leon Clark Junior, C-l-a-r-k.

22        THE COURT:  Go ahead, Mr. Westphal.

23

24

25                    EXAMINATION

1  BY MR. WESTPHAL:

2      Q.   Good morning, Mr. Clark.

3      A.   Good morning.

4      Q.   How old are you, sir?

5      A.   26.

6      Q.   How far have you been in school?

7      A.   Ninth grade.

8      Q.   Did you ever get your GED?

9      A.   I took the test, but I don't know if I passed or not.

10     Q.   You are currently in federal custody, is that correct?

11     A.   Of course, yes.

12     Q.   And what did you plead guilty to?

13     A.   Conspiracy to distribute drugs.

14     Q.   What day did you get arrested?

15     A.   I believe it was June 27th or June 28th.

16     Q.   Of what year?

17     A.   2007.

18     Q.   Was it --

19     A.   I mean 2008.  Sorry.

20     Q.   This year?

21     A.   Yes.

22     Q.   In January of 2007 were you involved in distributing

23 drugs?

24     A.   Yes.

25     Q.   What type of drugs were you personally involved with

1    in distributing?

2        A.    Crack cocaine.

3        Q.    Any other drugs?

4        A.    No.

5        Q.    Were you using drugs during that time period?

6        A.    On different occasions.

7        Q.    What type of drugs were you using?

8        A.    Marijuana.

9        Q.    How often would you use marijuana?

10       A.    It varies.  Probably every day or every other day.

11       Q.    How often would you get crack cocaine to distribute?

12       A.    Sometimes between one and three days, sometimes a

13   couple times a day.

14       Q.    And what was a normal quantity that you would get at

15   one time?

16       A.    A 63, anywhere from a 63 to four and a half.

17       Q.    And a 63 means how many grams?

18       A.    63 grams.

19       Q.    And a four and a half is how many grams?

20       A.    126.

21       Q.    Now, when you would obtain this crack cocaine, would

22   you actually distribute it yourself?

23       A.    Yes.

24       Q.    Would you distribute it to individuals that were just

25   crack users?

1      A.    No.

2      Q.    Would you distribute it to people that were taking the

3  crack you give them and selling it to other people?

4      A.    Yes.

5      Q.    What was the most common amount that you sold to those

6  people?

7      A.    28 grams, ounces.

8      Q.    Do you know Gilarime Mueller?

9      A.    Yes.

10     Q.    How long have you known Gilarime Mueller?

11     A.    For a number of years.

12     Q.    Did you know him in 2007 and part of 2008?

13     A.    Yes.

14     Q.    In 2007 were you giving crack cocaine to Gilarime

15  Mueller?

16     A.    No.

17     Q.    Were you receiving crack cocaine from Gilarime

18  Mueller?

19     A.    Yes.

20     Q.    How often were you receiving from Gilarime Mueller?

21     A.    Anywhere between one and three days.

22     Q.    And what type of quantities would you receive from

23  him?

24     A.    One halfs, 63s.

25     Q.    What is the largest amount you received from him at

1    one time?

2        A.    Nine ounces.

3        Q.    When you would purchase nine ounces would that be

4    powder or crack?

5        A.    Crack.

6        Q.    You would purchase nine ounces of crack, how much

7    would that cost?

8        A.    Anywhere between 53 to 5,900.

9        Q.    And what about 63 grams, how much would you pay Mr.

10   Mueller for that?

11       A.    Anywhere between 1,350 and 1,500.

12       Q.    This four and a half ounces, you were also getting

13   that quantity from Mr. Mueller, is that correct?

14       A.    Yes.

15       Q.    How much were you paying for that?

16       A.    Anywhere from 26 to 2,900.

17       Q.    When Mr. Mueller would -- when you would meet with Mr.

18   Mueller to get crack cocaine, would anyone else be with him?

19       A.    Yes.

20       Q.    Who else would be with him that you recognized?

21       A.    Matthew Canady.

22       Q.    Anyone else?

23       A.    Jeremy Canady.

24       Q.    How would you contact Gilarime Mueller to get ahold of

25   him to get crack cocaine?

1    A.    Cell phone.

2    Q.    Did he always have the same cell phone number?

3    A.    He had different numbers.

4    Q.    How often would he change his number?

5    A.    Whenever he wanted to.

6    Q.    Often?

7    A.    Yes.

8    Q.    What were some of the places that you would meet Mr.

9  Mueller to get crack cocaine from him?

10    A.    13th Street, Fareway Food Market on 53rd, side

11  streets, Kimberly Downs behind Chuck E Cheese, Northwood

12  Village.

13    Q.    Those are all in Davenport?

14    A.    Yes.

15    Q.    In 2008, from January 2008 to May 2nd of 2008 were you

16  still receiving crack cocaine from Gilarime Mueller?

17    A.    Yes.

18    Q.    The same frequency?

19    A.    Yes.

20    Q.    The same type of quantities?

21    A.    Yes.

22    Q.    Pursuant to your plea to these federal charges did you

23  sign a written Plea Agreement and Cooperation Agreement with the

24  government?

25    A.    Yes.

1    Q.   In front of you is Government's Exhibit 92.  Do you

2  recognize what that is?

3    A.   Yes.

4    Q.   What is that?

5    A.   It's a Plea Agreement with my name on it.

6    Q.   Do you see your signature on those documents?

7    A.   Yes.

8    Q.   Does that appear to be -- what date did you sign it?

9    A.   11-17 of '08.

10   Q.   So this Monday, last Monday you signed it?

11   A.   Yes.

12   Q.   Is that the day you also pled guilty?

13   A.   Yes.

14   Q.   Does that appear to be the same Plea Agreement that

15  you signed on November 17th of 2008?

16   A.   Yes.

17        MR. WESTPHAL:  At this time we move to admit

18  Government's Exhibit 92.

19        MR. DUSTHIMER:  No objection.

20        THE COURT:  92 is received.

21  BY MR. WESTPHAL:

22   Q.   Mr. Clark, have you ever been convicted of any felony

23  offenses?

24   A.   No.

25   Q.   If you saw Gilarime Mueller again would you recognize

1  him?

2      A.   Yes.

3      Q.   Do you see him anywhere in court here this morning?

4      A.   Yes.

5      Q.   Can you describe where he is at so we know where you

6  are referring?

7      A.   On the right side of the courtroom.

8      Q.   What is he wearing?

9      A.   A blue shirt.

10         MR. WESTPHAL:  I think those are my questions for now,

11 Mr. Clark.  Thank you.

12         THE COURT:  Mr. Dusthimer?

13                    EXAMINATION

14 BY MR. DUSTHIMER:

15     Q.   This Exhibit 92, it is about 23 pages, thereabouts.

16 How many pages is yours?

17     A.   18.

18     Q.   Out of your 18 pages --

19     A.   I'm sorry.  19.  It got two, it didn't say 19 at the

20 end so 18.

21     Q.   That's fine.  Thank you.  When did you first receive

22 the document?

23     A.   11-17 of '08.

24     Q.   One day?

25     A.   Yes.

1     Q.   Do you know about what time?

2     A.   No.

3     Q.   Do you know how long you had to read it?

4     A.   About 30 minutes.

5     Q.   How well do you read?

6     A.   I read okay.

7     Q.   Did you have any time to talk with your attorney about

8 this?

9     A.   Yes.

10    Q.   A lot of time, a little time?

11    A.   Enough time.

12    Q.   When were you arrested for this approximately?

13    A.   June 27th.

14    Q.   Is there anything special that happened on June 27th

15 that led to your arrest?

16    A.   Just a regular old arrest to me.

17    Q.   Help us understand.  The rest of us may not have

18 experienced it.  Did you know the police were after you?

19    A.   No.

20    Q.   Did you try to do anything to hide or destroy any

21 evidence?

22    A.   Yes.

23    Q.   What did you do?

24    A.   When I seen they was after me I ran.

25    Q.   Did you do anything else?

1    A.   Yes.

2    Q.   What?

3    A.   I jumped a few fences.

4    Q.   How many?

5    A.   Probably three.

6    Q.   From the time you first started running until the time

7  they caught up to you, how long was it?

8    A.   It was very fast.

9    Q.   Once again, good answer, but help us understand.  One

10  minute, two minutes, three minutes?

11   A.   If I had to estimate, probably one to four minutes or

12  three minutes.

13   Q.   Anything else happen?

14   A.   Yes.

15   Q.   What?

16   A.   I started breathing hard, I was tired.

17   Q.   Good answer.  Did you try to destroy any evidence?

18   A.   Yes.

19   Q.   What?

20   A.   Crack cocaine.

21   Q.   How much?

22   A.   I don't know.  I can't remember exactly.  It was a

23  large amount.

24   Q.   How did you try to destroy it?

25   A.   By flushing it down the toilet.

1    Q.   Were you successful?

2    A.   I don't know.

3    Q.   Do you have page 11 of your Plea Agreement in front of

4  you?

5    A.   Yes.

6    Q.   Does it start off by saying, "Crack cocaine was," and

7  then it has weights in front of it?

8    A.   Excuse me?

9    Q.   How does it start off?  What is the first two words or

10  first three words on that page?

11    A.   "Crack cocaine was."

12    Q.   Okay.  The police were able to recover just under 120

13  grams of crack cocaine out of the toilet, is that correct?

14    A.   Yes.

15    Q.   But they didn't recover all of it, did they?

16    A.   Like I said, I don't know how much it was.

17    Q.   Did some of it make it down the stool?

18    A.   Like I said, I don't know.

19    Q.   The Plea Agreement talks about two counts being

20  dismissed, is that right?

21    A.   Yes.

22    Q.   What were the two counts?  Do you know?

23    A.   Distribution.

24    Q.   Were those kind of hand-to-hand deals that you did?

25    A.   Yes.

1    Q.    Page four, Paragraph 12, do you have that in front of

2 you?

3    A.    Yes.

4    Q.    It talks about special assessment.

5    A.    Yes.

6    Q.    It says, "Agrees to pay," it goes on to say, "Within

7 14 days of the signing of this or prior to the entering of plea

8 of guilty, whichever occurs first," is that correct?

9    A.    It says, "The defendant is to pay the United States a

10 special assessment of $100 per count as required by Title 18,

11 United States Code.  The defendant agrees to make such payment,

12 by cashier's check or money order payable to Clerk of U.S.

13 District Court, to the U.S. Clerk of Court within two weeks, 14

14 days."

15    Q.    Continue.

16    A.    "Of the execution of this agreement, or prior to the

17 defendant entering his guilty plea, whichever occurs first.

18 This is a material condition of this agreement."

19    Q.    So did you pay your $100 special assessment before you

20 pled guilty?

21    A.    No.

22    Q.    But it says here that you would?

23    A.    I would.

24    Q.    Do you have the Stipulation of Facts on page 10 and

25 11?  Do you have that?

1     A.    Yes.

2     Q.    And you were able to read through that and make

3 changes that you needed to?

4     A.    Excuse me?

5     Q.    You were able to read through that and make changes if

6 you needed to?

7     A.    What you mean?  Can you rephrase that for me?

8     Q.    Sure, I'll be honored.  Were you able or allowed to

9 make any changes that you needed to before you signed this plea

10 agreement?

11     A.    Yes.

12     Q.    In fact, there is one change, a date is corrected on

13 page 10, correct?

14     A.    Can you rephrase that?  Excuse me?

15     Q.    On page 10 of the Stipulation of Facts, Paragraph 1,

16 was there a correction of the date?

17     A.    I'm not aware of that.

18     Q.    Was there a change made on the document?

19     A.    Not the one I have in front of me.

20     Q.    Anywhere in this Plea Agreement does it have Mr.

21 Mueller's name?

22     A.    No.

23     Q.    Do you have prior felony convictions?

24     A.    No.

25     Q.    I'm sorry?

1    A.    No.

2          MR. DUSTHIMER:  May I visit with counsel for a moment?

3          (An off-the-record discussion was held.)

4    BY MR. DUSTHIMER:

5    Q.    Were you convicted as an adult for any drug offenses?

6    A.    Yes.

7    Q.    What?

8    A.    I have a marijuana charge.

9    Q.    Just one?

10   A.    Probably like two or three.

11   Q.    Did that include a charge in '97?

12   A.    I believe so.  I'm not positively sure.

13   Q.    Sir, all I want you to do is read through the page

14   down here and just tell me if that helps refresh your

15   recollection.  You don't have to answer, just read through it

16   for now and see if that helps you remember.

17   A.    Right here (Indicating) all the way down?

18   Q.    This part here (Indicating) and I think that goes with

19   it.  (Indicating)  Does that help refresh your recollection as

20   far as whether or not you had a conviction in '97?

21   A.    No.

22         MR. DUSTHIMER:  Thank you.  That's all.

23         THE COURT:  Anything else?

24         MR. WESTPHAL:  No, Your Honor.

25         THE COURT:  You are excused.  Counsel, could I get you

1   to approach the bench?  I don't need the court reporter.

2           (An off-the-record discussion was held.)

3           THE COURT:  Call your next witness.

4           MR. WESTPHAL:  Call Agent Matt Allers.

5                     MATTHEW ALLERS,

6   witness herein, called as a witness by the government, after

7   having been first duly sworn, was examined and testified as

8   follows:

9                       EXAMINATION

10  BY MR. WESTPHAL:

11      Q.   Good morning.

12      A.   Good morning.

13      Q.   Your name for the record?

14      A.   It is Matthew Allers, A-l-l-e-r-s.

15      Q.   And your current occupation?

16      A.   I'm a Special Agent with the Iowa Department of Public

17  Safety, specifically the Division of Narcotics Enforcement for

18  the State of Iowa.  I'm also cross-designated as a Task Force

19  officer with the Drug Enforcement Administration.

20      Q.   How long have you been employed with the Iowa Division

21  of Narcotics Enforcement?

22      A.   I've been employed by the Division of Narcotics

23  Enforcement for over three years, however, I've been employed as

24  a police officer with the state for over seven years.

25      Q.   And how long have you been a Task Force officer with

1  the DEA?

2      A.    Over a year.

3      Q.    In your duties with the DNE as the DEA, obviously you

4  are involved in narcotics investigations, is that correct?

5      A.    That's correct.

6      Q.    And does that commonly include the drug crack cocaine?

7      A.    In this area, yes, it does.

8      Q.    Have you been involved yourself in investigations

9  concerning the distribution of crack cocaine?

10     A.    Yes.

11     Q.    And have you spoken to individuals that have

12 distributed concerning how they distribute, what type of

13 quantities, that type of information?

14     A.    Absolutely.

15     Q.    And you have participated in search warrants and

16 seeing some of the common items associated with distribution?

17     A.    Yes.

18     Q.    Drug usage, have you been involved in investigations

19 involving just individuals that used crack cocaine?

20     A.    Not as frequently, but sometimes, yes.

21     Q.    And crack cocaine users come up as part of your

22 investigations?

23     A.    Yes, they do.

24     Q.    And have you spoken to those individuals about common

25 ways that they ingest and use crack cocaine?

1      A.    Yes.

2      Q.    Now, you became involved in an investigation and

3  started a surveillance on May 2nd of 2008?

4      A.    That is correct.

5      Q.    As part of that investigation were you working with a

6  confidential informant?

7      A.    Yes, I was.

8      Q.    And was that informant making phone calls on that day

9  in your presence?

10     A.    Yes, he did.

11     Q.    And as part of your procedure for making those calls

12 did you record what number was being called?

13     A.    Yes, I did.

14     Q.    On May 2, 2008, do you know what number the informant

15 was calling?

16     A.    Yes, the informant was calling 563-571-766 -- excuse

17 me, 7763.

18     Q.    Approximately when was the first time that informant

19 placed a call?

20     A.    I spoke with the informant that morning, based upon

21 records I have obtained it appears that phone call was made at

22 approximately 8:53 a.m. in the morning from the confidential

23 informant's number to a number we have associated with Matt

24 Canady.

25     Q.    Did the informant also make some calls during the

1  surveillance?

2      A.   Yes, he did.

3      Q.   And where was Matt Canady at when those calls were

4  first made during the surveillance?

5      A.   The recorded phone calls were made while Mr. Canady

6  was approximately at Enterprise Rent-a-Car that day.

7      Q.   You are also familiar as part of that investigation

8  with the informant's phone number as well, the number he was

9  calling from?

10     A.   Yes, I was.

11     Q.   Based on -- after those calls were you planning on

12  making a controlled purchase of crack cocaine on May 2, 2008?

13     A.   Initially in the morning the information I received

14  from the confidential informant was leading us to believe that

15  we potentially would be able to do a controlled buy from Matt

16  Canady later that day; however, once we made the phone calls,

17  the recorded phone calls to Matt Canady, we were less optimistic

18  that we were actually going to have a transaction that day.

19     Q.   Were you assisting in surveillance over at 2319 North

20  Linwood?

21     A.   Yes, I was.

22     Q.   And were you assisting in any surveillance over at

23  5372 North Linwood?

24     A.   Yes, I was.  I was not in a position to firsthand see

25  anything, but I was in the area when that surveillance was

1  taking place.

2  Q. Did you later assist at all in a search at 2319 North

3  Linwood?

4  A. Yes.

5  Q. Did you go there while a search was being conducted?

6  A. Not as a search was being conducted, specifically I

7  approached the residence shortly after we had the pursuit with

8  Mr. Canady, I felt that there was a possibility he might have

9  returned or was going to return to that residence.

10  Q. Did you speak with anyone inside 2319 at that point in

11  time?

12  A. Yes, I did.

13  Q. Who did you speak with?

14  A. Upon entering the residence Renata Wilson -- excuse

15  me, Nicky Hill was inside the residence with an infant child.  I

16  -- after knocking on the door, identifying myself as a police

17  officer, I went in and spoke with Miss Hill in her living room.

18  Q. What did you tell her about talking?

19  A. I briefly advised her of the nature of our

20  investigation, of Matthew Canady, him being involved with the

21  distribution of crack cocaine in the Quad Cities, I advised her

22  that earlier that day we had conducted surveillance of Mr.

23  Canady, had attempted to stop him, and he fled at a high rate of

24  speed, and I was concerned about the safety of the public at

25  this point and I asked her -- I guess I probably directed her to

1   attempt to make a phone call to Mr. Canady because I wanted to

2   speak with him.

3       Q.   Did you at any time tell her that if you didn't say --

4   tell you what you wanted to hear that her family would be in big

5   trouble?

6       A.   I absolutely did not.

7       Q.   Did you go over to 5372 North Linwood while a search

8   was being conducted over there?

9       A.   It was prior to -- it was after the house had been

10  secured, but before the actual search warrant had been signed

11  and the search of the property took place, yes, I did.

12      Q.   As -- let me ask you this first.  In your duties with

13  the DNE and the DEA, are you familiar with investigations

14  involving the use of an undercover officer in a controlled

15  purchase of crack cocaine?

16      A.   Yes.

17      Q.   And how common is it for an undercover officer to be

18  involved in these type of investigations?

19      A.   We try to utilize this type of investigation as much

20  as possible.  It's more common at the street level distribution

21  of crack cocaine and other sales, the use of an undercover

22  becomes increasingly difficult the further up the food chain you

23  go in these criminal organizations.

24      Q.   Is it -- based on your experience is it sometimes

25  difficult to get an undercover officer involved in these type of

1  investigations?

2      A.   Yes, generally the only way we get undercover agents

3  or officers involved in these investigations is by being

4  introduced utilizing a confidential source or confidential

5  informant.  We very rarely are able to get into somebody and

6  make purchases from somebody without having somebody for lack of

7  a better term vouch for us.

8      Q.   Now, as part of -- well, were you involved in this

9  investigation -- let me ask this.  Prior to May 2nd of 2008 were

10 you aware of 5372 North Linwood being involved in this

11 investigation?

12     A.   Not specifically, no.

13     Q.   As part of your investigation have you reviewed

14 various cell phones and information on some of those cell

15 phones?

16     A.   Yes, I have.

17     Q.   Handing you Government's Exhibit Number 86, have you

18 seen that phone before?

19     A.   Yes, I have.

20     Q.   And do you know where that phone came from?

21     A.   I believe it was seized out of the bedroom of 5372

22 North Linwood on May 2nd.

23     Q.   Now, have you checked that phone to see if it has any

24 contact information in it?

25     A.   Yes, I have.

1    Q.    And does that phone have any contact information --

2  what contact information did you note as potentially of interest

3  to you on that phone?

4    A.    There were two numbers that we from our investigation

5  have associated with Mr. Mueller in this phone.  One of the

6  numbers is 563-650-4004 and that's under -- I believe it is

7  baby, but not spelled correctly, it is B-a-b-e I believe.  That

8  would be the number associated with the cell phone that we took

9  off of Mr. Mueller's person at the time the house was secured.

10           The other number --

11   Q.    It is not that phone, you are kind of holding it up,

12  that is not the phone you took off Mr. Mueller?

13   A.    No, not this phone, a separate phone we took from Mr.

14  Mueller on May 2nd.

15   Q.    Anything else in the phone, Government's Exhibit 86,

16  of interest besides that number?

17   A.    Yes, we also located another number that we have

18  associated with Mr. Mueller through Mario Williams.  Mario

19  Williams identified one of Mr. Mueller's numbers as --

20           MR. DUSTHIMER:  Objection.  Hearsay.

21           THE COURT:  Do you have a response to that?

22           MR. WESTPHAL:  Can I ask a different question?

23           THE COURT:  I am going to sustain that objection.

24

25  BY MR. WESTPHAL:

1      Q.   Was there a -- any number on that phone under the Gs?

2      A.   Yes, there is.

3      Q.   And did you note any numbers on that phone under the

4  Gs?

5      A.   Yes, under the Gs there is a contact that's G and then

6  an I and the number for that is 563-499-3808.

7      MR. WESTPHAL:  At this time the government would move

8  to admit Government's Exhibit 75 and Government's Exhibit 91

9  which are records with attached records custodian Affidavits.

10     MR. DUSTHIMER:  Objection.  Hearsay.

11     THE COURT:  I haven't seen the originals.  Can I just

12  see them?  Objection is overruled.  75 and 91 are received.

13     MR. DUSTHIMER:  Mr. Westphal, which one is 75?

14     THE COURT:  75 and 91.

15  BY MR. WESTPHAL:

16      Q.   Let me ask you this.  Agent Allers, Government's

17  Exhibit 75, what number do those records pertain to?

18      A.   Government's Exhibit 75 pertains to records from two

19  different numbers, one of which is 571-7763.

20      Q.   And Government's Exhibit 91, what numbers do those

21  pertain to?

22      A.   It is records of two separate numbers again, one of

23  which is 563-499-3808.

24      Q.   As part of your investigation did you analyze or

25  review a phone that was seized off Mario Williams?

1      A.   Yes.

2      Q.   And did you review some of the numbers that were in

3  his contact list?

4      A.   Yes.

5      Q.   Government's Exhibit 89, have you reviewed this

6  information taken off the phone of Mr. Williams?

7      A.   Yes, I have.

8      Q.   And 499-3808 was again in Mr. Williams' phone as well?

9      A.   Yes.

10     Q.   What was it under?

11     A.   G-L-M.

12     Q.   Did that phone also show some made and received calls

13  to the 571-7763 number?

14     A.   Yes, it did.

15     Q.   Did Mr. Williams' phone also show a number for --

16  listed as a G-E-M?

17     A.   Yes.

18     Q.   And what was that number?

19     A.   It is 563-499-2293.

20     Q.   Now, on May 2nd of 2008 in your role in the

21  investigation were you keeping track of times and events?

22     A.   Yes, I was.

23     Q.   And how are you keeping track of times and events?

24     A.   I had a notebook, I wrote the time and then the

25  information after that.

1    Q.    Have you, using all these records, done some type of

2    analysis as to the phone activity on May 2nd of 2008?

3    A.    Yes, I have.

4    Q.    I am showing you what is marked as Government's

5    Exhibit Number 93.  What is that?

6    A.    That's a summary of the phone activity between various

7    numbers on May 2, 2008.

8    Q.    Now, on your -- in your analysis did you track various

9    calls from the 499-3808 number?

10   A.    Yes, I did.

11   Q.    And did you track numbers from the 571-7763 number?

12   A.    Yes, I did.

13   Q.    And did you track calls from the 570-2293 number?

14   A.    Yes.

15   Q.    And you have 579-0307 number?

16   A.    Yes.

17   Q.    You knew the number the confidential informant was

18   calling from on May 2, 2008, is that correct?

19   A.    That's correct, yes.

20   Q.    What are any calls during the day from that number to

21   the 571-7763 number?

22   A.    Yes, there was several phone calls between the two

23   numbers.

24   Q.    When was the first call?

25   A.    The first one from phone records show a phone call

1  from the confidential informant to the 7763 number at 8:53 a.m.

2       Q.    Were there any other calls between those two numbers

3  during the day on May 2nd?

4       A.    Yes.

5       Q.    What were -- what was the next time a call is placed

6  between those two numbers?

7       A.    At 12:44 p.m. the 7763 number placed a phone call to

8  the confidential informant's number.

9       Q.    Was there another call after that?

10      A.    Yes, at approximately 12:54 p.m. the 7763 number

11 placed another call to the confidential informant's number.

12      Q.    And was there a call after that between those same two

13 numbers?

14      A.    Yes, at approximately 1:47 p.m. the confidential

15 informant's number placed a phone call to the 7763 number.

16      Q.    And when was the next call?

17      A.    At approximately two minutes later at 1:49 p.m., the

18 7763 number placed a phone call to the confidential informant's

19 number.

20      Q.    And right after that there was another call?

21      A.    Yes, the -- well, approximately a minute later at 1:50

22 p.m. the confidential informant placed a call to the 7763

23 number.

24      Q.    And when was the next call after 1:50 between those

25 two numbers?

1    A.   Another number -- there was not contact between those

2  two numbers until approximately 4:48 p.m. that afternoon.

3    Q.   And was there another call after 4:50?  I'm sorry.

4  After 4:48?

5    A.   Yes, at 4:50 p.m. the confidential informant's number

6  placed a phone call to the 7763 number and then at 4:05 p.m. and

7  at 5:05 p.m. there were two phone calls placed to -- well, from

8  the 7763 number to the confidential informant's number.

9    Q.   Now, were there phone calls listed for the number that

10  was listed under G-L-M on Mr. Williams' phone and G-I on the

11  pink RAZR phone?

12        THE COURT:  Mr. Westphal, let's hold that.  We will

13  ask that question again when we come back at 10:50.

14        (A recess was taken from 10:31 a.m. until 10:51 a.m.)

15        (In the presence of the jury.)

16        THE COURT:  Please be seated.

17  BY MR. WESTPHAL:

18    Q.   Agent Allers, I believe we left off going through some

19  phone numbers.  Start up again.  Now, the number that was

20  identified on Government's Exhibit 89 under G-L-M, were there

21  any calls between that number and the 571-7763 number on May

22  2nd?

23    A.   Yes.

24    Q.   And when was the first of those calls?

25    A.   The first of those calls was made from the 7763 number

1    to the number associated with G-L-M, the 3808 number at

2    approximately 12:46 p.m. which was -- excuse me, 12:45 p.m.

3         Q.   And when is the next call between those two numbers?

4         A.   The next call between those numbers is a minute later

5    and it is 12:46 p.m. and it is from the 3808 number to the 7763

6    number.

7         Q.   What -- do you know what was taking place as far as

8    this surveillance based on your log of times at that point?

9         A.   By that time Mr. Mueller -- I'm sorry, Mr. Canady had

10   departed Scott Community College and we had been following him.

11        Q.   Are there any additional calls between those two

12   numbers?

13        A.   Yes, there is.

14        Q.   When is the next call?

15        A.   I believe the next call between those two numbers

16   occurred at 3:10 p.m. that same day, it was from the 7763 number

17   to the 3808 number.

18        Q.   And is there another call shortly after that?

19        A.   Yes, approximately nine minutes later at 3:19 p.m.

20   there's a phone call from the -- I'm sorry.  The 7763 number to

21   the 3808 as I am going to back up.  I misspoke.  Actually there

22   is a phone call from the 3808 number to the 7763 number at 2:38

23   p.m. according to the records.

24        Q.   At 2:38 p.m. based on surveillance where was Matt

25   Canady?

1    A.    I cannot recall specifically.  I believe he was at the

2  residence, the 2319 North Linwood.

3    Q.    At 3:10 based on the surveillance and the times that

4  you tracked, where was Matt Canady?

5    A.    At that time he was en route from the 2319 North

6  Linwood Avenue address to the 5372 North Linwood address.

7    Q.    And at 3:19 based on your logging of times of

8  surveillance where was Matt Canady?

9    A.    Based at that time in my notes I had at 3:18 p.m. Mr.

10  Canady had arrived at the 5372 address.

11    Q.    And the phone records, there was a call between those

12  numbers at 3:19, correct?

13    A.    Yes, at 3:19.

14    Q.    Are there any calls between the 3808 number and the

15  2293 number that is listed under G-E-M on Mr. Williams' phone?

16    A.    Yes, there's several.

17    Q.    And when is the first one of those calls?

18    A.    The first call was made from the 3808 to the 2293

19  number at 10:26 a.m. that morning, May 2nd.

20    Q.    Were there several calls between those two numbers

21  during the morning hours?

22    A.    Yes.

23    Q.    Approximately how many?

24    A.    It appears like there are five -- five calls between

25  those two numbers during the morning hours of May 2nd.

1     Q.   When was the last call between those two numbers?

2     A.   The last call between those two numbers occurred --

3  that day or that morning?

4     Q.   Now, Government's Exhibit 93 is an exhibit that you

5  put together based on your review of these records?

6     A.   Yes.

7     Q.   Now, on that exhibit you have names associated with

8  these numbers, is that correct?

9     A.   Yes, I do.

10     Q.   Do you know specifically based on your investigation

11  whether or not these specific individuals were calling each

12  other just based on the phone records?  For example, can you say

13  Gilarime Mueller was calling Matt Canady at a specific time?

14     A.   I cannot.  The phone records only show the phone --

15  the contact or attempted contact between numbers.  Without

16  physically being present when somebody is calling from a phone,

17  there's no way to know whether that person is, you know, the

18  person who owns the phone or is associated with the phone is

19  making that call or somebody else is.

20          MR. WESTPHAL:  At this time we move to admit

21  Government's Exhibit 93.

22          MR. DUSTHIMER:  Hearsay on the matters of the

23  purported event times listed.  Obviously I don't believe this

24  defendant -- I think I said hearsay, because I don't believe on

25  the matter of the event times that this witness was there at all

1  times, all places.

2      THE COURT:  Objection is overruled.  93 is received.

3      MR. WESTPHAL:  Also at this time during the break I

4  was checking past exhibits and I believe the government

5  previously referred to photographs Government's Exhibits 47, 48,

6  and 58 were identified by witnesses.  I don't believe the

7  government formally moved to enter them in.  At this time we

8  would move to admit Government's Exhibits 47, 48, and 58.

9      MR. DUSTHIMER:  No objection.

10      THE COURT:  They are received.

11      MR. WESTPHAL:  I believe those are my questions for

12  now, Agent Allers.  Thank you.

13                          EXAMINATION

14  BY MR. DUSTHIMER:

15      Q.  Do you know where the phone -- where the phone is for

16  this 499-3808, do you know where the phone is located?

17      A.  No, I do not.

18      Q.  Everyone who went to 5300 North Linwood or 5200 North

19  Linwood went in for the purposes of preserving and protecting

20  evidence before it was destroyed?

21      A.  Law enforcement personnel, yes, prior to the search

22  warrant on that date.

23      Q.  And they did so?

24      A.  Yes, they did.

25      Q.  And they watched everyone there to make sure that they

1  were -- that there was no evidence which was being destroyed?

2      A.   Once entry was made, that is correct, yes.

3      Q.   And that's where you found Mr. Mueller?

4      A.   Yes.

5      Q.   And all the phones that were inside the area were

6  seized, inside the 5200 North Linwood property?

7      A.   I can't say that the officers seized the cell phones

8  that they located.

9      Q.   But do we have today this 499-3808 phone?

10     A.   I do not believe so, no.

11     Q.   But we did get a phone off of Mr. Mueller, correct?

12     A.   Yes, we did.

13     Q.   And that phone was a different phone, correct?

14     A.   Different phone number, yes.

15     Q.   Different carrier, correct?

16     A.   Yes.

17     Q.   It was a Sprint, not an i Wireless?

18     A.   That is correct.

19     Q.   As for the benefit of the jury those are two

20  competitors that each provide cell phone service here in the

21  Davenport area?

22     A.   Yes, they're both different cell phone companies as

23  there are numerous other ones that are out there, they're not

24  the same company.

25     Q.   And you had an opportunity to review the log for the

1    contacts for the cell phone taken from Mr. Mueller's person,

2    correct?

3         A.   Yes, I did.

4         Q.   Were there any numbers there which matched up with

5    other known, how did you call it, people claimed to be

6    affiliated with drug transactions?   I don't remember your

7    words.  I am not trying to misquote you.

8         A.   People associated with certain numbers?

9         Q.   Sure.

10        A.   To my recollection -- are you referring to specific

11   numbers on my summary?

12        Q.   On the Samsung phone contact log.

13        A.   Yes, but I am asking are you referring to the numbers

14   -- you are referring to are there any contact numbers from the

15   people I have associated with the individuals on my summary

16   chart?

17        Q.   Just generically.  I will take anyone if it is there.

18        A.   Yes, there were contacts on his phone.

19        Q.   Yes?

20        A.   Yes.

21        Q.   Did you go through those contacts on his phone?

22        A.   Yes.

23        Q.   Did you find other people's numbers listed which you

24   in somehow, someway, affiliate with drug dealings?

25        A.   I don't recall on that specific phone, no.

1      Q.    And that's the one that was found on Mr. Mueller's

2   person?

3      A.    Yes.

4      Q.    The Samsung, not the -- the Sprint, not the i

5   Wireless?

6      A.    That is correct, yes.

7      Q.    And I think your testimony was is out of those 300

8   some pages of phone records you went through and cross linked

9   what you could, is that correct?

10      A.    Yes.

11      Q.    The event times, you weren't all the various places

12   when it was called out, correct, you relied upon others'

13   information?

14      A.    I was present as part of the surveillance and heard

15   those being called out by other officers at that time.  I was

16   not -- I did not personally witness every one of those event

17   times.

18      Q.    But somehow you show that Mr. Canady shows up at 5300

19   North Linwood and the next minute he calls the 3808 number?

20      A.    Yes.

21      Q.    Once he's inside the same building as Mr. Mueller?

22      A.    Yes.

23      Q.    The pink RAZR phone, do you remember which exhibit

24   number that is?

25      A.    It is Government's Exhibit 86.

1    Q.    Do you know what phone number that is?

2    A.    I do not, no.  No.

3    Q.    When you went through these 300 and some odd pages of

4    phone records, did you find the 650-4004 phone number reference?

5    A.    When I went through the -- I do not recall if I did or

6    not.  I don't believe so.

7    Q.    And you have been through enough cell phone contact

8    sheets, right?

9    A.    Yes, I have.

10    Q.    More than a few?

11    A.    Yes.

12    Q.    And sometimes they use oddball names and various

13    illiterations to identify the people they want to call, is that

14    fair?

15    A.    Most certainly.

16    Q.    So maybe B-a-b-e is Babe, not Baby?

17    A.    It could be perceived that way.

18    Q.    Well, I think you made reference to it being

19    misspelled possibly.

20    A.    Yes, I did.

21    Q.    So that is your interpretation?

22    A.    Yes, that was my interpretation.

23    Q.    Approximately when in April or earlier did this

24    investigation start?  I am not trying to make that -- I am not

25    trying to force you to give me a specific date, we just heard

1  something about an April 20th date and now we are talking a May

2  2nd date.  I don't know how far ahead you were actively involved

3  with this.

4       A.   The active portion of this case began in mid-April of

5  2008.

6       Q.   And you had opportunities to do video surveillance,

7  correct?

8       A.   Yes.

9       Q.   And you had opportunities to do audio surveillance, is

10  that correct?

11      A.   Yes.

12      Q.   And you had opportunities to do controlled buys,

13  correct?

14      A.   Yes.

15      Q.   And in any of those do you have physical, documented

16  evidence that Mr. Mueller was there other than that April 22nd

17  incident?

18      A.   Other than the April 22nd incident during our drug --

19  well, payment for prior drug debt, no.

20      Q.   And were you there on the April 22nd incident?  Were

21  you able to watch what was going on?

22      A.   During the specific transaction?

23      Q.   Yes, please.

24      A.   No, I was not.

25      Q.   So the testimony that you heard about Mr. Canady at

1  one point walking away from the others that were there, you

2  don't have any way to say that that's, in fact, accurate or not

3  accurate or what otherwise happened, is that fair?

4      A.   That's fair.  I do not know.

5      Q.   And I think your testimony during direct examination

6  was before the May 2nd date, 52 or 5300 North Linwood wasn't

7  part of the investigation?

8      A.   Specifically the address, no; however, during

9  surveillance of Mr. Canady on one occasion prior to that date I

10 observed him drive up in the area of that residence and park,

11 however, I was unable to see -- to tie that directly with this

12 specific address of 5372.

13     Q.   You have been at this for a while, correct?   I mean,

14 law enforcement, drug enforcement?

15     A.   For over three years, yes.

16     Q.   And there are times where data entries are made in

17 error, correct?

18     A.   Sure.

19     Q.   There's a time where you did a report here, the wrong

20 officer who was involved was -- or the wrong name was listed,

21 correct?

22     A.   Yes, that's correct.

23     Q.   And during prior testimony in this you identified I

24 think Mr. Simpson as being arrested in February when we all know

25 he was arrested in January, is that correct?

1    A.    I would have to take a look at my interview, but I'd

2    say it's possible, yes.

3    Q.    But those are things that people in the future might

4    rely upon?

5    A.    In what regard?

6    Q.    Statements that were noted, now known to be in error,

7    but otherwise reviewed and perceived by others as an accurate

8    statement?

9    A.    Rephrase that question for me.

10    Q.    I can try.  The report, you ordinarily had -- you were

11    the one who drafted the report, correct?

12    A.    Yes, I am.

13    Q.    And that report had the wrong officer's name listed?

14    A.    Yes, it did, initially.

15    Q.    If somebody read the record prior to your correcting

16    it, they would have relied upon that name as being accurate?

17    A.    Yes, I also include in my reports though when they are

18    initially drafted that it is a preliminary report and not until

19    I have to send my report to DEA in Cedar Rapids and I get the

20    final draft back and review it and sign off on it is it a

21    finalized report.

22    Q.    But in the meantime other people have had an

23    opportunity to review it, correct?

24    A.    Yes, they have.

25    Q.    You heard Sergeant Smull talking about jumping on a

1    case?

2         A.    Yes.

3         Q.    And you have seen that in your career?

4         A.    I've heard of it.

5         Q.    You haven't seen it?

6         A.    Oh, it depends in what regard you refer to jumping on

7    a case.

8         Q.    Is it a term that is used especially regarding various

9    federal defendants regarding testifying possibly about things

10   they don't know for the purposes of hoping to get a reduction?

11        A.    That is always a possibility in every case.  If it's

12   -- we know about it, that's not something we would -- we would

13   not use that person if we knew that that was the case.  We never

14   knowingly use anybody who provides false or, you know,

15   intentionally inaccurate information.

16        Q.    But you have interviewed hundreds of various people

17   charged with criminal offenses?

18        A.    Generally, yes.

19        Q.    Thousands?

20        A.    I don't know if I'd say thousands in my short career,

21   but I'd say well over 100.

22        Q.    And some of them are more astute and street smart in

23   being able to find a version or a story to tell you or tell

24   other officers?

25        A.    There's a whole spectrum of individuals out there,

1   some who are not very aware of the circumstances to people who

2   are, like you say, very streetwise.

3        Q.   This Exhibit 25, this is -- I think it is the cell

4   phone, the Sprint, the one that was taken from Mr. Mueller, is

5   that correct?  Do you want to see the rest of it?

6        A.   Yes.  No, it appears to be.

7        Q.   And you understand that to be the 650-4004?

8        A.   Yes, that's the number associated with the phone.

9        Q.   Law enforcement has had it in their custody and

10  control since that May 5th date, is that correct?

11       A.   I believe since May 2nd, but when it was physically

12  logged in to the evidence custodian, I believe that was the May

13  5th date.

14       Q.   I'm sorry.  I misspoke.  I meant to say May 2nd.  I am

15  not trying to mislead you regarding what the actual log-in

16  documentation shows.

17       A.   Yes, it has been in police custody since that time.

18       Q.   When was the first time you saw Mr. Mueller?

19       A.   First time I saw Mr. Mueller was on May 2, 2008.

20            MR. DUSTHIMER:  Thank you.  That's all the questions I

21  have.

22            THE COURT:  Mr. Westphal?

23

24

25                        FURTHER EXAMINATION

1  BY MR. WESTPHAL:

2      Q.   You reviewed the records for the numbers ending 7763

3  and 3808 as part of your analysis, correct?

4      A.   Yes, that's correct.

5      Q.   After May -- prior to May 2nd is there a fair amount

6  of volume on both of those records associated with both of those

7  numbers?

8      A.   Yes, both -- well, both phones were activated at

9  approximately the same time, the records go back I believe on

10  Mr. Canady's -- I'm sorry, the 7763 number, it went back

11  approximately three weeks and the phone number associated with

12  the 3808 number went back approximately a month.  During those

13  two time frames -- and then they were essentially deactivated or

14  the accounts were canceled shortly after May 2, 2008, within a

15  week or a week and a half.

16          There's almost no calls, either -- there's calls

17  placed to those -- both of the phones after the pursuit on May

18  2nd, the time that that occurred, I believe there's only one

19  call placed from the 3808 after that date, it would have been a

20  couple days later, otherwise there's a lot of calls going to

21  those phones, but they were not being answered, go into voice

22  mail.

23          The call volume on those phones during that -- well,

24  for the 7763 number, the approximate three weeks there, there

25  are about 2,000 phone calls either to, from, going to voice mail

1   on that particular phone number.  On the 3808 number I would say

2   there's -- I didn't have a chance to get a specific number, but

3   I would say it is approximately -- less than -- just under 1,000

4   phone calls during that month-long time period to that phone

5   where it is calls to that number, from that number, or going to

6   voice mail, things of that nature.

7       Q.   After May 2nd, calls to both of those numbers, how did

8   they change?

9       A.   After May 2nd all the phone calls minus the one phone

10  call placed by the 3808 number I believe on May 4th all appear

11  to go unanswered and go straight to voice mail until they're

12  deactivated within a week or two.

13      Q.   Now, in your review, talking about the call between

14  this 7763 number and 3808 number at 3:19 on Government's Exhibit

15  93, what is the source for that 3:19 time?

16      A.   That comes from the records that we subpoenaed from i

17  Wireless.

18      Q.   Over here the event at 3:18, what was the source for

19  that?

20      A.   It would have been the clock in my vehicle and it's

21  originated on this from my report, but the time when I wrote it

22  down on my notes came from the clock that was in my vehicle.

23      Q.   Jumping on a case, is that something you encourage as

24  part of your investigation?

25      A.   Absolutely not.

1    Q.   Do you take steps to try to guard against that

2  happening?

3    A.   Yes, I always in any of my cases attempt to weed out

4  information that is provided that is inaccurate, intentionally

5  inaccurate or not true, it is not condoned to allow people to

6  intentionally make up things and then use them against other

7  people.

8         MR. WESTPHAL:  Those are my questions.  Thank you.

9         THE COURT:  Anything else, Mr. Dusthimer?

10         MR. DUSTHIMER:  Yes, please.

11                    FURTHER EXAMINATION

12  BY MR. DUSTHIMER:

13    Q.   Intentionally inaccurate or not true, are those the

14  words you used?

15    A.   I'd have to --

16    Q.   Does it sound like those are the words you used?

17    A.   It could have been, yes.

18    Q.   By whose perception not true?  By law enforcement

19  according to the other reports generated if the individual saw

20  those reports?

21    A.   It would be -- I guess if I said not true, it would be

22  any information that we had in that case up to that point, what

23  we believe to be the evidence or facts in the case.

24    Q.   So if the witness who is jumping on a case had an

25  opportunity to review information regarding the allegations,

1  then they could repeat them and would they -- their statements

2  be true or not true?

3      A.   It depended on what they claim to have been.  If they

4  claim to have seen something or claim to have been involved in

5  something --

6      Q.   That is not what you said.  I thought you said

7  intentionally inaccurate or not true.  But there was a third

8  version, whether or not they had actual knowledge, isn't that

9  true?

10     A.   Rephrase that question in the context, if you could.

11     Q.   I will try.  What you really want is someone who has

12 independent, firsthand knowledge and that statement about their

13 independent, firsthand knowledge is accurate, is that correct?

14     A.   That would be a way to put it, yes.

15     Q.   But if it is just not intentionally inaccurate or not

16 true, that's something different, isn't it?

17     A.   Yes.

18         MR. DUSTHIMER:  Thank you.  That's all the questions I

19 have.

20         THE COURT:  Anything else, Mr. Westphal?

21                   FURTHER EXAMINATION

22 BY MR. WESTPHAL:

23     Q.   Agent Allers, have you met with most of the

24 individuals that testified as cooperating defendants in this

25 case, is that correct?

1      A.   Yes.

2      Q.   Did you show any of those witnesses any of your

3 reports from other witnesses?

4      A.   Never.

5      Q.   Did you show any of them police reports concerning

6 events?

7      A.   No.

8      MR. WESTPHAL:  Thank you.

9                 <u>FURTHER EXAMINATION</u>

10 BY MR. DUSTHIMER:

11     Q.   Are there other ways they could find out?

12     A.   Theoretically, yes.

13     MR. DUSTHIMER:  That's all.  Thank you.

14     THE COURT:  Thank you, sir.  Mr. Westphal?

15     MR. WESTPHAL:  The government would rest, Your Honor.

16     THE COURT:  Members of the jury, the government has

17 rested meaning that it has completed the presentation of its

18 evidence.  At this point there's a little piece of business that

19 we are supposed to do outside your presence, I am going to meet

20 with the lawyers and the parties at the side bar, this takes

21 just a few minutes so feel free to stand and stretch and we will

22 be right back with you.

23     (Outside the presence of the jury.)

24     THE COURT:  Mr. Dusthimer?

25     MR. DUSTHIMER:  We will move for a Judgment of

1   Acquittal.  We believe the evidence even taken in the light most

2   favorable to the government's position is insufficient to prove

3   either a conspiracy existed between my client, Mr. Gilarime

4   Mueller, and anyone else for the purposes of cocaine trafficking

5   and more specifically and completely there's no evidence even

6   when taken in an appropriate measurement in the light most

7   favorable to the government to suggest that he was in any way,

8   shape, or form specifically involved with possession with intent

9   to deliver on the May 2nd date.

10         I can go through with specifics, it has been two and a

11  half days worth of trial, the testimony of experts, he was at

12  the 5300 block North Linwood property for some of the time,

13  exactly when he showed up is unclear, when he was there Mr.

14  Williams gave various explanations as I recall it, but other

15  than that, there was no other indication that he was directly

16  involved with any of the matters or even whether or not the

17  cocaine was cooked at that 52 or 5300 North Linwood property.

18         As far as the other matters of conspiracy, I agree it

19  is probably a less strong Motion, but I think the government or

20  the Court is entitled and is obligated to review the evidence in

21  the light most favorable to the government, but still determine

22  whether or not the evidence is sufficient to submit the matter

23  to the jury.  For those reasons we ask the Motion for Judgment

24  of Acquittal be sustained.

25         THE COURT:  Mr. Westphal?

1          MR. WESTPHAL:  The government submits the Motion

2    should be denied.  Viewing the evidence in the light most

3    favorable to the government, there have been several witnesses

4    who have identified the defendant during the time period alleged

5    in the conspiracy as being involved in transporting drugs,

6    cooking powder cocaine into crack cocaine, distributing crack

7    cocaine, those witnesses, viewed in the light most favorable

8    have to -- are very important aspects corroborating each other.

9    Again the events, including the events on May 2nd, the defendant

10   was identified in the residence.

11          Viewing the evidence in the light most favorable,

12   crack cocaine came from that residence, potentially packaged and

13   packaging and the defendant's fingerprints were later found so I

14   think there's sufficient evidence to deny the Motion.

15          THE COURT:  Viewing the evidence in the light most

16   favorable to the government, the defendant's Motion for Judgment

17   of Acquittal is denied.

18          Mr. Mueller, there's a lot of decisions that your

19   lawyer gets to make along the way, what to say in opening

20   statements, what questions to ask, what objections to make to

21   questions, but there's one decision that you get to make and

22   ultimately you have to make and in the final analysis only you

23   can make and that's the decision as to whether or not to

24   testify.  Do you understand that?  You have to answer out loud,

25   please.

1          THE DEFENDANT:  Yes.

2          THE COURT:  Do you intend to testify?

3          THE DEFENDANT:  No, I don't.

4          THE COURT:  Very well.

5          MR. DUSTHIMER:  Have we had multiple occasions to

6    discuss the good things, bad things that can arise if you

7    testify?

8          THE DEFENDANT:  Yes.

9          MR. DUSTHIMER:  And, in fact, we talked about ten

10   o'clock last night about it just to make sure and you had more

11   time to think about it?

12         THE DEFENDANT:  Yeah.

13         MR. DUSTHIMER:  We talked about it this morning?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Very well.  As long as we are at the

16   table, I am going to talk about the jury instructions, but I

17   don't need the court reporter for that.

18         MR. DUSTHIMER:  We have no witnesses.

19         (An off-the-record discussion was held.)

20         (In the presence of the jury.)

21         THE COURT:  The government has rested.  Mr. Dusthimer?

22         MR. DUSTHIMER:  Your Honor, we are not calling any

23   witnesses and so therefore our reservation of opening statement

24   is moot and we would also rest.

25         THE COURT:  Members of the jury, Mr. Mueller has

1  rested his case meaning he has completed the presentation of his

2  evidence so there are just two parts left of this trial, but

3  they are important parts.  If they weren't important, we

4  wouldn't do them.  I just sent my law clerk out with the final

5  changes on the jury instructions, they will be done in minutes,

6  we will have copies printed for everyone, so we are going to

7  come back in 10 or 15 minutes and at that point I am going to

8  read to you the jury instructions then we will go to lunch at

9  noon, come back at 1:00 to hear the closing arguments of the

10 parties.

11         You remember what I told you last night and it is

12 important, we all must fight that natural tendency that we have

13 to want to make up our minds.  We still have two important parts

14 of the trial and we need to listen to those carefully before

15 making up our minds finally in this matter.  So take a little

16 break and we will read the jury instructions in about 10 or 15

17 minutes, as soon as they come down.

18         (A recess was taken from 11:30 a.m. until 11:42 a.m.)

19         (Outside the presence of the jury.)

20         THE COURT:  Be seated.  There's two pieces of business

21 to take care of outside the presence of the jury.  The first is

22 to make objections to the jury instructions.  Are you ready to

23 do that, Mr. Westphal?

24         MR. WESTPHAL:  I am, Your Honor.

25         THE COURT:  Do you have comments you would like to

1  make?

2          MR. WESTPHAL:  I do not.

3          THE COURT:  Mr. Dusthimer, are you ready?

4          MR. DUSTHIMER:  Yes.

5          THE COURT:  What are your comments?

6          MR. DUSTHIMER:  None, Your Honor.  I have talked with

7  -- I have spoken with my client.  He does want that additional

8  language in the jury instruction as the Court has prepared it.

9          THE COURT:  It is there.  Very well.  Finally,

10 pursuant to United States versus Bell, I need to make a ruling

11 on the admissibility of the statements offered pursuant to the

12 co-conspirator hearsay exception or co-conspirator utterances

13 section Rule 801(d)(2)(E).

14         There were three instances during the life of the

15 conspiracy in which statements from Mr. Canady were admitted,

16 there was also one instance in which a statement from Andrew

17 Sullivan was admitted pursuant to that section.  I find that in

18 each of those four instances the defendant and the declarant

19 were members of the conspiracy; that the statements were made

20 during the course of it, in furtherance of the conspiracy; and

21 therefore though they were conditionally admitted, now they are

22 finally admitted.  I don't intend to make any further statement

23 to the jury in that regard.  I assume that's the way you want

24 it, Mr. Dusthimer.

25         MR. DUSTHIMER:  Yes, please.

1    THE COURT:  All right.  Is there anything else before

2  we read the instructions to the jury?

3    MR. WESTPHAL:  No, Your Honor.

4    THE COURT:  Very well.  Call the jury, please.

5    (In the presence of the jury.)

6    THE COURT:  Please be seated.  Members of the jury, we

7  will read the instructions before we go to lunch.  We will come

8  back in an hour after we recess, and then we will hear the

9  closing arguments of the lawyers.  They can have as much as one

10  hour per side to make their closing arguments so from that you

11  can tell that you will begin your deliberations by about three

12  o'clock p.m. today.

13    After that, you will control your deliberations.  I

14  told you when you started that it is typically the case that

15  jurors stay even if it goes after 5:00.  You are welcome to do

16  that, we will bring in dinner if you like, so whatever you would

17  like to do is fine, but if you wanted to come back tomorrow

18  morning, that would be fine with me too.

19    So on your chair when you came back in the courtroom

20  was a copy of the instructions.  I would ask that you follow

21  along as I read them out loud.  You will get to keep that set of

22  instructions to use during your deliberations.  The court

23  reporter doesn't need to take down the reading of the

24  instructions, just follow along on your copy and report any

25  place where I deviate from the written word.

1          (The Final Instructions to the Jury Nos. 1 through 7

2     were read by the Court.)

3          THE COURT:  Okay.  We are going to break for lunch,

4     come back at 1:15, and at that time we will hear the closing

5     arguments of the lawyers.  We will see you at 1:15.

6          (A recess was taken from 12:10 p.m. until 1:14 p.m.)

7          (In the presence of the jury.)

8          THE COURT:  Please be seated.  As I said earlier, this

9     is the time for closing argument.  Closing arguments are not

10    evidence, it is the opportunity that the lawyers have to attempt

11    to persuade you that you should adopt their views in the case.

12    The government goes first because it bears the burden of proof

13    and Mr. Dusthimer will go second and if Mr. Westphal saves part

14    of his hour, he may give a rebuttal argument.

15          Mr. Westphal, you may give the government's closing

16    argument.

17          MR. WESTPHAL:  May it please the Court, Mr. Dusthimer,

18    Mr. Mueller, ladies and gentlemen.  I will try not to hide

19    behind that.  Good afternoon.  The evidence that you heard in

20    this case basically showed that from January of 2007 to May 2nd

21    of 2008 this group of individuals, co-conspirators, as you will,

22    were bringing in two to five kilograms of cocaine or crack

23    cocaine a couple times a month, a substantial amount of cocaine

24    and crack cocaine.  Even the cocaine that they brought back you

25    heard was converted into crack cocaine.  In fact, as Andrew

1　Sullivan said, one of the advantages is that you could take nine

2　ounces of powder cocaine and turn it into approximately 14

3　ounces of crack cocaine and these individuals were in it

4　obviously to make money and specifically from approximately

5　beginning of January 2007 some of these groups pooled -- several

6　individuals pooled money to obtain cocaine and crack cocaine.

7　　　　　Andrew Sullivan, he mentioned other individuals, Kenta

8　Hopson, Michael Coleman, Matt Canady, and also the defendant,

9　Gilarime Mueller, were going up to Chicago to obtain powder

10　cocaine to bring it back to Davenport to turn it into crack and

11　sell it on the streets. Gilarime Mueller by at least the spring

12　of 2007 to May 2nd of 2008 was assisting in driving up and

13　obtaining the cocaine, he was contributing money, he was

14　assisting in the cooking of the crack cocaine, and he was

15　distributing the crack cocaine.

16　　　　　Now, the elements that you will be reviewing for a

17　conspiracy are that from January 2007 to May -- continuing to on

18　or about May 2nd of 2008, two or more individuals entered into

19　an agreement or understanding to distribute crack cocaine.

20　　　　　Now, there was evidence that doesn't have to

21　necessarily be at that point Mr. Mueller, it could be, basically

22　has this group of people that very early on in January 2007 had

23　agreed to pool their money for the purpose of obtaining the

24　cocaine; that the defendant, Gilarime Mueller, joined in that

25　agreement or understanding either at the beginning or at some

1  time when that same agreement or understanding was in effect.

2  At the time he joined in that agreement he knew the purpose was

3  to distribute crack cocaine.

4       Now, the physical evidence was mainly gathered

5  exclusively on May 2nd of 2008.  You heard some surveillance on

6  Matt Canady that led to search warrants, including at 2319 North

7  Linwood, the residence of Matt Canady; another search warrant at

8  5372 North Linwood, the residence of Gilarime Mueller.  What

9  that kind of showed you on May 2nd of 2008 is a mini snapshot of

10  what was going on in the previous months in this conspiracy.  It

11  is corroborating what the other witnesses have said that there

12  was cocaine being obtained, there was money being pooled for the

13  purpose of going out of town to get drugs.

14       There are vehicles needed to transport drugs.  There

15  had to be drugs, powder cocaine brought back, cooked.  You heard

16  Mr. Sullivan who by his own description is a good cook turning

17  powder cocaine into crack cocaine, described how that process

18  works and some of the items that are used in that, a measuring

19  cup; what he described, Mr. Sullivan, remember, one of the best

20  things for crack cocaine dealers is a brown Pyrex bowl because

21  of its ability to sustain a large amount of hot and cold items

22  and baking soda, a common ingredient.  All those in the

23  residence on May 2nd of 2008, including Gilarime Mueller.

24       They had on May 2nd of 2008 crack cocaine packaged up.

25  Ended up the items, the crack cocaine, the two yellow baggies,

1  remember they were somewhat pinked by them being processed for

2  prints, but packaged up.  To be packaged up you need to weigh it

3  out if you are a drug dealer.  On top of the kitchen cupboard

4  where Corporal Hutcheson said he could only see it if he climbed

5  up on the counter was the scale that Gilarime Mueller uses.

6  And, of course, distributed, Matthew Canady left the residence

7  and went to the residence of the confidential informant,

8  unfortunately for him it ended up being a high speed pursuit and

9  instead of going to the ultimate customer, it ended up being

10  deposited there on top of an abandoned gas station.

11      May 2nd shows what these other witnesses were

12  describing took place throughout the previous months of this

13  conspiracy, money being pooled, transportation being arranged,

14  drugs are being purchased, drugs are being cooked, crack is

15  being broken down, crack is being distributed.

16      Now, you will have -- in evidence there were several

17  witnesses that have Plea Agreements with the government and the

18  government is providing those Plea Agreements for you to review

19  in considering their testimony and that is a factor and the

20  government is not asking you not to consider that factor in

21  assessing those Plea Agreements.  Unfortunately for the world of

22  drug dealing sometimes the best witnesses for that are the

23  people that are actually involved, the drug dealers themselves,

24  the people that are purchasing the drugs, people that are

25  cooking the drugs, people that are breaking down the drug and to

1    hear from them pursuant to these Plea Agreements you will see

2    the terms of that, basically they are required to tell truth.

3    They are not allowed to falsely accuse anyone, they are not

4    allowed to protect anyone.  In return for that in the Plea

5    Agreement has the potential for getting a sentencing reduction.

6    Now, again, that may, in initial review, may be a fact you want

7    to consider, but it is not a big surprise to anyone that someone

8    in prison would like a lower sentence; but in considering their

9    testimony, you can't stop there based on the Plea Agreement.

10   You can't categorically disallow anything they say.

11        You have to listen to what they say and I ask you when

12   you go back to review that, consider the detail they gave you

13   and how these cooperating defendants not only had Plea

14   Agreements and none of them said they expected to get out of

15   jail, but they hoped to lower their sentence, but how they

16   corroborate each other, the details they give, whether or not

17   any of it is corroborated by physical evidence and how they

18   somewhat corroborate each other in viewing and determining that

19   credibility, that final determination of credibility.

20        Andrew Sullivan as we heard was arrested on January

21   9th of 2008 after being on the run since October.  He described

22   in detail how they would obtain the powder cocaine and crack

23   from Chicago, bring it back, and at various locations cook it

24   up.  He described they were going a couple times a month,

25   bringing back two to five kilograms.  They were spending on

1  these kilograms per trip 25 to $50,000, 50 to $100,000 a month,

2  this was a substantial undertaking, and one of the people they

3  looked to to help plan this undertaking was Mr. Mueller,

4  according to Mr. Sullivan contributing approximately $10,000 at

5  a time.

6         I believe you recall Mr. Sullivan saying the price for

7  a kilo of cocaine was around 20,000, crack around $16,000, and

8  on May 2, 2008, Gilarime Mueller has 16,980, approximately

9  $17,000.  He described how they would bring it back and at

10  various residences cook it up including at Fair Avenue where he

11  stayed with his then girlfriend, Heather Vanhoosier, who you

12  heard from this morning.  That on at least two occasions Mr.

13  Sullivan recalled Gilarime Mueller being present when that crack

14  cocaine was being cooked at the residence, Matt Canady would

15  cook, Gilarime Mueller would be there as well, described that

16  sometimes he would help stir for Mr. Sullivan, showing him

17  various steps in cooking crack cocaine, did also involve actual

18  hands-on in the cooking of crack cocaine and they would all sit

19  around the table, they would break it down, and everyone would

20  take their cut.

21         You also heard corroborating much of the instances

22  described by Mr. Sullivan was Damar Hampton who described he was

23  also over at that Fair Avenue residence and he also saw Andrew

24  Sullivan a lot of times cooking up crack cocaine, on at least

25  two occasions, one at the Fair Avenue address, one at another

1   address off Harrison Street, Damar Hampton saw the defendant

2   Gilarime Mueller participating in those cooks.  He saw what he

3   described today as Andrew Sullivan was teaching him how to do

4   various steps of it, I think Andrew Sullivan's description and

5   Damar's are pretty much the same, they are just from different

6   perspectives, but certainly they involve Gilarime Mueller being

7   involved cooking cocaine on Fair Avenue and breaking down and

8   leaving with crack cocaine on several occasions.

9           You heard Heather Van Hoosier also describe the same

10  type of activity, that she was there, she saw Sullivan cooking

11  crack cocaine and Matt Canady cooking crack cocaine and the

12  defendant, Gilarime Mueller, at least by her description present

13  out in the kitchen cooking crack cocaine and sitting down at the

14  table with everybody breaking up the crack cocaine.

15          Andrew Sullivan described an incident in July of 2007

16  where he was notified that one of the vehicles bringing back

17  powder cocaine had been stopped and someone fled in the

18  cornfield with approximately three kilograms of powder cocaine.

19  He contacted according to Mr. Sullivan several individuals,

20  including Damar Hampton, Gilarime Mueller, and Matt Canady to go

21  look for it.  He said they did not find it.  Remember Damar

22  Hampton recalled the same incident, how he was contacted by

23  Andrew Sullivan, and told to go look for those three kilograms

24  of cocaine.  By price, 25 to $50,000 loss for this conspiracy.

25  Obviously they wanted it back.

1          So Damar Hampton also described going out to this
2   location near Chicago and looking for those lost three kilograms
3   of powder cocaine.  He described being present as well as Mr.
4   Sullivan described the same thing.  Present was Gilarime Mueller
5   along with Matt Canady and another person out there looking for
6   the powder cocaine.

7          Now, Andrew Sullivan also described receiving --
8   physically exchanging crack cocaine with Matt Canady and
9   Gilarime Mueller as part of this conspiracy.  Sometimes when one
10  subject would run out, someone else in the group would help you
11  out.  Substantially he described one time exchanging kilogram
12  quantities with Matt Canady, but also described various times
13  exchanging 63-gram quantities of crack cocaine with the
14  defendant, Mr. Mueller, when either side was running low.

15         You also heard Andrew Sullivan describe the incident
16  at the Fair Avenue address where Mr. Sullivan, Damar Hampton,
17  Gilarime Mueller, Matt Canady were all present.  Mr. Canady
18  became upset at Mr. Hampton and ended up pointing a gun in his
19  face.  Damar Hampton described the same incident, he believed it
20  was -- he thought Mr. Canady was accusing him of coming up short
21  on the money because that day they had gone up to Chicago to get
22  some drugs.  Andrew Sullivan and Damar Hampton both described
23  that incident and the gun was pointed in the face and again on
24  May 2nd if you remember when they searched 2319, the residence
25  of Matt Canady, they found, in fact, a firearm under the bed,

1  between the mattress at Mr. Canady's residence.  Both Andrew

2  Sullivan and Damar Hampton both described that.

3         Leon Simpson was another witness that you heard from

4  pursuant to a Plea Agreement.  He described also getting crack

5  cocaine from Gilarime Mueller every other day beginning

6  September of 2007 till his arrest on November 9, 2007.  He

7  described calling up Mr. Mueller when he needed crack cocaine

8  and they would meet, he would normally get 63 grams or four and

9  a half ounce quantities from Mr. Mueller.  In fact, he recalled

10 on the day Mr. Simpson got arrested he was contacting Mr.

11 Mueller to get more crack cocaine and when he showed up to get

12 his 63 grams he noticed that Mr. Mueller in a van had another

13 one to one and a half kilos in the van.

14        You also heard testimony from Terry Clark this morning

15 that he, during the January 2008 to May 2008, was receiving

16 crack cocaine from Gilarime Mueller, 63-gram quantities.

17 Throughout this conspiracy several individuals all describe the

18 same type of conduct, all describing specifically their

19 observations and the personal involvement of the defendant,

20 Gilarime Mueller.

21        You heard testimony from Mario Williams and Mario

22 Williams was present on May 2nd of 2008.  You heard that Mario

23 Williams has given a couple statements in the past that were

24 different from his trial testimony and you are allowed to take

25 that into account in reviewing his testimony because he said --

1  also take into account, you saw him testify, and he testified in

2  front of you in describing these same events and he basically

3  said he was tired of lying.  He described on May 2nd of 2008 he

4  is in a relationship with the sister of Matt Canady and I think

5  from his testimony you can conclude that that played a part in

6  some of his decision making of what to tell and when to tell it

7  in addition to his personal decision in relation to Gilarime

8  Mueller and Matt Canady, not telling on his friend.

9      He described on May 2nd of 2008 being dropped off by

10  his girlfriend at 5372 North Linwood.  When he went in, he saw

11  on a counter -- well, he saw in the kitchen, Gilarime Mueller,

12  Matt Canady, and Jeremy Canady, and he saw a bag of a substance

13  on a counter which he believed to be cocaine, what he described

14  as a white bag with black lettering.  Before he came in Mario

15  Williams testified that he was seeing things outside, that he

16  thought the police were outside so he actually decides later to

17  leave and go down to the BP gas station.

18      He comes back a short time later, goes in the

19  residence, and sees now two yellow bags on the kitchen table,

20  smaller, different color bags, Matt Canady picks them up, puts

21  them in his pocket, and they drive away.

22      He describes stopping at a residence, you heard him

23  describe it was 1719 West 55th, the photograph will be in

24  evidence.  Mr. Canady gets out, goes and knocks on the door,

25  doesn't find anyone present, gets back in the vehicle, then they

1   drive off, end up going down Division Street.  As they proceed

2   down Division Street, Mario Williams notices Corporal Proehl

3   driving in a van next to him.  He recognizes Corporal Proehl and

4   he decides at that point finally after seeing this stuff all day

5   he knows now that the police are following him and he tells Matt

6   Canady.

7           Proceeding down through Kimberly to turn on the

8   streets going west where officers try to stop the vehicle, Mr.

9   Canady tries to evade, striking one and drives off in the

10  vehicle at a high rate of speed, around and up North Pine Street

11  at such a high rate of speed the officers are not able to catch

12  him that day.  He stops in an abandoned gas station on Cheyenne

13  and 46th, lets Mario Williams out of the vehicle, and throws two

14  yellow bags of crack cocaine at him, these two yellow bags that

15  contain the crack cocaine.  Mario Williams takes off running and

16  throws the crack cocaine up on the roof of the abandoned gas

17  station.  He gets taken into custody, up that way and then back,

18  and then taken into custody a short time later.

19          Now, while the car is driving, Mario Williams

20  describes that Matt Canady wants him to call someone.  Matt

21  Canady is in a car, Matt Canady has that crack cocaine still,

22  speeded away from law enforcement officers and the first person

23  he thinks to call and asks Mario Williams to call is Gilarime

24  Mueller and you saw in the phone logs that were taken off the

25  phone later from Mario Williams that, in fact, during the time

of the chase he calls which is a number that is already in his
phone, G-L-M, which you will see later is the 3808 number, he
tries to call Gilarime Mueller and he says he can't get ahold of
him so Matt Canady calls the second person also in the house,
Jeremy Canady right after that, 5:15, doesn't get ahold of
either one. Mario Williams' statements about those two calls
are corroborated by his cell phone information.

Now, Mario Williams also described that on at least
two prior occasions he was over at the residence at 2319 North
Linwood when crack cocaine was being cooked; that present at
that time was Matt Canady who was doing the cooking and Gilarime
Mueller and that they were both basically watching the windows
for the police, Mr. Mueller and Mr. Williams, while Matt Canady
cooked up the crack cocaine.

After that was done break down -- Gilarime Mueller and
Mario Williams helped break down and package up the crack
cocaine. May 2, 2008, when they searched 2319, I believe you
will recall Mr. Williams described they broke it down and
weighed it out on a black scale. When they go and search on
that day on May 2nd again, exactly what they find consistent you
will see the same type of scale they find in Gilarime Mueller's
house. This model looks like a USN 250, the other one is USN
150, but they are essentially the same type of scale used that
Mario Williams described and not only Mario Williams described
crack cocaine being cooked over at 2319, but again this morning

1   you heard Nicky Hill describe, she lived there with Matt Canady,

2   she described she saw Matt Canady with crack cocaine at this

3   residence and, in fact, she saw Matt Canady cooking cocaine at

4   that residence and she saw present during those cooks Gilarime

5   Mueller.

6          Now, specifically on May 2nd the search at the

7   residence at 5372 North Linwood found several items.  Up in the

8   bedroom, Government's Exhibit 53 photograph, you will remember

9   that you heard Agent Allers talk about the cell phone that was

10  seized off there that also had some numbers that matched up with

11  Mario's phone.

12         You heard Detective Lansing testify yesterday that

13  upstairs in that same bedroom they came across a pillow and a

14  pillowcase and when they looked in that pillowcase, in that same

15  bedroom, you heard them describe they found some indicia for Mr.

16  Mueller in there, in this pillowcase, they dump it out and

17  that's what is in there.   17 rubberbanded, individually wrapped

18  bundles of pretty much 1,000 bucks a bundle, one was $20 short,

19  like a $20 rock of crack cocaine short.

20         You will also recall this morning in testimony when

21  Heather Van Hoosier described seeing Gilarime Mueller with large

22  amounts of cash over on Fair Avenue, again she described how did

23  that money look?  It was bundled together, large amount, with a

24  rubberband.  She specifically described seeing the defendant,

25  Gilarime Mueller, hand it to Andrew Sullivan to take to Chicago

1   to buy more cocaine.

2        In the kitchen remember Detective Westbay seeing an

3   individual wearing clothing which is also described clothing

4   consistent with Jeremy Canady come out after the Volkswagen

5   leaves and put a trash bag in the trash.  Detective Westbay

6   later went back and after they got a search warrant Corporal

7   Hutcheson went through and opened up the bag, on top is the blue

8   bag that you heard Matt Schwarz talk about, later they found two

9   prints on that blue bag.

10        Corporal Behning described earlier in the day around

11  3:08 when he saw Matt Canady leave 2319 he was carrying a blue

12  bag.  Detective Hutcheson describes when the Passat arrives at

13  North Linwood, Matt Canady gets out, carries a blue bag, and the

14  fingerprints to match them.  Underneath that, immediately

15  underneath that according to Corporal Hutcheson is this yellow

16  bag.  On top is the bag that's carried in by Matt Canady with

17  his prints on it, underneath is the yellow bag.  You are going

18  to have part of it torn off, see right down there, (Indicating)

19  you heard testimony yesterday where it is circled was what Matt

20  Schwarz you will see identified as the left thumb print of the

21  defendant, Gilarime Mueller, on that sack, grabbing it at least

22  with his hands, the torn sack.

23        Also in the kitchen other items found at 5317 in the

24  kitchen were other yellow bags that came from there, the

25  measuring cup, the infamous brown Pyrex, and of course again the

scale, similar to the same type of one that was found over at Matt Canady's house on top of the cupboard, hidden on top of the cupboard, the kitchen cupboard.  This is where they found the scale.  Everything in the kitchen needed and consistent with what Mario Williams described that the individuals were in there cooking up crack cocaine on May 2, 2008, breaking it down and weighing it up and Matt Canady was with them.

If Matt Canady wanted to be alone with the crack cocaine, why did he go over to 5372 that day?  Why is it the first person Matt Canady thinks to call when he is on the run from the police with 39 grams, these two packages in his car, is Gilarime Mueller.  Gilarime Mueller, where they just left the crack cocaine with the $17,000.

Ladies and gentlemen, when you go back and review the evidence in this case from start to finish and think of it all together and how it fits together and how it doesn't fit together, when you think of those cooperating defendants, by all means think of why they were here and how did they testify and you did see them testify in front of you and your judgment on their credibility, take into account the criminal history and take into account the details, the consistent pattern of activity consistently describing Gilarime Mueller and again how this evidence on May 2nd of 2008, how this one day, basically this one afternoon of their conspiracy is consistent with what was described taking place by these other individuals from

1   January '07 to the present, these individuals at least on May

2   2nd already in custody, May 2nd of 2008 Andrew Sullivan, Leon

3   Simpson, a lot of these people are already in custody.

4         Matt Canady and Gilarime Mueller had to do a lot of

5   that activity on their own on that day.  Again that's what the

6   evidence shows.  They got the cash, they got the car, they got

7   the equipment.  They had an agreement, a continuing agreement to

8   obtain and distribute crack cocaine.  Gilarime Mueller clearly

9   by the testimony and the evidence seized on May 2, 2008,

10  knowingly and intentionally joined in that agreement and knew

11  that the agreement was to distribute crack cocaine.  And also on

12  that date he helped Matt Canady.

13        Matt Canady makes contact with the confidential

14  informant, ends up over at Gilarime Mueller's house.  He's there

15  to go to the confidential informant for the purpose of

16  distributing the crack cocaine.  He has in his car the two

17  yellow packages.  There is the yellow bag -- the blue bag in

18  Gilarime Mueller's house, he is in there for an hour and a half

19  with all these items in the kitchen, leaves, and where's the

20  first place he goes, off to the informant to distribute that

21  crack cocaine which could have happened prior to his stop at

22  Gilarime Mueller's residence.

23        Gilarime Mueller being at the residence, knowing the

24  crack cocaine was there, possessed it, and the evidence shows he

25  also aided and abetted Matt Canady's possession and Canady

1  distributed the crack cocaine.  I ask you to find based on all

2  of this evidence that the defendant Gilarime Mueller is guilty

3  of conspiracy to distribute crack cocaine.

4          I also ask you to consider in the drug amount, you

5  heard -- you will see 39 grams was seized on May 2nd of 2008;

6  but you are also able to consider as evidence of the drug

7  quantity the substantial quantities that were described by the

8  cooperating defendants, well over 50, well over a kilo, multiple

9  times.

10         You can also consider what the $17,000 was that was

11 seized on May 2nd of 2008.  No other reason but drug proceeds.

12 17,000 according to these witnesses bought approximately a

13 kilogram of drugs.  All that evidence, substantial evidence,

14 well in excess of 50 grams required of you to find.

15         Based on all the evidence, find the defendant,

16 Gilarime Mueller, guilty to distribute at least 50 grams and

17 guilty of possession with intent to distribute those 50 grams.

18 Thank you.

19         THE COURT:  Mr. Westphal, would you remove your stuff,

20 both the chart and the ELMO.  Mr. Dusthimer, you may make Mr.

21 Mueller's closing argument.

22         MR. DUSTHIMER:  Thank you.  May it please the Court,

23 Mr. Westphal, ladies and gentlemen.  Thank you.  Mr. Mueller,

24 thank you.  Mr. Westphal, thank you.

25         Here comes the last but sometimes hardest part.  It is

1   my opportunity now to talk to you and to help you with the

2   hardest part.  I've been doing this longer than some of you have

3   been alive, I've done it different ways, but what I find to me

4   that makes more sense is that I go back when I took my teacher's

5   training.  You are about to take an open book test.  The open

6   book you already have in front of you.  In order to help you

7   take an open book test, what I want to do is I want to take you

8   through and talk about some of the items that you already have

9   heard.  I am going to be referring to them, I might or might not

10  put them up at the top, but every time I refer to one, I will

11  either refer to it by the page number or I will refer to it by

12  the instruction number because ultimately the next and final

13  phase of this for you is that you have to finish this paper.

14  You have to finish this test.

15          And how do you finish this test?  The last two sets of

16  pages are the Verdict Forms.  If you go to the back there's page

17  one, it says Verdict Form.  Count 1, conspiracy with regard to

18  the crime of conspiracy as charged, we, the jury, do you

19  remember me talking about it, find the defendant, Gilarime

20  Mueller, either not guilty or guilty.  Remember I talked about

21  it, questioned whether or not the government has met its burden

22  of proof and we are going to talk about that a little bit.  That

23  is the form that you see there.

24          Then you have an Interrogatory, that's a lawyer word

25  for a question.  Do you find that there was more than 50 grams

1  of crack cocaine that Mr. Mueller was involved with?  Do you

2  find that there was five grams or more of crack cocaine that he

3  was involved with?  Or do you find less than five grams?  We

4  will talk about that.

5          Next page, Count 2.  Same basic questions, same basic

6  idea.  With regard to the crime of possession with intent, we,

7  the jury, find the defendant, Gilarime Mueller, either as we

8  talked about before, not guilty or guilty.  Same issue regarding

9  weight involved, kind of.  So how do you fill it out?  Well, as

10  we promised and as you talked about in the oath that you took

11  you said you were going to follow the instructions.  The Court

12  told you some of the instructions at the front end, telling you

13  the instructions now, and I want to help you go through those

14  instructions so you know better how to fill out that form.  So

15  the question about it is is what has to be done.

16          Instruction four on page seven, caption, Indictment,

17  Presumption of Innocence, Reasonable Doubt.  You have to

18  re-evaluate the government's case.  You have to evaluate their

19  case by starting off as the Judge asked one of you, one of the

20  prospective juror panel, I don't believe that gentleman is with

21  us here this afternoon, without knowing more, how do you vote?

22  Because there's a presumption of innocence.  Okay.  There's a

23  presumption of innocence.  What does it take to overcome that

24  presumption of innocence?  The presumption of innocence is

25  overcome when there's evidence -- only if the government proves

1  beyond a reasonable doubt each element of the particular crimes

2  charged.

3          What is a reasonable doubt?  Last paragraph.  Whether

4  based on reason, common sense, skipping down, which would make a

5  reasonable person hesitate to act.  You may hear me say that

6  once or twice again throughout this half hour.  Must be proof of

7  such a convincing nature or character, I apologize for

8  misreading, that a reasonable person would not hesitate to rely

9  or act upon.  We will talk about that a little bit more.

10          So what does the government have to prove?  Next page

11  or page eight, Instruction 5, you've got two counts.  Count 1

12  talks about three things and Mr. Westphal talked about those,

13  that there was two or more people trying to work together to

14  commit a crime at sometime, somewhere, someway Mr. Mueller

15  decided to join in on that, and at the time Mr. Mueller joined

16  in on that, that he knew what he was doing.  The government must

17  prove all of these elements beyond a reasonable doubt otherwise

18  you must find him not guilty, last line.

19          Count 2, next page.  Same basic idea.  Defendant was

20  in possession of crack cocaine, he knew it was crack cocaine,

21  and he wasn't planning on keeping it all to himself.  My

22  paraphrase.  If the government has failed to prove any of those

23  elements beyond a reasonable doubt, you must find the defendant

24  not guilty.  What's possession?  Way in the back, there's

25  definitions.  They talk about possession, they talk about

1  distribution, they talk about -- now you got the agreement, on

2  or about, success immaterial, those items are there, I don't

3  want to bore you, but it may be we will refer to those while we

4  talk about what is going on.

5       So you got an idea, ultimately you have to make a

6  decision.  What do you have to do?  You have to decide did the

7  government prove the elements with evidence that a reasonable

8  person would not hesitate to act.  My paraphrase.

9       I do want to remind you, because I remind every jury

10  and I don't hesitate doing it, just like the Judge says at the

11  very beginning of the first paragraph I think it is, if I

12  misquote it, please, the instructions speak for themselves, are

13  what count.  Sometimes I will paraphrase in hopes that I can

14  help you understand what is being said.  But these are the

15  rules, these are the standards, I started off by asking the

16  group did you take the oath because that's what counts here.

17  The oath is to follow the instructions, to hold the government

18  to their burden of proof, and to see whether or not the

19  government provided evidence such that a reasonable person would

20  not hesitate to act.

21       So what do we have?   We have police officers

22  watching.  Probably around mid-April, maybe a little later.

23  Agent Allers, first time he saw the defendant, Mr. Mueller, was

24  on this May 2nd date.  You hear testimony that once on April

25  22nd somebody saw Mr. Mueller somewhere close to where an

1    alleged sale was being completed, where the money was being paid

2    back and forth.

3          What else did you hear?  You heard that at some point

4    during that April 22nd near Heatherton and Michigan that Mr.

5    Canady walked away, stepped aside.  No one here explained what

6    actually was seen, no one here explained what actually was said,

7    there is no audiotape presented, there was no videotape

8    presented, though I asked, but somehow, someway, somewhere,

9    somehow Mr. Mueller happened to be there along with somebody

10    else that we have no idea of his whereabouts and the person that

11    saw it, we didn't hear.  If they don't prove it, it is not our

12    fault.  That's the oath.

13          What did they prove regarding whose residence it was

14    at 5372 North Linwood?  I think you will find one piece of

15    evidence that shows that Mr. Mueller had a Western Union -- I am

16    not even finding it -- sent and there may have been an address.

17    I don't think anyone brought it to your attention, I don't think

18    anyone otherwise suggested that they knew that that was Mr.

19    Mueller's address, I don't think that anyone testified anything

20    else other than he, along with Jeremy Canady, along with I think

21    it was Renata Wilson, and a small child were there.  That's it.

22    Nothing more.  If you remember something different, please, it's

23    your memory that controls.

24          Once again, page one, the Judge says what I say is not

25    evidence.  You have to go by your recollection because I -- I

don't think you can see the amount that I'm anxious right now,
but I mean it when I say that your oath is what counts here,
your oath to determine whether or not the liars, cheats, and the
stealers, that's the way the police admitted, yup, that's a good
characterization that they want you to rely upon, the ones that
gave you the Plea Agreements, every one of the Plea Agreements,
not once in any of those Plea Agreements was Mr. Mueller's name
mentioned.  Documents drafted by the government.

What do we have?  We have Mr. Sullivan.  What's he
got to lose?  He's in for life.  If he tells a story, are they
going to sentence him for perjury?  Where's he going?  Is it
going to make any difference?  Is there substance to that?

Mr. Clark, he gets confronted by the police, what's he
do?  Runs, tries to flush.  Mr. Hampton, he's arrested in
April, he signs pretrial release papers, you heard the list.  On
the release violations, what was his answer?  Only two of them
were not traffic tickets.  Signed the piece of paper for the
Plea Agreement just like he signed his bond release papers.  Mr.
Simpson, released from prison in August.  He gets rearrested in
November, but he doesn't plead until August of '08.

Those are the people they want you to believe.  Those
are the people that you should not hesitate to act in listening
to what they have to say because if you do hesitate to act, then
there's a reasonable doubt and if there's a reasonable doubt,
then you have to ask yourself have they met their burden of

1   proof and if they didn't meet their burden of proof, then you're

2   obligated to find Mr. Mueller not guilty.  That is, Mr.

3   Mueller's case as presented by the government in this courtroom

4   did not meet its burden of proof.

5           Was it Exhibit 93, the phone chart, the phone chart

6   where we put names down instead of numbers to help you?  So what

7   did it say?  Okay.  You testified you went in, secured the place

8   waiting for a search warrant.  Where's the phone, this phone

9   that you've got red tagged back and forth as far as what Mr.

10  Mueller is doing, where is it?  Is it here?  No.  What phone did

11  you find on him?  A Sprint phone.  Is that a different phone?

12  Yeah.  What's the phone number?  It's a different number.  In

13  any of those 300 some pages of phone records you introduced, did

14  you do any study on the phone that you found on Mr. Mueller?

15  No.  But they want you to believe that those phone records are

16  such evidence that a reasonable person would not hesitate to act

17  in interpreting that to show that Mr. Mueller -- that the

18  evidence against Mr. Mueller is such that it is evidence beyond

19  a reasonable doubt.

20          Was there a weapon found at the other house?  Yeah.

21  Was there a Pyrex dish found?  Yeah.  Did I ask?  Are you going

22  to find Pyrex dishes -- can you find Pyrex dishes in most

23  households?  Yes.  How about baking soda?  Yeah. Can you tell

24  from the time this baking soda was last used?  No.

25          Fingerprints were taken, obviously things that were

1   washed.  Yeah, we're not expected to find fingerprints.  Find

2   any fingerprints of Mr. Mueller's on the scale that's put up

3   high?  No.  The plastic bag which may or may not be the source

4   of the wrapping, don't know, I haven't tried to jigsaw it, I

5   have not tried to jigsaw it, it may be there, may not be, but

6   the point is Exhibit 23 shows guess what?  The same type of

7   plastic bags underneath the kitchen sink.  I keep mine out in

8   the garage in a little bag.  I assure you my garbage bags in my

9   house have my fingerprints on them.  Did all of those?  One bag

10  somewhere, someway, somehow had Mr. Mueller's.  Is that evidence

11  such that a reasonable person would not hesitate to act in

12  determining whether or not the government has proven their

13  evidence beyond a reasonable doubt?

14        Help me remember something.  The 63s, did he tell us

15  goes to the next level dealer or do you sell them side to side

16  as between you because -- I won't categorize it, what I am going

17  to say is I thought I heard testimony that the 63s is kind of

18  what you go to the next level dealer, but quite frankly I don't

19  remember.  Someone said they were trading 63s back and forth.

20  Trading kilos back and forth.

21        Did you ever hear any police talk about the time,

22  work, cars to pull over and somebody ran from the car after it

23  was pulled over and was able to hide three kilos of cocaine in a

24  cornfield somewhere an hour and a half from here?  If someone

25  was pulled over, wouldn't it have been noted?  If someone was

1  pulled over and somebody ran, don't you think the police would

2  have been involved?  But somewhere, someway, somehow two people

3  that happen to be working together and admitted they work

4  together and I think even their plea agreement will say that

5  they worked together, they said that well, I wasn't even on that

6  trip, but you heard about it.  But somehow, someway, somewhere

7  Mr. Mueller was also involved in it.  I can't remember if that

8  was -- no, was that the guy sentenced to life who's got nothing

9  to lose or is that the guy who told five different stories twice

10 under oath or was that the guy who signed his federal pretrial

11 release papers and only two of his violations after he signed

12 them were not traffic tickets?  I can't remember which one.

13        This is a nice, pretty, blue plastic bag, it was on

14 the top of the garbage, you are allowed to use common sense and

15 experience, but did any police officer say yup, that looks like

16 the same color blue bag that I saw carried in?  Did anyone tell

17 you that?  Or did they just say a blue bag?  I didn't go back

18 and look at my inventory, I don't necessarily see any other blue

19 bags in Exhibit 23, but I imagine I have dark blue bags, light

20 blue bags, Wal-Mart type, Hy-Vee bags, but did you hear the bag

21 that was on the counter was what color?   Blue, right?  It is

22 not the testimony I heard.  I heard it was white with black

23 lettering.  That's the evidence that you are to not hesitate to

24 act upon in making a determination as to whether or not the

25 government has met its burden of proof.  If they don't prove it,

1    it is not our fault.

2            The phone log.  What do we know?  We know that there

3    were some numbers involved, some cryptic letters involved, we

4    know with the 330 some pages of reports, I don't think if you

5    look closely you will even see Mr. Mueller's name.  Not the

6    people who own the account, not anything about the

7    documentation.  But as I pointed out, Mr. Allers, he is not

8    trying to mislead you.  Typos sometimes are made, happy to point

9    that out.  Misinterpretation, not as happy to point it out.

10   Errors in entry, sometimes it happens.  We all do it.  I'm sure

11   you saw me do it two or three times during this trial; but when

12   it is something that you are asked to rely upon, something to

13   help you be convinced that without hesitation you can rely upon

14   that, that's --that's very difficult.

15           You are allowed to take your common sense and

16   experience in weighing in the evidence.  Your experience as an

17   employee, how many times have you filed Work Force and

18   Development reports?  Sounds to me like it is more of an

19   employer-type responsibility.  The extent that Mr. Carnahan's

20   testimony makes a difference to you, ask yourself who is

21   supposed to report it.

22           Count 1, Instruction No. 5, page eight.  First, that

23   on or about January 1, 2007, and continuing to May 2, 2008, two

24   or more persons reached an agreement or came to an understanding

25   to distribute crack cocaine.  I think they've proved that.  Mr.

1  Hampton and Mr. Sullivan I think it was alone proved that.

2          Two, the defendant voluntarily and intentionally

3  joined the agreement either at the time it was first reached or

4  at some time later.  Well, if you believe the liars, the cheats,

5  and stealers to the extent that you would not hesitate to act,

6  then yeah, they proved that if you are willing to not hesitate

7  to rely on what they told you because they signed a new piece of

8  paper that says they're promising to tell the truth, just like

9  everything else they've ever signed.

10          Three, the defendant joined in the agreement or

11  understanding, he knew the purpose of the agreement or

12  understanding.  I am going to suggest it might be a big deal if

13  he knew he was joining in the agreement and I don't believe when

14  you take into consideration that a reasonable person would not

15  hesitate to rely and act upon those statements, I would submit

16  to you that a reasonable person would hesitate.  So bottom line,

17  the government must prove all of the elements beyond a

18  reasonable doubt otherwise you must find the defendant not

19  guilty, Verdict Form number one, accordingly.

20          Instruction No. 5, page nine, same evaluations, I want

21  to take you on a little side trip here.  One of the instructions

22  that you are given is aiding and abetting.  Aiding and abetting

23  I think is the next page, Instruction 6, page ten.  The

24  government is required to prove Mr. Mueller's alleged

25  involvement, either he was doing it himself or my paraphrase of

1  this instruction, that he was knowingly helping.

2         The proof of knowingly helping would come from the

3  same liars, cheats, and stealers that you have already heard me

4  talk about regarding the incident on May 22nd -- I'm sorry, May

5  2nd.  See, I misspoke again.  As far as what may or may not have

6  happened in that room where Mr. Clark -- Mario has left if I

7  remember one of the versions of his testimony, he was in

8  possession either himself or by aiding and abetting; number two,

9  he knew he was in possession either himself or by aiding or

10 abetting; number three, that he intended to distribute or sell,

11 aiding and abetting.  When you take a look at that reasonable

12 doubt standard, they have failed to meet all of those, much less

13 any of them; but if the government has failed to prove any of

14 the elements beyond a reasonable doubt, you must find the

15 defendant not guilty, obviously Verdict Form number two, page

16 two at the very end.

17        I would be remiss in not finalizing with three things.

18 Number one, there is a question of quantity here.  The quantity

19 regarding the May 2nd date, I think Mr. Westphal said it

20 properly about 40 grams, you use that weight if you need to.

21 Quantity, the other weights you heard, if you believe the liars,

22 cheats, and stealers.

23        Number two, no doubt about it.  Let me tell you

24 something.  I asked each and every one of you at the beginning

25 if you were going to follow the oath because under the

1   instructions you are given, you are not supposed to have a

2   decision to make.  Wow, Mr. Dusthimer, that's great, we know now

3   what our decision is going to be.  That is not your instructions

4   and I don't want that.  You are agreeing to make a decision,

5   Instruction 9, page 15, as an individual as to whether or not

6   the government has made and proven its case with evidence beyond

7   a reasonable doubt.

8           And finally, you have seen me two and a half days,

9   typing away, making notes, I got three sticky notepads with the

10  instructions in my hand.  I guarantee you I forgot something,

11  maybe something that you think I should comment on, and I am not

12  commenting on it.  That's my fault.  I am quaking now, like I do

13  every trial, I quake less now, but the point I want to make is

14  that the only decision you are asked to make is the Verdict Form

15  number one and Verdict Form number two, did the government meet

16  its burden.  If they did that, that's one thing.  If they

17  didn't, it is something else; but if I forgot to mention

18  something that you think is important, whatever you do, focus on

19  what counts, not whether or not I forgot to say something.

20  Thank you.

21          THE COURT:  Mr. Westphal, you may make the

22  government's rebuttal argument.

23          MR. WESTPHAL:  Ladies and gentlemen, defendants in

24  these type of cases, drug conspiracy cases, spend a lot of time

25  calling the cooperating defendants liars, cheats, and stealers

1  because they want you to categorize them as that based on their

2  history alone because they, as Mr. Mueller understands, that if

3  you believe any one or all those witnesses being credible, and

4  it only points to one conclusion, that Gilarime Mueller is

5  guilty so unless you categorize them up front and ignore

6  everything they said after that, then you find Mr. Mueller

7  guilty.

8         5372, there's a lot of evidence taken out of there and

9  I believe you heard Mario actually testify that that was

10  Gilarime Mueller's residence where he was meeting Matt Canady

11  that day.

12         You heard our argument that the police admitted that

13  these witnesses were liars, cheats, and stealers, I don't think

14  you heard them admit that.  I think you heard questioning from

15  the defense as to whether or not in a broad sense that happens

16  and they try, but you did hear Sergeant Smull and Agent Allers

17  testify that that's not how they conduct their investigations.

18  These are narcotics investigations that come with the pros and

19  cons that go with that type of subject matter, but that is not

20  how these agents did this investigation, that is not how this

21  evidence came in, that is not how this investigation was

22  conducted.

23         Cell phones, tools of the trade unfortunately.  As you

24  heard, almost every cooperating defendant say they are changed

25  on a regular basis, numbers and phones and locations and the

1  3808 was not found as Agent Allers said, but a couple things on

2  that.  You heard a couple of cooperating defendants testify they

3  had several phones.  There was a somewhat time gap as created by

4  Mr. Mueller as far as entering the residence.  He locked the

5  door.  Remember his first reaction when Corporal Hutcheson comes

6  up to the back of the door?  He does first say UPS, Mr. Mueller

7  comes and sees these three officers on his back deck, his

8  reaction, lock the door.  When he knows police are at his

9  residence right after he knew what they were doing in that

10 residence, he knew to lock that door.

11         Mario Williams, when he is asked to call Gilarime, you

12 will see on his phone it says G-L-M which he identified as

13 Gilarime's number, that's the number he dials so at the very

14 least in Mario's mind when he says call Gilarime, he's calling

15 Gilarime and that is corroborated by his phone.  Whether or not

16 that phone was there or not and the other phone that we also

17 seized, the pink phone in the upstairs bedroom, has that same

18 number in it under G-I so that information -- the government is

19 not asking you to find on that information alone, but that one

20 piece of the puzzle corroborates Mario Williams and identifies

21 the defendant.  You may consider that in that fashion.

22         The defendant wants you to believe somehow that these

23 witnesses got together and got their statements together, that's

24 why they're corroborating; but let's take two, for example,

25 Damar Hampton who signed his Plea Agreement on October 29th of

1  2007 and Andrew Sullivan was admittedly on the run from October

2  to January 2008, talked to you about as soon as he was arrested

3  in January 2008 he gives a statement that day.  One of the

4  people he mentions in that statement was Gilarime Mueller and he

5  pleads guilty in April of 2008.  They can say all they want, but

6  there's been no evidence and actually there's been contrary

7  evidence as to the cooperating defendants themselves and the

8  agents that any of these cooperating defendants that you have

9  seen or heard have talked to anyone else or testified.  There's

10  no evidence whatsoever that Damar Hampton and Andrew Sullivan

11  have even seen each other since October 9th of 2007, that they

12  have ever talked to each other, and there's no evidence that

13  they have reviewed what each other has said.

14         Instead what the government asks you to look at in

15  this case is not the category of what they came from, but the

16  content of what their testimony was.  There's no evidence to

17  support the defendant's conclusion.  He wants you to go here, I

18  asked you to look at the evidence that came from that witness

19  chair.  I asked you to consider all the witnesses and what they

20  said and how it corroborates each other, not on what category,

21  not that they're drug dealers.  You don't have to like them.

22  They are not necessarily all likable people; but that is not

23  your duty as jurors.  Your duty is to decide truthfully what

24  happened from January 2007 to May 2nd of 2008.

25         What would have to be true for the defendant's theory

1  to be correct?  Mario Williams of course is an easy lightning

2  rod.  He admitted to you he had given two prior statements, one

3  under oath.  But you can't stop there in assessing his

4  testimony.  You can take that into account, the government is

5  not hiding that from you, I ask you not to take that into

6  account.  How he testified.  Why he said he did that.  And you

7  can also take into account other information in this

8  investigation that corroborates what Mario Williams testified

9  to.  He testified that he saw activity consistent with crack

10 cocaine being cooked at the residence of 5372 North Linwood on

11 May 2, 2008.  When agents go in there and serve that search

12 warrant, they find evidence consistent with crack cocaine being

13 cooked at that residence.  They find Pyrex and baking soda.

14 They find measuring cups.  They find $17,000 in cash.  They find

15 a scale hidden on top of a cupboard.  So there is physical

16 evidence that corroborates what Mario Williams said.  He says he

17 cooked crack cocaine or saw crack cocaine cooked at 2319 North

18 Linwood on prior occasions and again when they go over to North

19 Linwood, they find scales, they find baggies, they find $1,000

20 worth of cash, again there's some evidence over there to

21 corroborate as well.

22         On top of that Nicky Hill corroborates what he says as

23 far as Gilarime Mueller and Matt Canady being over there cooking

24 crack cocaine at that residence at 2319 North Linwood.  Can't

25 just categorize him, who he is and where he came from.  Think of

1    the evidence.  The government asks you to consider the evidence

2    in this case, not theories, not categories, not types of drug.

3             In fact, at 5372 North Linwood not only is the biggest

4    piece of evidence that clearest piece of evidence, the $16,980

5    in individually wrapped packages hidden in a pillowcase, the

6    scale hidden on top of a kitchen cupboard, Gilarime Mueller

7    locking the door when police are on the outside.  What does that

8    indicate to you as to what is going on inside that residence?

9             That evidence points to one thing, the baking soda,

10   the Pyrex, the scale, the 16,980 cash, the crack cocaine thrown

11   on the roof.  Let's work backwards on that.

12            Two packages in yellow packaging are found on the roof

13   at the abandoned gas station.  Where did they come from?  They

14   came from Mario Williams.  Where did Mario Williams get them?

15   Matt Canady tossed them to him in the Volkswagen Passat.  Where

16   did the Volkswagen Passat just come from?  Actually it stopped

17   at this guy's residence first then it came from 5372 North

18   Linwood.  What do we find at 5372 North Linwood?   All this

19   evidence consistent with cooking and in the trash one, two blue

20   bags, yellow bag, torn corner.  Blue bag, Matt Canady's prints;

21   yellow bag, Gilarime Mueller's prints.

22            All the evidence, all the circumstances point to one

23   individual, one resident involved with that crack cocaine.  Not

24   only possessing with the intent to distribute the 39 grams, but

25   conspiracy to distribute 50 grams or more throughout this whole

1    time period.

2            There's a lot of questions and argument on no one saw

3    Gilarime Mueller.  Well, the fact of the matter is nobody from

4    law enforcement saw Gilarime Mueller till May 2, 2008, and you

5    heard a lot of testimony, there's a lot of runners in this group

6    and I guess they had to catch up to them first to find him and

7    it is certainly a conclusion that if Mario Williams had gotten

8    through to Gilarime Mueller, the search and what they found that

9    day might have turned out different, but it is not that no one

10    saw it.  It is not that no one saw Gilarime Mueller being a drug

11    dealer.  Andrew Sullivan, Leon Simpson, Mario Williams, Terry

12    Clark, Nicky Hill, Heather Vanhoosier, all those individuals saw

13    Gilarime Mueller obtaining drugs, cooking drugs, breaking down

14    drugs, distributing drugs, and no big surprise, those people

15    aren't big on audiotape and videotaping their activity so it is

16    not that no one -- that all those people that testified saw it.

17    Gilarime Mueller was involved in all this activity.

18            The Work Force records show that under the Social

19    Security number provided by Mr. Mueller he shows zero income,

20    that obligation as an employee, we can argue this all day long,

21    all this evidence, and the money seized shows one thing.  Based

22    on the conspiracy to distribute that Mr. Mueller is involved in

23    the possession on May 2nd, Mr. Mueller is not punching the

24    clock, he is not waiting a table, he is not working in a shop,

25    he's not staying late at the office, he's a drug dealer.  That's

1   where that $16,980 cash comes from.  That's what this evidence

2   shows.  There's no other legitimate reason for that money found

3   up there than one conclusion, one conclusion that's consistent

4   with all the evidence, Gilarime Mueller is guilty of conspiracy

5   to distribute crack cocaine so Gilarime Mueller is guilty of

6   possession with intent to distribute, aiding and abetting, on

7   May 2nd.  Thank you.

8           THE COURT:  Members of the jury, now you have heard

9   the entire trial and it becomes your duty to begin your

10  deliberations and so I am going to send you out in just a

11  moment.

12          Shortly after you begin your deliberations, we will

13  have each of the exhibits that were admitted into evidence sent

14  back to you for use during your deliberations.  They don't just

15  get assembled in five minutes, it takes us a little while to

16  sort through all of this stuff to get it back there, but they

17  will be back in 20, 25 minutes, something like that.

18          Together with them I will send the original copy of

19  the jury instructions.  This is the Verdict Form in the back of

20  this notebook that you should use to record your verdicts.

21          When you deliberate, all 12 of you need to remain

22  together.  That means that if someone goes to the bathroom, the

23  Court Security Officer takes someone out to the back dock to

24  have a cigarette, if for any reason one of you or more is

25  missing, deliberations have to stop.  All 12 of you must be

1   together when you are talking about it.

2          As I told you earlier, your hours, you will set your

3   hours for deliberations.  If you intend to -- if after

4   deliberating for the next hour it appears that you will be here

5   at dinnertime, tell the Court Security Officer that and they

6   will have dinner brought in if that's your desire and that's at

7   no cost to you.

8          We want you to be comfortable here in the courthouse

9   so we want you to have your cell phones so that you can contact

10  your friends, your loved ones, and your employers and whoever

11  else you need to call while you are on jury duty.  But there is

12  a very important point of law that takes place during the jury

13  deliberations.  It is exceedingly important to the integrity of

14  a jury verdict that no outside influences be possible to be

15  brought to bear on you.  That's why we have the Court Security

16  Officer sit outside your door.

17         For that reason, we ask that you do not bring your

18  cell phones in to the deliberations with you.  If you break to

19  go get a can of pop or just take a break, come out and get your

20  cell phone, call home, but while you are deliberating, we ask

21  that you just leave your cell phones outside.  They have a nice

22  spot for them there.

23         Similarly, we hope that you bring reading material

24  with you to jury duty if that's what you like to do during your

25  breaks, but invariably we find in the back of the Newsweek that

1   you may bring to court with you there's an article about crack

2   cocaine or something so we ask that you leave your reading

3   materials outside the jury room as well during your

4   deliberations.

5            I am not encouraging or discouraging questions during

6   your deliberations, just reminding you of the last instruction

7   that says there is only one way to contact me and that is a

8   written note signed by one or more jurors and that it is never

9   helpful for me to know numerically how you stand on any

10  particular issue.

11           Finally, my least favorite part of sending juries out

12  to deliberate and that's to inform you that there are 13 of you

13  for a very good reason, that if one of you had gotten sick

14  yesterday or were in an auto accident, God forbid, or had some

15  problem, we would need to continue this trial with 12 jurors and

16  so one juror is the alternate juror who is and I noticed took

17  particularly good notes during all the trial, but that person is

18  exceedingly important, but doesn't serve during deliberations.

19           Ms. Hazelett, you are the alternate and so as you

20  leave, it is perfectly appropriate to say good-bye to the other

21  jurors, I would ask that you not tell them how you might have

22  voted on any particular issue.  If you want to find out how the

23  case comes out, call one of the others or call our clerk's

24  office; but as you leave, you are free to go as the jurors walk

25  out here.

1          With respect to your notes, you have two options.  You

2    can tear your notes out, take them with you and destroy them

3    yourself, leave them with the Court Security Officer and I

4    assure you no one will read them and they will be destroyed.  It

5    is up to you how you want to do that.  I thank you for your

6    service, you were a very important person to this, but you were

7    the alternate.

8          Very well.  Take your notes, take your copy of the

9    jury instructions, and you may begin your deliberations at this

10   time.

11         (Outside the presence of the jury.)

12         THE COURT:  Please be seated.  Counsel, don't leave

13   the courtroom until you have satisfied the clerk that she has

14   all the appropriate exhibits that go back for the jurors'

15   deliberations.  Also leave with her a cellular telephone number.

16   Our expectation is that you can be here or be available to

17   answer a question on ten minutes notice or so.

18         As soon as you finish that, we will begin the

19   sentencing in this courtroom in the Figarino case.  Thank you.

20         (A recess was taken from 2:39 p.m. until 4:08 p.m.)

21         THE COURT:  Please be seated.  Ms. Keith, I assume

22   from the fact you are holding the Verdict Form you must be the

23   foreperson.

24         MS. BEATE ANN KEITH:  I am.

25         THE COURT:  Has the jury reached a verdict?

1          MS. BEATE ANN KEITH:  Yes, we have.

2          THE COURT: Is the verdict unanimous, meaning does

3     every juror agree to it?

4          MS. BEATE ANN KEITH:  Yes.

5          THE COURT:  In the matter of the United States of

6     America versus Gilarime Mueller, Count 1, with regard to the

7     crime of conspiracy to distribute crack cocaine as charged in

8     Count 1 of the Indictment, we, the jury, find the defendant,

9     Gilarime Mueller, guilty.

10         Interrogatory No. 1.  We, the jury, find beyond a

11    reasonable doubt that the amount of crack cocaine involved in

12    the conspiracy was 50 grams or more of crack cocaine.

13         Count 2, with regard to crime of possession with

14    intent to distribute cocaine base as charged in Count 2 of the

15    Indictment, we, the jury, find the defendant, Gilarime Mueller,

16    guilty.

17         Interrogatory 1.  We, the jury, find beyond a

18    reasonable doubt that the amount of crack cocaine that the

19    defendant possessed with the intention to distribute is five

20    grams or more.

21         It is signed by the foreperson and by the other 11

22    jurors.  The Clerk of Court shall file the original of the

23    instructions, the Verdict Form, and make it available for public

24    inspection.

25         Mr. Dusthimer, do you wish to have jury polled?

1          MR. DUSTHIMER:  Yes, please.

2          THE COURT:  Patricia Burnett, is this your verdict?

3          MS. PATRICIA BURNETT:  Yes.

4          THE COURT:  Eric Dibbern, is this your verdict?

5          MR. ERIC DIBBERN:  Yes.

6          THE COURT:  Sally Horst, is this your verdict?

7          MS. SALLY JO HORST:  Yes.

8          THE COURT:  Andrea Dibble, is this your verdict?

9          MS. ANDREA DIBBLE:  Yes.

10         THE COURT:  Annie McPherson, is this your verdict?

11         MS. ANNIE McPHERSON:  Yes.

12         THE COURT:  Ms. Keith, is this your verdict?

13         MS. BEATE ANN KEITH:  Yes.

14         THE COURT:  Merle Wendhausen, is this your verdict?

15         MR. MERLE WENDHAUSEN:  Yes.

16         THE COURT:  Claudia Criswell, is this your verdict?

17         MS. CLAUDIA CRISWELL:  Yes.

18         THE COURT:  Greg Guy, is this your verdict?

19         MR. GREG GUY:  Yes.

20         THE COURT:  Stanley Burns, is this your verdict?

21         MR. STANLEY BURNS:  Yes.

22         THE COURT:  Chris Bolander, is this your verdict?

23         MR. CHRISTOPHER BOLANDER:  Yes.

24         THE COURT:  Mark Hymes, is this your verdict?

25         MR. MARK HYMES:  Yes.

1          THE COURT:  Very well.  Members of the jury, on behalf

2     of the Court for the Southern District of Iowa, I wish to thank

3     you for your service over the past three days.  When our

4     country's independence was won, our forefathers included within

5     the United States Constitution the Sixth Amendment, a part of

6     the Bill of Rights, which guaranteed that cases such as this

7     would not be decided by kings or presidents or judges, but

8     rather people selected at random from the community and so by

9     your service this week you have truly lived out our United

10    States Constitution and perhaps our most tangible form of

11    self-government and for that I thank you.  I am going to meet

12    with you privately and say good-bye in the jury room in just a

13    moment, but I wanted to thank you publicly before I did that.

14    You are excused.

15          (Proceedings concluded at 4:12 p.m., November 20,

16    2008.)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4            I, the undersigned, a Certified Shorthand Reporter of
the State of Iowa, do hereby certify that I was called in the
5    capacity of a Certified Shorthand Reporter to report the
foregoing proceedings in the above-captioned matter and that
6    same was taken down by me in stenotype and later reduced to
Computer-Aided Transcription under my supervision and direction,
7    and that the foregoing Transcript of Proceedings is a true
record of the testimony given and all objections interposed and
8    rulings made thereon.

9

            I further certify that I am neither attorney or
10    counsel for, nor related to or employed by any of the parties to
the action in which these proceedings were had, and further,
11    that I am not a relative or employee of any attorney or counsel
employed by the parties hereto or financially interested in the
12    action.

13

            Dated at Davenport, Iowa, this 13th day of July,
14    2009.

15

16                            _____
                              Certified Shorthand Reporter
17                            and Notary Public
                              Linda Faurote-Egbers
18                            Notarial Seal
                              Commission Number 223944
19                            My Commission Expires 8-10-11

20

21

22

23

24

25